## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLOOMBERG L.P.,
731 Lexington Avenue
New York, NY 10022,

               Plaintiff,

     v.

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581,

               Defendant.

Civil Action No. _____

## COMPLAINT

Plaintiff BLOOMBERG L.P. for its complaint against Defendant, UNITED STATES

COMMODITY FUTURES TRADING COMMISSION, alleges, by and through its attorneys, on

knowledge as to Plaintiff, and on information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.     This is a lawsuit under the Administrative Procedure Act ("APA") challenging

Rule 39.13(g)(2)(ii), a regulatory requirement promulgated by the U.S. Commodity Futures

Trading Commission ("CFTC" or "Commission").  By a divided 3-2 vote, the Commission

unexpectedly announced margin requirements for the clearing of derivatives that differ based on

whether the derivative is labeled a "swap" or a "future."  *See* Derivatives Clearing Organization

General Provisions and Core Principles, 76 Fed. Reg. 69,334 (Nov. 8, 2011) ("Adopting

Release").  Rule 39.13(g)(2)(ii)'s disparate treatment of futures and commodity-based swaps, on

the one hand, and financial swaps, on the other hand, has improperly created an opportunity for

arbitrage between financial swaps and interchangeable "swap futures" contracts.  That arbitrage

opportunity threatens the viability of the Swap Execution Facilities ("SEFs") that Congress, in the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), sought to foster in order to enhance transparency and further the public interest. It will also have the imminent effect of diverting trading away from existing over-the-counter swap platforms, in the period before the Commission's SEF rulemaking is completed and SEFs become operative.

2.      The rulemaking at issue established, among other things, requirements regarding the determination of the amount of "margin" that parties must post in order to clear trades in swaps and futures. Margin is determined in part by "liquidation time," that is, the estimated amount of time it would take to offset a defaulted position in a product. When the CFTC issued its notice of proposed rulemaking ("NPRM") to establish risk management requirements for Derivatives Clearing Organizations ("DCOs"), it proposed different minimum liquidation times for swaps based solely upon the venue on which the swap was executed. The proposed rule provided a minimum liquidation time of one day for swaps executed on a Designated Contract Market ("DCM"), but a minimum liquidation time of five days for swaps executed on any other platform, including a SEF. In response to concerns expressed by commenters, the CFTC was "persuaded," it said, that "requiring different minimum liquidation times for cleared swaps that are executed on a DCM and equivalent cleared swaps that are executed on a SEF could have negative consequences." 76 Fed. Reg. at 69,367.

3.      Having found that the proposed rule was unacceptable, the Commission then unexpectedly announced an entirely new approach in Rule 39.13(g)(2)(ii), under which each DCO must use "(A) A minimum liquidation time that is one day for futures and options; (B) A minimum liquidation time that is one day for swaps on agricultural commodities, energy commodities, and metals; (C) A minimum liquidation time that is five days for all other swaps

. . . ." *Id.* at 69,438. The Commission based this unexpected new approach—which elevates form over substance—on the purported "differing risk characteristics of these product groups" and stated (without elaboration) that the new rule was "consistent with existing requirements that reflect the risk assessments DCOs have made over the course of their experience clearing these types of swaps." *Id.* at 69,367.

4.      As the Commission acknowledged elsewhere in the Adopting Release, however, the liquidation time for a particular product is appropriately determined by looking to factors in the relevant market that bear on the DCO's ability to liquidate promptly a defaulting clearing member's position in that product: trading volume, open interest, and predictable relationships with highly liquid products. *Id.* at 69,368. Under that approach, it is clear that significant positions in many financial swaps can be liquidated in a single day, and take the same or less time to liquidate than positions in comparable futures products.

5.      Commissioners Sommers and O'Malia dissented from adoption of the new requirement. Commissioner Sommers criticized the Commission for "'using only one criterion—i.e., the characteristic of the commodity underlying a swap—to determine liquidation[, which] could result in less-than-optimal margin calculations.'" *Id.* at 69,473. She also noted the Commission's inconsistency in relying on the "reasonable and prudent judgment" of DCOs for deriving liquidation times, but nevertheless reasoning that there would be a "race to the bottom" among those same DCOs unless the Commission imposed the mandatory minimum liquidation times. *Id.* at 69,474. For his part, Commissioner O'Malia objected to the Commission's failure, in setting minimum liquidation times, to weigh any of the factors that the CFTC required DCOs themselves to consider in establishing the liquidation time for particular products. *Id.* at 69,477.

6.      The Commission is obligated under the Commodity Exchange Act ("CEA") to evaluate the costs and benefits of its proposed regulations, including the effects on efficiency and competition. 7 U.S.C. § 19(a)(2). In adopting Rule 39.13(g)(2)(ii), however, the Commission offered only a fleeting, bare-bones discussion of economic effects that contained no financial or quantitative estimates. With respect to the Rule's costs, the Commission admitted that the minimum liquidation times might be excessive, but provided no estimate whatsoever of the resulting adverse effects. The Commission also failed to mention—let alone analyze or quantify—the costs that the minimum liquidation time requirement would impose on SEFs, by incentivizing DCMs to convert financial swaps into "swap futures" contracts with the same essential characteristics and risk profiles, thereby escaping the five-day minimum liquidation time. As to the benefits of the regulation, the Commission claimed ill-defined benefits to the public and "legal certainty."

7.      The Commission is also required when adopting rules to consider their effect on the "public interest" and the furtherance of the purposes of the CEA. *See* 7 U.S.C. § 19(a)(2). A key purpose of the Dodd-Frank Act was to further transparency and the public interest by fostering trading through SEFs, regulated platforms that facilitate—immediately and free of charge—the public dissemination of information on executed swap transactions. The Commission has openly and repeatedly acknowledged the importance of SEFs to Dodd-Frank, the public, and the vitality of the financial markets, including in this very rulemaking, where it discarded its proposed venue-based approach to setting minimum liquidation times because of the adverse effects for SEFs. Yet, the Commission then proceeded to adopt requirements that pose a comparable threat to swap transparency and to SEFs, a form-over-substance approach that—by giving determinative weight to how products are labeled—will drive liquidity away

from standardized swaps to "swap futures" that lack the post-trade transparency and regulatory requirements that Congress determined in Dodd-Frank would best further the public interest.

8.      In announcing its new minimum liquidation requirements for the first time in the final rule, the Commission violated the APA by failing to give Plaintiff and other members of the public notice and the opportunity to comment on the new regulatory approach and its consequences.  The Commission compounded its error by repeatedly deploying arbitrary and capricious reasoning to explain its action.  The Commission based its minimum liquidation times on the purported voluntary practices of DCOs prior to the passage of the Dodd-Frank Act, practices that the Commission considered to be reasonable and prudent.  Yet, the Commission sharply limited DCOs' ability to exercise their expertise, judgment, and experience to determine liquidation periods in the more regulated environment post-Dodd-Frank.  Instead, the Commission imposed its own, heightened across-the-board minimum liquidation times for financial swaps without citing any evidence that more time is needed to liquidate positions in swaps than in futures contracts, let alone functionally interchangeable "swaps futures" contracts.  And, the Commission deployed inconsistent, self-contradictory reasoning by adopting its new approach without addressing the fact that this approach posed some of the same problems that the Commission had cited in explaining why it was dropping the proposed rule's venue-based standard.

9.      For these reasons, and for the reasons set forth below, Plaintiff asks this Court to hold unlawful and set aside Rule 39.13(g)(2)(ii) to the extent that Rule provides for longer minimum liquidation periods for swaps than for futures contracts; enjoin the CFTC from implementing and enforcing such requirements or giving them effect in any manner; and order other appropriate relief.

## II. PARTIES

10.     Plaintiff Bloomberg L.P. ("Bloomberg") operates the BLOOMBERG

PROFESSIONAL® service, a leading privately held electronic service that, among other things,

facilitates the trading and processing of swaps over-the-counter (" OTC").  Bloomberg's core

business is the delivery of analytics and data on approximately five million financial instruments,

as well as news on almost every publicly traded company through the BLOOMBERG

PROFESSIONAL® service, television, radio, websites, mobile applications, and magazines.

The BLOOMBERG PROFESSIONAL® service provides comprehensive coverage on all major

asset classes and currencies, including derivatives.  With 2,400 news professionals in 72

countries, Bloomberg is one of the largest news gathering organizations in the world.  Through

Bloomberg Law, Bloomberg Government, Bloomberg New Energy Finance and Bloomberg

BNA, Plaintiff provides information and analysis to a wide range of professionals in industries

beyond finance.

11.     In addition, Bloomberg intends to operate a SEF in order to facilitate trading in

the swaps market, as soon as the CFTC's ongoing SEF rulemaking is completed.  Bloomberg has

already created a subsidiary that will operate the SEF, has drafted a rulebook for that SEF that

has been reviewed by the National Futures Association, and has taken substantial steps toward

creating the technological infrastructure for operating the SEF.  Additionally, given the increased

availability of market data that Congress sought to encourage with the creation of SEFs and

Swap Data Repositories, Bloomberg intends—through the services referenced above—to devise

additional analytics for professional investors and provide additional news and information for

both professional investors and the general public.

12.     Defendant CFTC is an agency of the United States Government, which is subject

to the APA.  *See* 5 U.S.C. § 551(1); 7 U.S.C. § 2(a)(2).

### III. JURISDICTION AND VENUE

13.     This action arises under the APA, 5 U.S.C. §§ 500 *et seq.*, and the CEA, 7 U.S.C.

§§ 1 *et seq.* Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

14.     Plaintiff has standing because Rule 39.13(g)(2)(ii) is already diverting business

away from Plaintiffs' electronic trading platform and towards the "swap futures" market, and

that movement is expected to accelerate. Particularly, as discussed *infra* at ¶ 69, once the

Commission's additional clearing requirements come into force on June 10, 2013, large market

participants are expected to divert significant business away from the electronic platforms similar

to those operated by Bloomberg to the futures market, imposing substantial financial harm on

entities operating swap trading platforms or that will soon be operating SEFs, including Plaintiff.

Indeed, some of the largest futures exchanges have already listed or announced plans to list

financial "swap futures" contracts before the commencement of additional clearing requirements

on June 10, 2013. These substantial and imminent harms would be redressed by a favorable

decision setting aside the Rule.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action

against an agency of the United States that resides in this judicial district, and a substantial part

of the events or omissions giving rise to this action occurred in this judicial district.

### IV. BACKGROUND

**A.     The Swaps And Futures Markets**

16.     Derivatives have long played an essential role in the global economy by enabling

market participants to hedge and mitigate risk. A derivative is a financial instrument that derives

its value from the performance of an underlying commodity. Participation in the derivatives

markets by financial institutions provides market liquidity and enables those that wish to hedge

or mitigate risk to readily identify counterparties for their transactions.

17.     Three types of derivatives are relevant to this lawsuit:  swaps, futures contracts, and "swap futures" contracts.

18.     A "swap" is a contract that typically involves an exchange of one or more payments based on the underlying value of a notional amount of one or more commodities, or other financial or economic interest, and that transfers between the parties the risk of future change in that value without also transferring an ownership interest in the underlying asset or liability. *See* 7 U.S.C. § 1a(47); 77 Fed. Reg. 48,208 (August 13, 2012).   Swaps can be based on physical commodities, as in the case of "agricultural swaps" for instance, or can be based on financial or economic interests such as credit default indices (in the case of many "credit default swaps" ("CDS")) or interest rates (in the case of "interest rate swaps").

19.     Credit default swap indices are standardized swaps that can be used to protect bond owners against defaults, or for other purposes.  Each credit default swap index contains a list of companies based on various criteria (e.g., actively traded companies).  Credit default indices are updated regularly (typically semi-annually) to account for changes in the market.  Each credit default swap based on a credit default index is identified by index, "series," and "tenor."  The most recently published series is known as the "on-the-run" series, while the prior series are "off-the run."  Most trades occur in the "on-the-run" series, meaning that liquidity is concentrated in that series.

20.     By way of example, the "on-the-run" credit default swap Markit CDX.NA.IG (series 20, 5-year tenor) is a commonly traded credit default swap on a credit default index that comprises 125 North American investment grade reference obligations.  In this swap, one party pays a premium in exchange for payment by the other party if a company—or companies— referenced in the index defaults.

8

21.    A "futures contract" is commonly understood as an agreement to purchase or sell a commodity for delivery in the future (i) at a price that is determined at execution of the contract; (ii) that obligates each party to the contract to fulfill the contract at the specified price; (iii) that is used to assume or shift price risk; and (iv) that may be satisfied by delivery or offset.

22.    A "swap futures" contract is created by replicating the economic terms and performance of a swap in a futures contract, which is then listed on a DCM and treated and traded as a futures contract. The new "swap futures" contract can have the same essential characteristics and risk profile as its analogous swap; there is nothing inherent about a financial "swap futures" contract that makes it easier to liquidate than the financial swap on which it is modeled. On the contrary, as discussed below, futures contracts—including "swap futures" contracts—can be executed (and therefore positions can be liquidated) only on the DCM where they are listed, whereas swaps can be executed (and positions liquidated) on any SEF, DCM, or OTC platform.

23.    Many of the most commonly traded financial swaps have standardized terms, making it straightforward to "futurize" the swap. Indeed, CFTC Chairman Gary Gensler has characterized "futurization" as merely "relabel[ing]." To take just one example, on October 15, 2012, the IntercontinentalExchange, Inc. ("ICE") transitioned its cleared energy swaps listed on ICE OTC, a cleared swaps trading platform, to futures contracts listed on ICE Futures U.S. and ICE Futures Europe. ICE OTC's cleared energy swaps were converted into economically comparable futures contracts overnight, effectively eliminating ICE OTC's cleared energy swap market. This transition illustrates both how quickly swaps can be converted into "swap futures" contracts, and how effortlessly market participants are able to switch from cleared swaps to economically comparable "swap futures" contracts.

24.     ICE explained on its website that it "converted its cleared energy swap contracts to economically equivalent futures contracts," and then touted as a "benefit[]" of this conversion that "[a] participant that trades swaps will be required to report each swap to a swap data repository, whereas the same participant executing economically equivalent futures contracts will have no such obligation because of existing futures reporting."

25.     A DCM is a board of trade or exchange on which all futures contracts, including "swap futures," must be listed. 7 U.S.C. § 6(a). Swaps can also be listed on a DCM, but are not required to be. 7 U.S.C. § 7b-3(a)(1). Each DCM is required to register with the CFTC and is subject to the CEA and the CFTC's regulations. 7 U.S.C. § 7. Many futures contracts are executed electronically on a DCM's central limit order book (a trading method used by most exchanges to match bids and offers); however, certain transactions involving futures contracts may be privately negotiated and executed away from a DCM's order book. For example, futures transactions in excess of specific thresholds set by the DCM, known as "block trades," may be executed bilaterally off the exchange, even though they are listed on the DCM.

26.     A SEF is a platform on which swaps can be listed and executed. 7 U.S.C. § 7b-3(a)(1). Once the CFTC issues its final rules governing SEFs, each SEF will be required to register with the CFTC. 7 U.S.C. § 7b-3. SEFs were created in the Dodd-Frank Act to promote pre- and post-trade transparency for swaps, and to increase competition by bringing swaps onto regulated platforms.

27.     A swap must be executed on either a DCM or a SEF if the swap is both subject to the clearing requirement and "ma[de] . . . available to trade." 7 U.S.C. § 2(h)(8). Futures contracts, including "swap futures" contracts, cannot be listed on a SEF. 7 U.S.C. § 6.

28.    Post-trade swap transaction data are disseminated to the public in real time, free of charge.  On the other hand, DCMs charge fees to access futures data; these fees can be prohibitive and make access difficult.  In addition, pre-trade transparency requirements attach to swaps, except where the value of a swap exceeds a certain "block trade" threshold.  The "block trade" thresholds for swaps will be set by the CFTC; as proposed, the thresholds were set at levels high enough to ensure that only the largest trades are excluded from pre-trade transparency requirements.  And while pre-trade transparency requirements also apply to futures, the "block trade" thresholds for futures are set by the DCMs themselves, which regularly set the thresholds at lower levels, thereby ensuring that more futures transactions evade the transparency requirements.

29.    A DCO is a clearinghouse, clearing association, clearing corporation, or similar entity that enables the parties to a derivatives transaction to substitute, through novation or otherwise, the credit of the DCO for the credit of the parties.  A swap must be cleared by a DCO if the CFTC finds that the swap—or group, category, type, or class of swap—is required to be cleared, unless an exception applies.  *See* 7 U.S.C. 2(h)(2); 77 Fed. Reg. 74,284 (December 13, 2012).  Each DCM is connected to a single DCO—often the DCM's affiliate—which then clears all futures contracts (or other products) executed on that DCM.  SEFs can be connected to multiple DCOs and clear swaps executed on the SEF at a DCO that has been requested by the swap counterparties.

30.    To reduce the risk of derivatives transactions, DCOs collect "margin deposits" and guaranty fund contributions to offset potential losses resulting from a default by a clearing member.  In the event of default, the margin deposits and contributions that have been collected are used to satisfy payment obligations.

31.     The amount of margin required for a product is determined in part by an estimate of the time required to liquidate a specific position held by a clearing member on behalf of its customer, or "liquidation time." The longer the liquidation time, the greater the margin that the clearing member must collect from its customers and post, and thus the higher the cost to the customers of the clearing member for clearing the swap transaction.   In this way, higher margin requirements from DCOs result in greater costs to the customers of the swaps.

32.     Liquidation time is closely related to the liquidity in a product:  the more liquid a product, the shorter the liquidation time. Because futures contracts—including "swap futures" contracts—can be executed only on the DCM on which they are listed, the liquidity for a futures contract is limited to the DCM on which it is listed.  By contrast, swaps can be executed on any SEF (once the rules for SEFs are in place), DCM, or OTC platform.   Liquidity for a swap therefore can be found across the entire market, regardless of execution venue.

33.     The global swaps market exceeds $600 trillion in notional value, with some liquid products exceeding $10 billion in notional value per day, while other highly illiquid products may not even trade on a daily basis.  Similarly, there are thousands of different futures contracts. Some of these have virtually no volume and do not actively trade.

34.     Many of the index credit default swap and interest rate swap  products that the CFTC has determined are subject to a clearing mandate are among the most liquid derivatives contracts, and positions in them can easily be liquidated within one day.  Indeed, the CFTC has elsewhere recognized that certain financial swaps, such as swaps on on-the-run credit default indices, have significant liquidity.  Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 74,284, 74,294-95 (December 13, 2012).  For example, on-the-run 5-year

CDX.NA.IG is traded an average of more than 200 times per day, making it possible to liquidate a defaulted position in a matter of hours.

**B.      The Commission's Authority To Regulate Swaps And Futures Contracts**

35.      President Obama signed the Dodd-Frank Act into law on July 21, 2010.  Title VII of Dodd-Frank amended the CEA to reduce risk, increase transparency, and promote financial market integrity.  *See* Risk Management Requirements for Derivatives Clearing Organizations, 76 Fed. Reg. 3698, 3699 (Jan. 20, 2011).  Section 725(c) of Dodd-Frank amended provisions of the CEA that set forth certain "core principles" governing the operation of DCOs.  The Act also authorized (and in some instances, required) the Commission to adopt rules and regulations to implement the amendments to the CEA.  *See* 7 U.S.C. § 7a-1(c)(2).

36.      Pursuant to the authority granted to it by Dodd-Frank, the Commission began a multi-year process to design and implement regulations for cleared swaps.  The Commission has determined in a separate rule that many financial swaps, including many interest rate swaps and credit default swaps on indices, must be cleared at a DCO.  *See* 77 Fed. Reg. 74,284.

37.      The Commission has established a three-phase schedule for implementing these mandatory clearing requirements.  *See* Swap Transaction Compliance and Implementation Schedule: Clearing Requirement Under Section 2(h) of the CEA, 77 Fed. Reg. 44,441 (July 30, 2012).  Phase 1, which began on March 11, 2013, required clearing for swaps between the largest, most sophisticated entities.  Entities subject to Phase 1 are generally well capitalized and, in most instances, have already been clearing swaps.  Phase 2, beginning on June 10, 2013, will require clearing for the vast majority of other entities covered by the mandatory clearing requirement.  Many Phase 2 entities do not currently clear their swaps.  Phase 3, beginning on September 9, 2013, will require all other entities to clear their swaps or elect an exemption from the clearing requirement.

38.     The regulatory provision at issue in this case was adopted in conjunction with other "core principles" that were defined and codified to govern clearing by DCOs.  These core principles include, for example, Core Principle A—Compliance; Core Principle C—Participant and Product Eligibility; Core Principle E—Settlement Procedures; Core Principle F—Treatment of Funds; Core Principle G—Default Rules and Procedures; and Core Principle I—System Safeguards.  *See* 76 Fed. Reg. at 69,334.

39.     The provision at issue here relates to Core Principle D—Risk Management.  As amended by Dodd-Frank, Core Principle D requires DCOs to limit their exposure to potential losses from defaults "through margin requirements and other risk control mechanisms," which must be "sufficient to cover potential exposures in normal market conditions." 7 U.S.C. § 7a-1(c)(2)(D)(iii-iv).  The CEA mandates that "[e]ach model and parameter used in setting margin requirements . . . shall be—(I) risk-based; and (II) reviewed on a regular basis." *Id.* § 7a-1(c)(2)(D)(v).

40.     Rule 39.13 established requirements that each DCO must follow in order to manage the risks associated with clearing swaps and futures contracts.  *See* 76 Fed. Reg. at 69,362, 69,438-40.  The Commission's adoption of minimum liquidation times for swaps and futures contracts in Rule 39.13(g)(2) is part of that "Risk Management" regulatory regime.

**C.     The Proposed Rule**

41.     The Commission published the NPRM for public comment on January 20, 2011. *See* 76 Fed. Reg. at 3704.  The NPRM set forth requirements relating to margin methodology and the coverage that each DCO must receive from each clearing member to cover potential exposures under normal market conditions.  *Id.*  Among other things, the NPRM proposed a one-day minimum liquidation time for all swaps executed on a DCM, and a five-day minimum liquidation time for swaps executed on any other platform, including a SEF.  *Id.* at 3720.

42.     The proposed rule based these minimum liquidation times solely on the venue of execution—minimum liquidation times did not vary depending upon the type of commodity underlying the swap, or on whether the product was classified as a futures contract. Therefore, the proposed rule recognized that a one-day minimum liquidation time could be appropriate for at least some financial swaps.

43.     The NPRM included less than a page of discussion of the costs and benefits of the entire proposed rule. The Commission did not analyze the costs of the proposed minimum liquidation time requirement, but stated only that "costs to market participants and the public if these regulations are *not* adopted are substantial." *Id.* at 3717 (emphasis added). The NPRM also stated that the proposed release as a whole would have "many and substantial" benefits, including the protection of market integrity by "sound risk management practices associated with clearing and the efficiency that competition between clearinghouses will foster." *Id.*

**D.      Public Comment On The Proposed Venue-Based Minimum Liquidation Regime**

44.     The Commission received numerous comments on the NPRM's proposed venue-based minimum liquidation regime. *See* 76 Fed. Reg. at 69,366.

45.     A significant number of commenters encouraged the Commission to allow DCOs to determine the appropriate liquidation time based on the unique characteristics and actual liquidity of each product, rather than the Commission imposing minimum liquidation times on DCOs. LCH.Clearnet, for example, urged that "the liquidation period employed by the DCO should not be prescribed across all Swaps or Futures products, but rather be an objective function of the DCO's measurement of observed market volumes in the given products and set at a period that would be sufficient to enable the DCO to adequately hedge or close-out a defaulting member's risk." LCH.Clearnet, Comment (Mar. 23, 2011), at 11; *see also* FXall, Comment (July 8, 2011), at 3; ISDA, Comment (Mar. 21, 2011), at 6; Nadex, Comment (June 3, 2011), at 2

& n.1.  As an alternative to the proposed rule's disparate treatment of economically equivalent

transactions based on the venue of execution, CME Group argued that "the CFTC should give

each DCO reasonable discretion to determine liquidation times for the products it clears based on

more salient factors such as observable liquidity, which may change over time."  CME Group,

Comment (Mar. 21, 2011), at 6.  The Managed Funds Association likewise observed that the

"DCO is the appropriate party to establish initial margin requirements since only the DCO has

the risk management capability and control of all aspects of its default management framework,

of which margin is only one element."  MFA, Comment (Mar. 21, 2011), at 5.  Other

commenters argued that the Commission's broad proposed rules regarding margin requirements

were inconsistent with the mandate that margin requirements be "risk-based," as required by the

CEA, 7 U.S.C. § 7a-1(c)(2)(D).  Kansas City Board of Trade and Kansas City Clearing

Corporation, Comment (Mar. 21, 2011), at 8.

46.     Several commenters also exposed serious flaws in the NPRM's proposed

imposition of lower minimum liquidation requirements on swaps executed on DCMs than on

swaps executed on any other platform, including SEFs.

a.      Commenters criticized the NPRM's disparate treatment of DCMs and

SEFs as potentially inconsistent with Section 2(h)(1)(B) of the CEA and proposed Rule

39.12(b)(2), which prevent DCOs from discriminating against swaps that are not

executed on an affiliated DCM.  *See* WMBAA, Comment (Mar. 22, 2011), at 2;

BlackRock, Comment (Mar. 21, 2011), at 3; VMAC, Comment (Feb. 25, 2011), at 2;

GFI, Comment (Feb. 2, 2011), at 2.  VMAC stated that "the divergent treatment of

otherwise economically indistinguishable swaps conflicts with the CFTC proposed

Regulation § 39.12(b)(2) which requires DCOs to provide 'non-discriminatory clearing

of a swap executed bilaterally . . . or subject to the rules of an unaffiliated designated contract market or swap execution facility.'" VMAC Comment, at 2. BlackRock explained that "by requiring a DCO to factor the venue of execution into its margin requirement for a particular swap, the Commission would frustrate the intent of CEA section 2(h)(1)(B)(ii), which requires a DCO to provide for non-discriminatory clearing of swaps executed bilaterally or . . . subject to the rules of an unaffiliated DCM or SEF." BlackRock Comment, at 3. GFI agreed, and observed that DCO Core Principle C "prohibits discrimination by DCOs against unaffiliated SEFs." GFI Comment, at 3.

      b.    Commenters further noted that preventing discrimination against SEFs and thereby "promoting competition between the swap markets and the trading of swaps on SEFs" was a critical feature of Congress's intent in passing the Dodd-Frank Act. MarketAxess, Comment (Mar. 21, 2011), at 2; *see* WMBAA, Comment (Mar. 22, 2011), at 2 ("The WMBAA also believes that eliminating the disparity described above is consistent with the competitive landscape that Congress intended to establish for SEFs and DCMs."). WMBAA also cited the Commission's previous observation that the Dodd-Frank Act was designed "to encourage competition between SEFs and DCMs with respect to the trading of swaps, in part by rejecting the 'vertical silo' model that has traditionally been employed in the futures markets." WMBAA Comment, at 2 (citing 75 Fed. Reg. 63,732, 63,745 (Oct. 18, 2010)). And, FXall observed that Section 733 of the Dodd-Frank Act "specifically states that the goal of that Section is to 'promote the trading of swaps on swap execution facilities,'" but the proposed regulation's "higher margin cost will diminish SEFs in favor of vertically-integrated DCMs and DCOs." FXall, Comment (July 8, 2011), at 3.

     c.     Commenters also objected that the disparate treatment of DCM-executed and SEF-executed swaps bore no relationship to the factors that actually affect liquidation times.  ISDA noted that the liquidation time should reflect the time it actually takes a DCO to liquidate each relevant swap.  ISDA, Comment (Mar. 21, 2011), at 6.  LCH.Clearnet observed that "the liquidation period employed by the DCO should be an objective function of the DCO's measurement of observed market volumes and liquidity in each given product, and should be sufficient to enable the DCO to adequately hedge or close-out the risk."  *See* LCH.Clearnet, Comment (Mar. 23, 2011), at 11.  The evidence did not support the proposed rule's disparity in liquidation times, several commenters said.  NGX, Comment (Apr. 21, 2011), at 2; WMBAA, Comment (Mar. 22, 2011), at 2; Nodal Exchange, Comment (Mar. 21, 2011), at 2.  FXall explained, for example, that SEF-executed swaps will not take longer to liquidate because "the contracts traded on SEFs and DCMs will likely be economically equivalent to each other."  FXall, Comment (July 8, 2011), at 2 .

     d.     Commenters further observed that discriminating against SEFs would lead to regulatory arbitrage—artificially shifting swaps away from SEFs to DCMs.  FXall expressed concern that the proposed rule would provide DCMs with "an unnecessary and improper advantage over SEFs," resulting in "lower liquidity, higher transaction costs, and decreased competition."  FXall, Comment (July 8, 2011), at 1-2; *see also* MarketAxess, Comment (Mar. 21, 2011), at 2.  WMBAA was similarly concerned that the divergent margin requirements resulting from the different liquidation requirements make it "highly unlikely" that any competition would occur between DCMs and SEFs.  WMBAA, Comment (Mar. 22, 2011), at 2.  Nodal Exchange noted that the proposed rule

could "potentially create a detrimental arbitrage environment as an unintended consequence." Nodal Exchange, Comment (Mar. 21, 2011), at 2-3.

**E.      The Final Rule**

47.      The Commission approved the final rule by a vote of 3-2, and published it in the Federal Register on November 8, 2011.  76 Fed. Reg. at 69,334.

48.      In the final rule, the Commission completely abandoned the NPRM's bright-line distinction between swaps traded on DCMs and those traded on SEFs, for purposes of minimum liquidation times.  It had been "persuaded," the Commission said, by the "views expressed by numerous commenters" that "requiring different minimum liquidation times for cleared swaps that are executed on a DCM and similar cleared swaps that are executed on a SEF could have negative consequences."  76 Fed. Reg. at 69,367.

   a.      The Commission noted, for example, the concern that the venue-based approach proposed in the NPRM would "put SEFs at a competitive disadvantage to DCMs."  *Id.* at 69,366 (citing comment letters by GFI, MarketAxess, and BlackRock).

   b.      The Commission acknowledged the objection that the NPRM's venue-based approach would "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs."  *Id.* (citing comment letters from Tradeweb and FXall).

   c.      The Commission also explained that the NPRM's distinction based on the venue of execution would "potentially create detrimental arbitrage between standardized swaps traded on a SEF and futures contracts with the same terms and conditions traded on a DCM."  *Id.* (citing comment letter from Nodal).

49.      Rather than simply abandoning the NPRM's venue-based approach, however, the Commission announced for the first time an unexpected new approach—Rule 39.13(g)(2)(ii)— under which each DCO must use: "(A) A minimum liquidation time that is one day for futures

and options; (B) A minimum liquidation time that is one day for swaps on agricultural commodities, energy commodities, and metals; (C) A minimum liquidation time that is five days for all other swaps . . . ." *Id.* at 69,438.

50.     The Commission attempted to justify this new approach—which is based on form, not substance—by pointing to the "differing risk characteristics of these product groups," and then stated, without elaboration, that Rule 39.13(g)(2)(ii) was "consistent with existing requirements that reflect the risk assessments DCOs have made over the course of their experience clearing these types of swaps." *Id.* at 69,367.  Although the Commission invoked what it called the "reasonable and prudent judgment" of DCOs in determining the new minimum liquidation times, it simultaneously explained that minimum liquidation times were necessary because, in effect, DCOs could not be trusted.  DCOs "may misjudge the appropriate liquidation time frame because of limited experience with clearing," the Commission said, or might even engage in a "race to the bottom," setting progressively shorter liquidation times to attract business from one another.  *Id.* at 69,419.

51.     As the Commission acknowledged elsewhere in its Adopting Release, the liquidation time for purposes of initial margin calculation is best determined by looking to factors in the relevant market that bear on the DCO's ability to liquidate a defaulting clearing member's position in an instrument:  "(i) Average daily trading volume in a product; (ii) average daily open interest in a product; (iii) concentration of open interest; (iv) availability of a predictable basis relationship with a highly liquid product; and (v) availability of multiple market participants in related markets to take on positions in the market in question."  *Id.* at 69,368.  Yet, none of these factors was analyzed by the Commission in establishing the minimum liquidation times that it adopted.

52.     The CEA requires that before a rule is promulgated by the Commission, "[t]he costs and benefits of the proposed [rule] shall be evaluated in light of" several factors, including efficiency, competitiveness, and sound risk management. 7 U.S.C. § 19(a)(2). The Adopting Release contained only a cursory discussion of the costs and benefits of Rule 39.13(g)(2)(ii). In this discussion, the Commission admitted that its approach of "using only one criterion—*i.e.*, the characteristic of the commodity underlying a swap—to determine liquidation time could result in less-than-optimal margin calculations." *Id.* at 69,418. For some products, the Commission explained, "a five-day minimum may prove to be excessive and tie up more funds than are strictly necessary for risk management purposes." *Id.* Then, just a page later in the Adopting Release, the Commission made the inconsistent and irreconcilable statement that because "the rule simply establishes minimums [five days, for financial swaps], it will not hinder the exercise of sound risk management practices." *Id.* at 69,419.

53.     When considering Rule 39.13(g)(2)(ii)'s costs, the Commission observed that determining "the risk characteristics, price volatility, and market liquidity of even a sample for purposes of determining a liquidation time" would be a "formidable task" and that any results would be subject to "a range of uncertainty." *Id.* at 69,418. In truth, however, data readily available to the CFTC would have permitted it to conduct this analysis, at least for a "sample" of swaps. Instead, rather than providing an example of the margin that would be required for even a single representative product—and what the difference would be under a five-day and one-day rule, and the estimated effects on price and demand—the Commission simply declined to carry out this "task" at all. *Id.* at 69,419. The Commission took this approach even though it required each DCO to perform this same "task" for each contract that it clears.

54.     By statute, among the regulatory costs the Commission is required to consider are adverse effects on competition.  The adverse effect on SEFs' competitiveness with DCMs was among the reasons the Commission stated that it was rejecting the venue-based approach to liquidation times in the proposed rule.  And yet, in adopting its new minimum liquidation requirements, the Commission gave no consideration at all to whether that requirement likewise would adversely affect the competitiveness of the SEFs that Dodd-Frank was intended to foster.

55.     In its rulemakings, the Commission is also required to consider the public interest. In enacting Dodd-Frank, Congress created a regulatory regime for swaps that would further the public interest by providing a new, open, and closely regulated environment for trading in derivatives.  The Commission itself repeatedly has acknowledged the importance of SEFs to the Dodd-Frank regulatory regime, and to furthering the public interest through regulatory protections and ready access to information on swaps.  The Commission omitted any discussion from the final rule of the adverse effects the rule would have on the public and the financial markets by causing a substantial migration of trading away from SEFs and the regulatory regime created for swaps to futures exchanges and the regulatory regime that governs futures.

56.     In discussing the benefits of Rule 39.13(g)(2)(ii), the Commission explained that establishing a minimum liquidation time "will provide legal certainty" to the marketplace and asserted that the "rule protects market participants and the public."  *Id.*  Once again no estimate, quantification, or product-specific discussion was provided.  Nor did the Commission compare the benefits (and associated costs) of a five-day minimum liquidation period for a financial swap, with the benefits (and costs) of a one-day minimum period of an analogous swap future.

57.     In dissent, Commissioner Sommers criticized the Commission's discussion of the minimum liquidation requirement, pointing out that the Commission admitted that its approach

of "'using only one criterion—i.e., the characteristic of the commodity underlying a swap—to determine liquidation time could result in less-than-optimal margin calculations.'" *Id.* at 69,473. The CFTC had not justified its admittedly "less-than-optimal" five-day minimum liquidation time rule, Commissioner Sommers said, *id.* at 69,474; moreover, the Commission had inconsistently relied on the "reasonable and prudent judgment" of DCOs to derive its minimum liquidation times, while positing at the same time that DCOs would engage in a "race to the bottom" if the Commission did not impose minimum liquidation times in the final rule. *Id.* Commissioner Sommers also criticized the Commission for failing to "acknowledge the existence of other safeguards in the rules that give us strong tools for policing a potential race to the bottom." *Id.*

58.     Commissioner O'Malia also dissented, noting, among other things, the Commission's failure to weigh the factors that it required DCOs to consider in establishing the liquidation time for particular products. *Id.* at 69,477. The Commission's cost-benefit discussion of Rule 39.13(g)(2)(ii) improperly "fail[ed] to attempt meaningful quantification," Commissioner O'Malia said, despite the fact that the Commission possessed—within its Division of Clearing and Risk—the data and expertise to provide some quantification of the costs associated with the Commission's decision. *Id.* at 69,479. Like Commissioner Sommers, Commissioner O'Malia criticized the Commission for inconsistently relying on DCO's past practice to adopt a five-day liquidation time, while hypothesizing that a "race to the bottom" could occur if the Commission did not impose mandatory minimum liquidation times. *Id.* at 69,478.

59.     Even Commissioner Dunn, who voted *in favor* of the Rule, was skeptical of the Commission's "race to the bottom" justification for its minimum liquidation times. In the open

hearing where the Commission adopted the final rule, Commissioner Dunn explained "that working with a DCO is greatly different than looking at over-the-counter swaps for credit default swaps, for instance, because you have another entity that is at risk." He added, "this rule is much more prescriptive than I would like to see." Tr. of Open Meeting on Two Final Rule Proposals Under the Dodd-Frank Act (Oct. 18, 2011) ("Oct. 18 Tr."), at 79.

**F.     Impact Of Rule 39.13(g)(2)(ii) On The Markets And Public**

60.     As set forth *supra* at ¶ 49, Rule 39.13(g)(2)(ii) requires DCOs to establish initial margin requirements for clearing members using the minimum liquidity times as follows:  "(A) A minimum liquidation time that is one day for futures and options; (B) A minimum liquidation time that is one day for swaps on agricultural commodities, energy commodities and metals; (C) A minimum liquidation time that is five days for all other swaps . . . ."  76 Fed. Reg. at 69,438. Thus, DCOs must use the five-day minimum liquidation time when determining how much margin to collect for every financial swap, regardless of the liquidity for the particular swap. These requirements apply to all swaps trading, including on OTC swap platforms, such as those available on the BLOOMBERG PROFESSIONAL® service, in the period before the Commission's SEF rulemaking is completed and SEFs become operative.

61.     By contrast, a financial swap that—in the words of the Chairman of the CFTC— has been "relabeled" as a "swap futures" contract will automatically be subject to a one-day minimum liquidation time, without regard to any risk or liquidity considerations.  This will result in more favorable margin treatment for the "swap futures" contract than for a functionally comparable financial swap that has not been "futurized" and remains subject to a five-day liquidation time.

62.     Rule 39.13(g)(2)(ii)'s five-day minimum liquidation time for financial swaps requires that DCOs collect more margin for financial swaps than for comparable financial "swap

futures" contracts, which are subject to only a one-day minimum liquidation time. Trading in financial swaps will therefore be more costly than trading in comparable "swap futures" contracts, due to the additional margin DCOs must collect. This will be the case not only when the Commission's ongoing SEF rulemaking is completed and SEFs become operative, but will also affect swaps trading that occurs currently on OTC swap platforms such as those available on the BLOOMBERG PROFESSIONAL® service, with a substantial and irreparable adverse effect when Phase 2 Clearing begins on June 10, 2013.

63.     Commissioner O'Malia has explained that the disparity in Rule 39.13(g)(2)(ii)'s treatment of financial swaps and financial futures contracts will promote "futurization"—that is, the conversion of swaps into "swap futures" contracts, in order to escape rules that govern swaps. The disparity, Commission O'Malia said, "creates an incentive to trade financial futures over swaps." Scott O'Malia, Commissioner, Commodity Futures Trading Comm'n, Keynote Address at the Securities Industry and Financial Markets Association Compliance and Legal Society Annual Seminar (Mar. 19, 2013), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opaomalia-22.

64.     Indeed, DCMs have already begun to take advantage of the opportunity that Rule 39.13(g)(2)(ii) creates for regulatory arbitrage.

a.     ICE has announced that it intends to list futures contracts on financial swaps on its DCM by May 2013. Because ICE has procured a license to list futures contracts based on the CDS indices that underlie almost every index-based credit default swap, it can be expected to list substitute futures contracts on its DCM. Those new products—which will be cleared at a DCO owned by ICE (ICE Clear Credit)—will be subject to the one-day minimum liquidation time mandated in Rule 39.13(g)(2)(ii),

thereby avoiding the five-day liquidation minimum applicable to swaps with similar economic characteristics and risk profiles.

b.    CME Group and Eris Exchange already offer on their DCMs interest rate "swap futures" contracts that are subject to shorter liquidation time frames than comparable interchangeable interest rate swaps, even though those interest rate swap futures contracts have significantly less liquidity than comparable interest rate swaps.    Indeed, CME has advertised to the public its new interest rate "swap futures" contracts as standardized contracts with "*margins that are approximately 50% lower* than cleared" interest rate swaps.  *See* http://www.cmegroup.com/trading/interest-rates/files/dsf-swap-rate-curve-spreads.pdf(emphasis added).

65.    As set forth above, the final rule will harm the public by incentivizing trading to occur without the regulatory protections and access to information Congress intended to provide for swaps.

## COUNT ONE:

## VIOLATION OF THE COMMODITY EXCHANGE ACT AND ADMINISTRATIVE PROCEDURE ACT—INSUFFICIENT EVALUATION OF COSTS AND BENEFITS

66.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

67.    The CEA provides that before the Commission promulgates a rule, "[t]he costs and benefits of the proposed [rule] shall be evaluated in light of—(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations." 7 U.S.C. § 19(a)(2).  A similar obligation of the Securities and Exchange Commission has been interpreted to require the agency to determine "as best it can the economic

implications of" a proposed rule, "even if . . . the estimate will be imprecise" and the agency can

only identify the "range within which . . . cost[s] of compliance will fall." *Chamber of*

*Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005).

68.     The Commission's superficial discussion of the Rule's costs and benefits, which

contained no financial or quantitative estimates or projections of any kind, fell far short of this

statutory obligation.  With respect to Rule 39.13(g)(2)(ii)'s costs, the Commission admitted that

the "five-day minimum may prove to be excessive and tie up more funds than are strictly

necessary for risk management purposes." 76 Fed. Reg. at 69,418.  And yet, although the CEA

requires the Commission to "evaluate" a rule's effects on "sound risk management practices,"

the Commission nevertheless stated that the magnitude of those adverse effects could not be

determined because "the margin requirements for a particular instrument depend upon a variety

of characteristics of the instrument and the markets in which it is traded." *Id.*  Protesting that a

proper analysis would be a "formidable task," and "subject to a range of uncertainty," the

Commission chose instead to conduct no analysis whatsoever—it offered no data on the effects

on risk management and made no financial or quantitative estimates or projections. *Id.*

69.     Similarly, although elsewhere in the Release the Commission specifically

acknowledged that "detrimental arbitrage" and adverse effects on SEFs could result from the

proposed rule's venue-based requirement, in discussing the costs and benefits of the new Rule

the Commission gave no consideration to the costs it will impose on SEFs (and immediately

imposes on swap trading platforms such as those available on the BLOOMBERG

PROFESSIONAL® service) by incentivizing DCMs to convert financial swaps into substantially

equivalent financial "swap futures" contracts, which can only be listed on DCMs.  7 U.S.C.

§ 6(a).  The resulting disparity has placed swap trading platforms and SEFs at a competitive

disadvantage to DCMs, and undermines Dodd-Frank's objective of promoting trading of swaps on SEFs. It already has fostered significant regulatory arbitrage, which will increase substantially when the Phase 2 clearing requirements come into effect on June 10, 2013. In neglecting to consider these costs of its Rule, the Commission failed in its statutory responsibility to evaluate effects on "competitiveness" and "the protection of market participants and the public," including the effects on SEFs—which Dodd-Frank purposely sought to encourage—and on the ability of market participants to hedge and engage in other risk-mitigation strategies at optimal prices.

70.    The Commission similarly failed to properly consider the Rule's benefits in order to assess the Rule's final terms in light of both the costs and benefits it would generate. Rather, the Commission made only conclusory references to vaguely identified benefits to the public and to "legal certainty," which would have resulted from the Commission's decision to establish *any* fixed minimum liquidation period. *Id.* at 69,420.

71.    Plaintiff is therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), (C).

## COUNT TWO:

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—FAILURE TO PROVIDE INTERESTED PERSONS SUFFICIENT OPPORTUNITY TO PARTICIPATE IN THE RULEMAKING

72.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

73.    The APA requires that when an agency promulgates a rule, it "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). This requirement prohibits an agency from, among other things, adopting a final rule that is not a "logical outgrowth" of the rule proposed in the NPRM.

74.     The NPRM did not give fair notice of various aspects of Rule 39.13(g)(2)(ii).  In particular, the Commission did not give any notice of its intent to impose divergent minimum liquidation requirements on swaps based on the type of referenced product, as opposed to the venue of execution as set forth in the NPRM.

75.     Rule 39.13(g)(2)(ii) was not a "logical outgrowth" of the proposed rule in the NPRM, and thus deprived Plaintiff and other members of the public of the opportunity to comment on the significant adverse consequences of the approach the Commission adopted.

76.     Further, by adopting a new approach to minimum liquidation times that had not been identified in the proposing release, the Commission failed to give the public notice and an opportunity to comment on the scant benefits and significant costs of the new approach, and failed to give the public an opportunity to comment on the Commission's own cost-benefit analysis of this hitherto undisclosed regulatory approach.

77.     Plaintiff is therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(D).

## COUNT THREE:

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—ARBITRARY AND CAPRICIOUS AGENCY ACTION IN PROMULGATING THE FIVE-DAY MINIMUM LIQUIDATION REQUIREMENT FOR FINANCIAL SWAPS**

78.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

79.     The APA forbids an agency from acting in a manner that is "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A), and requires an agency to engage in "reasoned decisionmaking" when adopting new rules.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  This means, among other things, that an agency must treat similar cases in a similar manner, provide an adequate evidentiary basis for its action, and may not rely upon inconsistent, contradictory reasoning.

80.     The Commission arbitrarily imposed substantially different minimum liquidation requirements on financial swaps, on the one hand, and "swap futures" contracts and other futures products that possess similar—or, indeed, identical—characteristics and risk profiles, on the other hand.  The Commission failed to present any evidence that DCOs needed more time to liquidate positions in financial swaps than in functionally interchangeable financial "swap futures" contracts.  To the contrary, data in the Commission's possession demonstrated that DCOs do not need more time to liquidate financial swaps than functionally equivalent "swap futures" contracts.

81.     This unjustifiable disparate treatment was based on inconsistent, self-contradictory reasoning.  The Commission purported to derive the five-day minimum liquidation time from the voluntary practices of certain DCOs, which the Commission considered to be "reasonable and prudent," yet the Commission—based on purported doubts about DCOs' reliability—then stripped the DCOs of the same discretion that the Commission had said was exercised prudently.  Instead, the Commission entrenched a uniform liquidation period that is unreasonable and anachronistic in the context of a marketplace radically transformed by the Dodd-Frank Act.

82.     The Commission rejected the venue-based approach in the NPRM because that approach would "put SEFs at a competitive disadvantage to DCMs," "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs," and "potentially create detrimental arbitrage between standardized swaps traded on a SEF and futures contracts with the same terms and conditions traded on a DCM." 76 Fed. Reg. at 69,366.  But the Commission then contradicted itself by adopting Rule 39.13(g)(2)(ii) without addressing the fact that each of these adverse consequences results equally—if not more so—from the Rule's new standard.  The

Commission's error will sharply undermine trading on SEFs, which Dodd-Frank intended to

foster in order to increase transparency, and will thereby impair the public interests that Dodd-

Frank meant to further.  The Rule will also undermine trading on OTC swap platforms such as

those available on the BLOOMBERG PROFESSIONAL® service, until the CFTC finalizes its

rule for SEFs and SEFs become operative.

83.     The Commission's adoption of Rule 39.13(g)(2)(ii) was arbitrary, capricious, and

otherwise not in accordance with law, and Plaintiff is therefore entitled to relief under 5 U.S.C.

§§ 702, 706(2)(A), (C).

## COUNT FOUR:

## CLAIM FOR INJUNCTIVE RELIEF

84.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

85.     Plaintiff will be irreparably injured by the further implementation of Rule

39.13(g)(2)(ii).  The Rule will substantially and unjustifiably divert business away from financial

swaps subject to the five-day liquidation minimum (which are executed on SEFs as well as

DCMs) to functionally interchangeable financial "swaps futures" contracts (which can only be

executed on DCMs).  This regulatory arbitrage will shift market participants away from SEFs—

which the Dodd-Frank Act intended to foster—and into futures contracts that are comparable

except for the inexplicably different regulatory treatment given to them by the Commission.

Similarly, until the CFTC completes the SEF rulemaking and SEFs become operative, the Rule

will divert market participants away from OTC swap trading platforms such as those available on

the BLOOMBERG PROFESSIONAL® service.  If Rule 39.13(g)(2)(ii) is not enjoined, the

resulting marketplace shift from SEFs to futures markets will not be capable of being redressed

by a final judgment.

86.     In imposing the five-day minimum liquidation times for all financial swaps, the Commission did not consider the liquidity of many financial swaps, and thus unnecessarily increased costs to swaps market participants without justification.

87.     An injunction would serve the public interest by avoiding potential harms to the transparency, efficiency and liquidity of the commodity markets, OTC swap trading platforms (until the CFTC finalizes its SEF rules and SEFs become operative), and the SEFs that Congress intended to foster in the Dodd-Frank Act.

88.     These concerns outweigh any interest identified by the CFTC in issuing the minimum liquidation period Rule.

89.     Plaintiff is therefore entitled to injunctive relief under 5 U.S.C. § 702.

### PRAYER FOR RELIEF

90.     WHEREFORE, Plaintiff prays for an order and judgment:

a.     Declaring that Rule 39.13(g)(2)(ii), and its adoption, are not in accordance with the Commodity Exchange Act within the meaning of 5 U.S.C. § 706(2)(C); that the Rule was not promulgated in accordance with procedures required by law within the meaning of 5 U.S.C. § 706(2)(D); and the agency's action in adopting the Rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A);

b.     Vacating and setting aside Rule 39.13(g)(2)(ii), to the extent that Rule provides for longer minimum liquidation periods for swaps than for futures contracts;

c.     Enjoining the CFTC and its officers, employees, and agents from implementing or applying minimum liquidation requirements that are longer for swaps than for futures contracts;

d.      Issuing all process necessary and appropriate to postpone the further

implementation of the minimum liquidation requirements in Rule 39.13(g)(2)(ii) pending

the conclusion of this case;

e.      Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred

in bringing this action; and

f.      Granting such other and further relief as this Court deems just and proper.


Respectfully submitted,


Dated: April 16, 2013

By: _____

Mario M. Cuomo                          Eugene Scalia, SBN 447524
(*pro hac vice pending*)                 escalia@gibsondunn.com
mcuomo@willkie.com                      Misha Tseytlin, SBN 991031
Thomas H. Golden                        (*pro hac vice pending*)
(*pro hac vice pending*)                 mtseytlin@gibsondunn.com
tgolden@willkie.com                     Alex Gesch, SBN 1012422
WILLKIE FARR & GALLAGHER LLP             (*pro hac vice pending*)
787 Seventh Avenue                      agesch@gibsondunn.com
New York, NY 10019-6099                 GIBSON, DUNN & CRUTCHER LLP
Telephone: 212.728.8260                 1050 Connecticut Avenue, N.W.
Facsimile: 212.728.9260                 Washington, D.C. 20036
                                        Telephone: 202.955.8500
                                        Facsimile: 202.467.0539

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of April, 2013, I caused a copy of the foregoing

COMPLAINT to be served upon the Defendant, the United States Attorney General, and the

United States Attorney for the District of Columbia via Certified Mail.

U.S. Commodity Futures Trading
Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

The Honorable Eric H. Holder Jr.
Attorney General of the United States
United States Department of Justice
Room 4400
950 Constitution Ave., N.W.
Washington, D.C. 20530

United States of America
c/o United States Attorney
Ronald C. Machen, Jr.
United States Attorney's Office
for the District of Columbia
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530

_____
Eugene Scalia