PROTECTED INFORMATION
FILED PURSUANT TO
PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

BLOOMBERG L.P.,

              Plaintiff,

    v.

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

              Defendant.

Civil Action No. 13-523 (BAH)

## PLAINTIFF'S APPLICATION FOR
## A PRELIMINARY INJUNCTION

COMES NOW PLAINTIFF Bloomberg L.P. and hereby respectfully moves this Court for a preliminary injunction staying 17 C.F.R. § 39.13(g)(2)(ii), promulgated by defendant United States Commodity Futures Trading Commission ("CFTC"), to the extent that the Rule provides minimum liquidation times that are longer for financial swaps than for futures contracts. *See* Derivatives Clearing Organization General Provisions and Core Principles, 76 Fed. Reg. 69,334 (Nov. 8, 2011).

This Application is supported by the Memorandum of Points and Authorities filed concurrently herewith.  The CFTC opposes this Application.

Because, as set forth in the Memorandum, Plaintiff will incur significant, irreversible injury if a preliminary injunction is not entered before the commencement of the CFTC's "Phase 2" clearing mandate on **June 10, 2013**, Plaintiff respectfully requests expedited briefing and consideration of this Application pursuant to Local Civil Rule 65.1(c), (d).

PROTECTED INFORMATION
~~FILED PURSUANT TO~~
PROTECTIVE ORDER

Respectfully submitted,

Dated: May 2, 2013

Mario M. Cuomo
(admitted *pro hac vice*)
mcuomo@willkie.com
Thomas H. Golden
(admitted *pro hac vice*)
tgolden@willkie.com
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: 212.728.8260
Facsimile: 212.728.9260

Eugene Scalia, SBN 447524
escalia@gibsondunn.com
Misha Tseytlin, SBN 991031
(admitted *pro hac vice*)
mtseytlin@gibsondunn.com
Alex Gesch, SBN 1012422
(admitted *pro hac vice*)
agesch@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Counsel for Plaintiff*

PROTECTED INFORMATION
DELETED PURSUANT TO
PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BLOOMBERG L.P.,

           Plaintiff,

    v.

UNITED STATES COMMODITY FUTURES
TRADING COMMISSION,

           Defendant.

Civil Action No. 13-523 (BAH)

**PROTECTED INFORMATION
DELETED PURSUANT TO
PROTECTIVE ORDER**

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR A PRELIMINARY INJUNCTION**

Dated: May 2, 2013

Mario M. Cuomo
(admitted *pro hac vice*)
mcuomo@willkie.com
Thomas H. Golden
(admitted *pro hac vice*)
tgolden@willkie.com
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: 212.728.8260
Facsimile: 212.728.9260

Eugene Scalia, SBN 447524
escalia@gibsondunn.com
Misha Tseytlin, SBN 991031
(admitted *pro hac vice*)
mtseytlin@gibsondunn.com
Alex Gesch, SBN 1012422
(admitted *pro hac vice*)
agesch@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Counsel for Plaintiff*

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND......................................... 3

    A.     The Swaps And Futures Markets .......................................................... 3

        1.     Swaps And Futures ..................................................................... 3

        2.     Trading, Listing, And Execution Of Swaps And Futures ........... 5

        3.     Clearing, Posting Margin, And Minimum Liquidation Times .................. 7

    B.     The Proposed Rule ............................................................................... 10

    C.     The Final Rule....................................................................................... 11

    D.     The Rule's Imminent Adverse Effects On Plaintiff And Others ......................... 17

III.   SUMMARY OF ARGUMENT ........................................................................... 23

IV.    ARGUMENT ....................................................................................................... 25

    **A.**     Plaintiff Is Substantially Likely To Succeed On The Merits; At Minimum, It Has Raised A Serious Legal Question.................................. 25

        1.     The Commission Did Not Comply With The APA's Notice Requirements, Leading To Arbitrary And Capricious Treatment Of Economically Equivalent Products ........................................... 25

        2.     The Commission Did Not Comply With The Requirement That It Conduct A Cost-Benefit Analysis Before Promulgating A Rule, And That It Evaluate Effects On Competition, Efficiency, And The Public Interest ............................................................................... 33

    B.     The Rule Will Impose Irreparable Harm On Plaintiff And The Public ............... 39

        1.     The Rule Will Cause Substantial, Irreparable Harm To Plaintiff............ 39

        2.     The Rule Threatens The Public Interest, And Enjoining The Rule Would Not Substantially Injure Any Interested Parties............................ 43

V.     CONCLUSION.................................................................................................... 45

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

\* *American Equity Investment Life Insurance Co. v. SEC*,
   613 F.3d 166 (D.C. Cir. 2010) ................................................ 38

*Association of Private Sector Colleges & Universities ("Private Sector
   Colleges") v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) ................................................ 26

*Atlanta Attachment Co. v. Leggett & Platt Inc.*,
   No. 1:05-CV-1071-ODE, 2007 WL 5011980 (N.D. Ga. Feb. 23, 2007) ................................ 40

\* *Bracco Diagnostics, Inc. v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) ................................................ 29, 30, 31

*Brady Campaign To Prevent Gun Violence v. Salazar*,
   612 F. Supp. 2d 1 (D.D.C. 2009) ................................................ 23

\* *Business Roundtable v. SEC*,
   647 F.3d 1144, 1148-49 (D.C. Cir. 2011) ................................................ 35

*Chamber of Commerce v. SEC*,
   412 F.3d 133 (D.C. Cir. 2005) ................................................ 33, 34, 35

\* *CSX Transportation, Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009) ................................................ 26, 28

\* *Envtl. Integrity Project v. EPA*,
   425 F.3d 992 (D.C. Cir. 2005) ................................................ 25

*Feinerman v. Bernardi*,
   558 F.Supp.2d 36 (D.D.C. 2008) ................................................ 40, 42

*Gen. Chem. Corp. v. United States*,
   817 F.2d 844 (D.C. Cir. 1987) ................................................ 28, 31, 32

*Indep. Petroleum Ass'n of Am. v. Babbitt*,
   92 F.3d 1248 (D.C. Cir. 1996) ................................................ 29, 30

*Int'l Swaps & Derivatives Ass'n v. CFTC*,
   No. 12-5362, 2013 WL 1386242 (D.C. Cir. Apr. 5, 2013) ................................ 30

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
   407 F.3d 1250 (D.C. Cir. 2005) ................................................ 25, 28

# Table of Authorities
## (Continued)

Page

*Inv. Co. Inst. v. CFTC*,
  891 F. Supp. 2d 162 (D.D.C. 2012)................................................................. 29

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*,
  73 F. Supp. 2d 425 (S.D.N.Y. 1999) .............................................................. 39

*Morgan Stanley DW Inc. v. Rothe*,
  150 F. Supp. 2d 67 (D.D.C. 2001)................................................................... 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).......................................................................................... 28

*Nalco Co. v. EPA*,
  786 F. Supp. 2d 177 (D.D.C. 2011)........................................................... 40, 42

*National Fuel Gas Supply Corp. v. FERC*,
  468 F.3d 831, 839 (D.C. Cir. 2006) ............................................................... 38

*Ne. Md. Waste Disposal Auth. v. EPA*,
  358 F.3d 936 (D.C. Cir. 2004)........................................................................ 25

*Philip Morris USA Inc. v. Scott*,
  131 S. Ct. 1 (2010)..................................................................................... 42, 43

*Public Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004)...................................................................... 34

*TiVo Inc. v. EchoStar Commc'ns Corp.*,
  446 F. Supp. 2d 664 (E.D. Tex. 2006), *aff'd in part, rev'd in part,*
  *remanded in part*, 516 F.3d 1290 (Fed. Cir. 2008).................................... 40

*Transactive Corp. v. United States*,
  91 F.3d 232 (D.C. Cir. 1996).......................................................................... 29

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841, 844 (D.C. Cir. 1977)................................................................ 23

**Statutes**

5 U.S.C. § 553................................................................................................... 25

7 U.S.C. § 19........................................................................................... 14, 16, 33

7 U.S.C. § 1a....................................................................................................... 4

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

# Table of Authorities
## (Continued)

Page

7 U.S.C. § 2 ......................................................................................................... 3, 6, 7

7 U.S.C. § 6 ....................................................................................................... 6, 7, 15

7 U.S.C. § 6a ............................................................................................................ 30

7 U.S.C. § 7a-1 .................................................................................................... 8, 44

7 U.S.C. § 7b-3 .......................................................................................................... 6

**Regulations**

17 C.F.R. Part 43 ....................................................................................................... 6

66 Fed. Reg. 45,604 ................................................................................................. 10

76 Fed. Reg. 1214 ...................................................................................................... 6

76 Fed. Reg. 3698 ................................................................................... 6, 10, 11, 27

76 Fed. Reg. 69,334 .......................................................................................... passim

77 Fed. Reg. 15,460 ................................................................................................. 16

77 Fed. Reg. 44,441 ................................................................................................... 8

77 Fed. Reg. 48,208 ................................................................................................... 4

77 Fed. Reg. 74,284 ......................................................................................... 7, 9, 16

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* (3d
   ed. 2005) ............................................................................................................. 39

CME, James Boudreault, Swap Rate Curve Strategies with Deliverable Interest
   Rate Swap Futures, *available at* http://www.cmegroup.com/trading/interest-
   rates/files/dsf-swap-rate-curve-spreads.pdf (last visited on Apr. 30, 2013) ............ 19

Federal Reserve Bank of New York Staff Report, *An Analysis of OTC Interest
   Rate Derivatives Transactions: Implications for Public Reporting* (March
   2012) ...................................................................................................................... 5

Gordon Tullock, The Welfare Costs of Tariffs, Monopolies, and Theft, 5 Western
   Econ. J. 224 (1967) .............................................................................................. 37

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

## Table of Authorities
## (Continued)

<u>Page</u>

ICE Website, Key Information, *at* https://www.theice.com/S2F.jhtml (last visited
  on Apr. 30, 2013)...................................................................................................... 5

Press Release, IntercontinentalExchange Announces May Launch of Credit Index
  Futures Contracts (March 11, 2013), *available at*
  http://ir.theice.com/releasedetail.cfm?ReleaseID=747018 ...................................... 19

Scott O'Malia, Commissioner, Commodity Futures Trading Comm'n, Keynote
  Address at the Securities Industry and Financial Markets Association
  Compliance and Legal Society Annual Seminar (Mar. 19, 2013), *available at*
  http://www.cftc.gov/PressRoom/SpeechesTestimony/opaomalia-22....................................... 18

PROTECTED INFORMATION
SUBJECT TO PURSUANT TO
PROTECTIVE ORDER

## I.   INTRODUCTION

With this motion, Plaintiff Bloomberg L.P. seeks a preliminary injunction barring the U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") from enforcing minimum "liquidation periods" for financial swaps that are longer than the 1-day minimum liquidation period for futures.

The liquidation period for a swap or futures contract is a key determinant of how much "margin"—essentially, collateral—must be posted for a trade in the product to go forward.  In the rule at issue here, the Commission imposed a 5-day minimum liquidation period for financial swaps, but a 1-day period for futures and commodity-based swaps.

That difference will require margin that can be more than twice as high for financial swaps as for futures.  Yet, financial swaps and futures often have indistinguishable economic characteristics and risk profiles, meaning that the margin market participants should be required to post ought to be equivalent.  The Commission's rule simply disregards that fact.  Indeed, because this rule imposes greater margin requirements on financial swaps than on equivalent futures, the rule promotes "futurization," a phenomenon by which futures products are designed to mimic the essential characteristics of a swap in order to take advantage of regulatory arbitrage opportunities that the rule creates.  The CFTC's Chairman has aptly described this futurization process as "relabeling" a swap as a future.  These "labels" have decisive weight in this rule.

The divergent regulatory requirements imposed by this rule were never put out for notice and comment.  The regulatory approach that *was* included in the proposed rule was ultimately *rejected* in the final rule for reasons that apply equally to this new approach.  For instance, the Commission recognized that its initial proposal would create "detrimental arbitrage between standardized swaps traded . . . and futures contracts with the same terms and conditions."  This rule indisputably creates the same arbitrage.

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

In proceeding as it did, the CFTC violated the Administrative Procedure Act's requirements for "reasoned decisionmaking," and for advance notice and an opportunity to comment.  It also conducted a seriously deficient cost-benefit analysis in which it ignored significant anti-competitive effects and inefficiencies, and refused without reason to conduct *any* quantitative or financial analysis of the new requirement.

If this discriminatory liquidation period for financial swaps is not stayed by June 10, 2013, it will cause substantial and irreparable injury to Bloomberg and to the public at large. June 10 is the date by which market participants that are most affected by increased margin costs must begin "clearing" a large share of their overall swaps volume in accordance with CFTC rules.  The rule under challenge provides powerful, incentives for those traders to abandon swaps—and Bloomberg's swap trading platform—in favor of futures.  Indeed, the trading platforms that specialize in futures are actively and explicitly marketing "swap futures" products that replicate swaps but are not subject to the heightened margin requirements imposed by the CFTC, or to other requirements of the Dodd-Frank Act.  Once this business migrates to those other platforms it will be lost forever to Bloomberg, because of the "network" effects associated with trading platforms and the "stickiness" of the business relationships.

The public will benefit from an injunction of the challenged provision of this rule because, absent an injunction, this rule indisputably will harm—perhaps fatally—one of the Dodd-Frank Act's principal innovations for the swaps markets.  Title VII of the Dodd-Frank introduced and sought to foster "Swap Execution Facilities" for the trading of swaps.  These "SEFs" are intended to offer more transparency and information for market participants, in a carefully-calibrated regulatory environment.  Two of the principal reasons the Commission *abandoned* its initial proposed rule were, the Commission said, that would "put SEFs at a competitive disad-

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

vantage to" other platforms, and would "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs."  Yet that is precisely what this rule will do, immediately and irreparably, by diverting trading from swaps to future products that cannot be traded on SEFs.

There is no harm to the public or third parties in enjoining the 5-day minimum liquidation period in the rule, and subjecting all products to the same 1-day minimum liquidation period. These periods are *minimums*; the derivatives clearing organizations that have set margin requirements for years remain free to determine margin requirements based on longer liquidation periods as appropriate, and remain subject to the Commission's oversight and regulation.  The Commission itself cited the "reasonable" and "prudent" judgment of those very organizations when it adopted the rule at issue.

This rule is ill-considered, flawed to the core, and will cause imminent, irreparable harm. It should be enjoined forthwith.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Swaps And Futures Markets

#### 1.    Swaps And Futures

Since 1936, the Commodity Exchange Act ("CEA") has authorized the Commission (or its predecessor) to regulate the commodity derivatives markets, including by establishing a comprehensive scheme for regulating futures contracts.  7 U.S.C. § 2(a)(12).  Through the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Congress placed another type of derivative—"swaps"—under the Commission's regulatory authority.

Swaps and futures contracts are both financial instruments that derive their value from the performance of an underlying commodity.  A "swap" is a contract that typically involves an exchange of one or more payments based on the underlying value of a notional amount of one or more commodities, or other financial or economic interest, and that transfers between the parties

PROTECTED INFORMATION
SUBJECT TO RELEVANT TO
PROTECTIVE ORDER

the risk of future change in that value without also transferring an ownership interest in the underlying asset or liability. *See* 7 U.S.C. § 1a(47); Further Definition of "Swap," Security-Based Swap," and "Security-Based Swap Agreement," 77 Fed. Reg. 48,208 (Aug. 13, 2012). When a buyer and a seller come to agreement on the price and other terms of a swap they then "execute" that swap, meaning there is a legally binding agreement for each counterparty to make payments under the instrument. Swaps can be based on physical commodities, as in the case of "agricultural swaps," or can be based on financial or economic interests such as interest rates or credit default indices, as in the case of "credit default swaps" or "interest rate swaps." For example, the swap based on the 5-year "on-the-run" credit default index Markit CDX.NA.IG (series 20) is a commonly-traded credit default swap on a credit default index comprising 125 North American investment grade reference obligations. One party pays a premium in exchange for payment by the counterparty if a company—or companies—referenced in the index defaults.[1]

A "futures contract" is commonly understood as an agreement to purchase or sell a commodity for delivery in the future (i) at a price that is determined at execution of the contract; (ii) that obligates each party to the contract to fulfill the contract at the specified price; (iii) that is used to assume or shift price risk; and (iv) that may be satisfied by delivery or offset. Futures contracts, like swaps, can be based on physical commodities or financial or economic interests.

---

[1]  Each credit default swap index contains a list of companies based on various criteria. New series are issued regularly (typically semi-annually), so that at any given time there is always a recently-issued index of a given duration ("tenor") that can serve as the standard benchmark for market participants interested in trading swaps with approximately the same duration. Each credit default swap index is identified by index family (categorized by geographic region and credit quality), series, and tenor. The most recently published series is known as the "on-the-run" series, while the prior series are "off-the run." Most trades occur in the "on-the-run" series and at a 5-year tenor; thus, liquidity is concentrated in that series and tenor.

PROTECTED INFORMATION
TO BE KEPT CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

The economic terms of many swaps can be replicated in products known as "swap futures," which share the essential characteristics and risk profile of analogous swaps, but are traded and regulated as futures.  This process—known as "futurization"—is a well-recognized phenomenon.  *See* Declaration of Sharon Brown-Hruska dated May 2, 2013 ("Brown-Hruska Decl."), ¶ 16.  In January 2013, the CFTC convened a "public roundtable" on the "Futurization of Swaps," in which members of the public voiced concerns about the impact of futurization on the swaps markets and the regulatory structure that Congress established in the Dodd-Frank Act.  *See* Declaration of Misha Tseytlin dated May 2, 2013 ("Tseytlin Decl."), Ex. B.

The futurization of swaps—which the CFTC Chairman has characterized as "relabeling" (*id.*, Ex. A, at 21)—can be performed swiftly, by preassembling strips of futures contracts with aggregate cash flows that resemble swaps with the same size, tenor, and reset characteristics.  Brown-Hruska Decl. ¶ 16.  On October 15, 2012, IntercontinentalExchange, Inc. ("ICE") converted its cleared energy swaps into economically comparable futures contracts in one day, effectively eliminating its cleared energy swap market.  ICE explained on its website that it had "converted its cleared energy swap contracts to economically equivalent futures contracts."  In marketing the benefits of its new futures product, ICE noted: "[a] participant that trades swaps will be required to report each swap," "whereas the same participant executing economically equivalent futures contracts will have no such obligation because of existing futures reporting."  ICE Website, Key Information, https://www.theice.com/S2F.jhtml (last visited on Apr. 30, 2013).

2.      **Trading, Listing, And Execution Of Swaps And Futures**

Historically, swaps have been traded either by telephone or on electronic trading platforms.  *See* Federal Reserve Bank of New York Staff Report, *An Analysis of OTC Interest Rate Derivatives Transactions: Implications for Public Reporting* (March 2012), *available at* http://www.newyorkfed.org/research/staff_reports/sr557.pdf, at 3-4.  Plaintiff operates, on the

BLOOMBERG PROFESSIONAL® service, a leading electronic trading platform for swaps. Declaration of Benjamin P. Macdonald dated May 2, 2013 ("Macdonald Decl."), ¶ 4.

SEFs.   The Dodd-Frank Act created a new regime, under which swaps *may* be listed, traded, and executed on regulated trading platforms known as "Swap Execution Facilities" ("SEFs").   7 U.S.C. § 7b-3(a)(1).   SEFs are intended to promote transparency, and to increase competition by bringing swaps onto new regulated platforms.   Risk Management Requirements for Derivatives Clearing Organizations, 76 Fed. Reg. 3698, 3699 (Jan. 20, 2011).   Specifically, swaps transactions executed on SEFs will be subject to pre-trade transparency requirements, except where the value of the swap exceeds a "block trade" threshold.   Brown-Hruska Decl. ¶ 40. The "block trade" thresholds for swaps will be set by the CFTC, which is expected to set this threshold at sufficiently high level to ensure significant transparency for all but the largest block trades.   *Id.*   Post-trade data on swap transactions—including those on SEFs—will be required to be publicly disseminated in real-time, free of charge.   7 U.S.C. § 2(a)(13); 17 C.F.R. Part 43.[2]

The CFTC's rulemaking for SEFs is ongoing.   *See* Core Principles and Other Requirements for Swap Execution Facilities, 76 Fed. Reg. 1214 (Jan. 7, 2011).   Until this rulemaking is completed, most swaps trading will place over the phone or on electronic trading platforms such as those available on the BLOOMBERG PROFESSIONAL® service.   Macdonald Decl. ¶ 4.

DCMs.   Futures contracts *must* be traded, listed and executed on trading platforms known as Designated Contract Markets ("DCMs").   7 U.S.C. § 6(a).   DCMs lack the transparency that Congress required for SEFs.   For instance, DCMs charge fees to access timely post-trade

---

[2]   The Dodd-Frank Act requires that swap data for cleared and uncleared swaps be disseminated to the public "as soon as technologically practicable" after execution. 7 U.S.C. § 2(a)(13)(A).   Similarly, CFTC regulations require SEFs to send executed swap transaction data to a swap data repository, an entity registered with the CFTC, that will publicly disseminate the data free of charge.   17 C.F.R. Part 43 .

PROTECTED INFORMATION
SUBJECT TO
PROTECTIVE ORDER

futures data, making this data less accessible than SEF trading data will be.  *See* Brown-Hruska

Decl. ¶ 40.  And while certain pre-trade transparency requirements apply to futures that do not

exceed "block trade" thresholds, the DCMs set those thresholds themselves, and they regularly

set the thresholds at lower levels, thereby ensuring that more futures transactions evade the

transparency requirements.  *Id.*

Swaps can also be listed, traded, and executed on DCMs.  By contrast, futures will not be

permitted to be listed on SEFs.  7 U.S.C. § 6(a)(2).

### 3.      Clearing, Posting Margin, And Minimum Liquidation Times

Under the CEA and the CFTC's regulations, most swaps and all futures contracts must be

"cleared" by Derivatives Clearing Organizations ("DCOs").  These are clearinghouses or similar

entities that enable the parties to a derivatives transaction to substitute the credit of the DCO for

the credit of the parties to the swap.  *See* 7 U.S.C. § 2(h)(2); Clearing Requirement Determina-

tion Under Section 2(h) of the CEA, 77 Fed. Reg. 74,284 (Dec. 13, 2012).  Clearing is a process

by which the original derivative *between* the counterparties is extinguished and replaced by equal

and opposite obligations *to the clearinghouse* by both counterparties.  The original counterparties

clear their trades through intermediaries that are members of the DCO ("clearing members"),

with the clearing member standing between the original counterparty and the DCO.  To offset the

losses that could result in the event of default by a clearing member, the DCO collects "margin

deposits" and "guaranty fund contributions" from the counterparties to derivatives transactions;

the margin deposits and contributions are used to satisfy payment obligations in the event of de-

fault, and thereby reduce the risk of derivatives transactions.

Each DCM is connected to a single DCO—often the DCM's affiliate—which then clears

all futures contracts executed on that DCM.  Brown-Hruska Decl. ¶ 17.  By contrast, swaps trad-

ing platforms, including SEFs, will likely connect to multiple DCOs, which will clear swaps at

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

the DCO that has been requested by the swap counterparties.  *Id.* ¶ 18.  Swap counterparties that execute their trades on SEFs will be able to choose the DCO at which they clear, while parties to a futures contract do not have a choice of DCO.  *Id.*

The CFTC has established a three-phase schedule for implementing mandatory clearing requirements for swaps.  *See* Swap Transaction Compliance and Implementation Schedule: Clearing Requirement Under Section 2(h) of the CEA, 77 Fed. Reg. 44,441 (July 30, 2012). Phase 1, which began on March 11, 2013, required clearing for swaps between the largest, most sophisticated entities.  These entities, which include swap dealers, typically offset their swap positions in a short period of time (e.g., within a day), thereby mitigating their margin obligations.  Phase 2, beginning on June 10, will require clearing for entities—such as non-dealer banking institutions, commodity pools and many private funds—that are more sensitive to new margin obligations for cleared swaps.  The entities required to clear under Phase 2 typically keep their swaps positions open longer than those subject to Phase 1 clearing, meaning that they must maintain margin throughout the holding period.  Brown-Hruska Decl. ¶ 42.  The potential volume of transactions that will be subject to clearing as a result of Phase 2 is hundreds of billions of dollars per day.  *Id.*  Phase 3, starting on September 9, will require all other entities to clear their swaps or elect an exemption from the clearing requirement.

DCOs' collection of margin when clearing transactions is regulated by the CEA, as amended by the Dodd-Frank Act, which requires DCOs to limit their exposure to losses from default "through margin requirements and other risk control mechanisms," which must be "sufficient to cover potential exposures in normal market conditions."  7 U.S.C. § 7a-1(c)(2)(D)(iii-iv). This lawsuit concerns estimated "liquidation time," which is a crucial factor in determining how much margin must be deposited.  Liquidation time is the estimated amount of time it would take

PROTECTED INFORMATION SUBJECT TO PROTECTIVE ORDER

a DCO to "liquidate" a position held by a clearing member on behalf of its customer, in the case of default.  The longer the "liquidation time" for a particular swap or future, the greater the margin the clearing member must collect from its customer and post with the DCO.  Brown-Hruska Decl. ¶ 1.  A longer liquidation time means greater costs for the customer.  *Id.* ¶ 4.

The appropriate liquidation time for a product is closely related to the liquidity of the product—that is, the amount of trading in the product.  *Id.* ¶ 2.  Many swaps have significant liquidity, as the CFTC itself has recognized in other rulemakings.  *See* 77 Fed. Reg. at 74,294-95.  In these other rulemakings, the Commission explained that data from Markit (the predominant provider of credit default swap indices) showed "daily transaction volumes of 1,559 transactions using its licensed family of CDX indices, and 1,828 daily transactions in its European iTraxx indices."  *Id.* at 74,294.  This constitutes a rolling monthly average gross notional amount of $745 billion for the licensed family of CDX indices, and 680 billion euros for the iTraxx family—a high degree of liquidity.  *Id.*

Publicly available post-execution transaction data also demonstrates that certain commonly-traded "interest rate" swaps can be executed almost immediately.  *See* Brown-Hruska Decl. ¶ 23.  Similarly, publicly available data shows that certain "on-the-run" credit default index swaps are very liquid, and substantial positions in them can be executed easily.  *Id.*  Even for series that are no longer "on-the-run," the Commission has stated that there are "still significant volumes and outstanding notional amounts in each of these series."  77 Fed. Reg. at 74,295.  Another measure of liquidity, the bid-ask spread, further illustrates the liquidity of these products.  The bid-ask spread refers to the difference between the bid (the price at which a participant is willing to buy) and the ask (the price at which a participant is willing to sell) in a market.  A smaller spread indicates only a small difference in the buying and selling price, meaning that the

PROTECTED INFORMATION TO BE DISCLOSED ONLY PURSUANT TO PROTECTIVE ORDER

product is more liquid.  Commonly-traded "interest rate" swaps and credit default index swaps have narrow bid-ask spreads.  *See* Brown-Hruska Decl. ¶¶ 29-32.

Financial "swap futures" contracts are no easier to liquidate than the financial swap on which they are modeled.  *See id.* ¶¶ 21-22.  To the contrary, because futures contracts can be executed only on the DCM on which they are listed, the liquidity for a futures contract is limited to that DCM, whereas swaps can be executed by voice or on any DCM, or swaps trading platform, including (once the rules for SEFs are in place) on any SEF.  The liquidity of a swap may therefore be *greater* than the liquidity of an economically equivalent swap futures contract—which warrants a shorter liquidation time.  *See id.* ¶¶ 2, 22.

## B.    The Proposed Rule

On January 20, 2011, the CFTC issued a notice of proposed rulemaking ("NPRM") to set—among other things—requirements relating to the margin DCOs must receive from clearing members to cover potential exposures under "normal market conditions."  76 Fed. Reg. at 3704.  Historically, DCOs had set their own margin requirements based on product-specific liquidation times, among other considerations, and merely documented the forms and amounts of collateral that they required market participants to post.  *See* A New Regulatory Framework for Clearing Organizations, 66 Fed. Reg. 45,604, 45,612 (Aug. 29, 2001).   The CFTC stated that DCOs have carried out these responsibilities "reasonabl[y]" and "prudent[ly]."  Derivatives Clearing Organization General Provisions and Core Principles, 76 Fed. Reg. 69,334, 69,419 (Nov. 8, 2011).

In a departure from this historical practice, the NPRM proposed to set—for the first time—mandatory minimum liquidation times that DCOs must apply.  In the proposed rule, the duration of the liquidation time was based solely upon the venue where a derivative product was executed:  a 1-day minimum liquidation time for all futures or swaps executed on a DCM, and a

PROTECTED INFORMATION
TO BE REDACTED PURSUANT TO
PROTECTIVE ORDER

5-day minimum liquidation time for swaps executed on any other platform, including a SEF.  76

Fed. Reg. at 3720.

The Commission provided no analysis of the costs and benefits of imposing minimum

liquidation times, and instead stated that the proposed rule *as a whole* would have "many and

substantial" benefits, including the protection of market integrity through "sound risk manage-

ment practices associated with clearing," as well as the efficiency that competition between

clearinghouses will foster." *Id.*

In response to the NPRM, commenters objected that the proposal's venue-based approach

favored DCMs over SEFs and would lead to regulatory arbitrage—artificially shifting swaps

from SEFs to DCMs, thereby leading to "lower liquidity, higher transaction costs, and decreased

competition."  FXall Comment (July 8, 2011), at 1-2.  Commenters also noted that the NPRM's

disparate treatment of DCMs and SEFs was in tension with Section 2(h)(1)(B) of the CEA and

proposed Rule 39.12(b)(2), which prevents DCOs from discriminating against swaps that are not

executed on an affiliated DCM.  WMBAA Comment (Mar. 22, 2011), at 2; BlackRock Comment

(Mar. 21, 2011), at 3; VMAC Comment (Feb. 25, 2011), at 2; GFI Comment (Feb. 2, 2011), at 2.

Commenters added that preventing discrimination against SEFs and thereby "promoting compe-

tition between [the] swap markets and the trading of swaps on SEFs" was a critical feature of the

Dodd-Frank Act.  MarketAxess Comment (Mar. 21, 2011), at 2.

## C.    The Final Rule

On November 8, 2011, the Commission issued the final rule with an accompanying

Adopting Release.  76 Fed. Reg. at 69,334.  In the final rule, the Commission abandoned the

NPRM's proposal that DCOs collect margin for a 5-day liquidation time for products executed

on SEFs and margin for a 1-day liquidation time for products executed on DCMs.  *Id.* at 69,367.

The Commission explained that it was "persuaded" by the "views expressed by numerous com-

menters" regarding the proposal's potentially serious adverse effects, including, the Commission said, that the venue-based approach would:

- "potentially create detrimental arbitrage between standardized swaps traded on a SEF and futures contracts with the same terms and conditions traded on a DCM";

- "put SEFs at a competitive disadvantage to DCMs"; and

- "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs."

*Id.* at 69,366-67.

In place of the NPRM's venue-based rule, and by a divided 3-2 vote, the CFTC announced a final rule—Rule 39.13(g)(2)(ii) ("the Rule")—that determines the minimum liquidation time according, in part, to whether a product is labeled a swap or future. Specifically, in calculating the margin that they will collect under the Rule, DCOs must use: "(A) [a] minimum liquidation time that is one day for futures and options; (B) [a] minimum liquidation time that is one day for swaps on agricultural commodities, energy commodities, and metals; [and] (C) [a] minimum liquidation time that is five days for all other swaps . . . ." 76 Fed. Reg. at 69,438.

This new requirement was announced for the first time in the Adopting Release. It had not been mentioned, described, proposed, or vetted in any manner in advance. (On the contrary, the NPRM had treated a 1-day minimum liquidation period as appropriate for *all* swaps, when traded on a DCM.) The public therefore had no notice of the new approach, and no opportunity to comment and provide the Commission the benefit of its views. Nor had the public been afforded the opportunity to review and comment on the cost-benefit analysis that was required, by law, to be conducted in conjunction with adopting the requirement.

The Commission provided little explanation or justification for the distinction the Rule established between financial swaps on the one hand, and futures and all other swaps on the oth-

PROTECTED INFORMATION
TO BE DISCLOSED PURSUANT TO
PROTECTIVE ORDER

er hand.  The distinction, it claimed, without elaboration or citation to record evidence, related to "differing risk characteristics of these product groups"; it also stated that the Rule was "consistent with existing requirements that reflect the risk assessments DCOs have made over the course of their experience clearing these types of swaps."  *Id.* at 69,367.  The Commission said that it was setting mandatory minimum liquidation times because DCOs "may misjudge the appropriate liquidation time frame because of limited experience with clearing," or even engage in a "race to the bottom," by setting excessively short liquidation times to attract business.  *Id.* at 69,419.  Yet, on the very same page in the *Federal Register*, the Commission purported to derive these minimum liquidation times from the "assessments DCOs have made over the course of their experience."  *Id.*  The Commission did not explain why the past practices of DCOs could be trusted in identifying the proper liquidation time, but that going forward, DCOs should not be permitted to exercise the same judgment, based on that same "experience."

The Commission nowhere sought to reconcile the Rule, and its effects, with the reasons it gave for abandoning the NPRM's venue-based approach to liquidation times.  The NPRM's divergent 5-day and 1-day minimum liquidation times, the Commission said just a page earlier in the *Federal Register*, would "potentially create detrimental arbitrage *between standardized swaps traded on a SEF and futures contracts*."  *Id.* at 69,366 (emphasis added).  The Adopting Release thus acknowledged that certain futures serve as market alternatives to "standardized" swaps, and that different minimum liquidation times would invite "detrimental arbitrage" between the products.  Yet, in the Rule, the Commission imposed the same disparate 1-day vs. 5-day minimum liquidation requirements for "standardized swaps traded on a SEF and futures contracts," with no explanation why this was suddenly acceptable if, a page earlier in the *Federal Register*, it had been a reason to reject the NPRM's approach.

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

Commenters, for their part, were unable to address that inconsistency because they had no notice and opportunity to comment on the approach in the final rule.

Similarly, in the Adopting Release the Commission said it was abandoning the divergent 1-day vs. 5-day minimum liquidation periods for DCMs and other platforms because the variance would "put SEFs at a competitive disadvantage to DCMs." *Id.* at 69,366. However, the Rule also "put[s] SEFs at a competitive disadvantage to DCMs" (*id.*): "swap futures" may be traded on DCMs with a 1-day minimum liquidation period, whereas SEFs—which cannot be used to trade futures—must adhere to a 5-day liquidation period for swaps that share the same essential characteristics and risk profile as the "swap future." Accordingly, for interchangeable swap and "swap futures" products, DCMs have a built-in advantage that enables futures to be traded on DCMs at a substantially lower cost than analogous swaps on SEFs. This "competitive disadvantage" will incentivize "detrimental arbitrage" (*id.*) that is harmful to SEFs, yet the Commission in the Adopting Release nowhere reconciled this outcome with its statement that such adverse effects on SEFs were a reason to abandon the venue-based approach of the NPRM.

<u>Cost-Benefit Analysis</u>. The CEA provides that when the Commission promulgates a rule, it must "evaluate[]" "[t]he costs and benefits of the proposed [rule] . . . in light of" several factors, including competitiveness, efficiency, and sound risk management. 7 U.S.C. § 19(a)(2).

In the Adopting Release, the Commission recognized that divergent minimum liquidation periods could give rise to "detrimental arbitrage" that gives "futures contracts" a competitive advantage over "standardized swaps traded on a SEF," and could place SEFs at a "competitive disadvantage" in competing with DCMs for liquidity. Accordingly, under the Commission's own reasoning, the minimum liquidation periods in the Rule will have adverse competitive effects on

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

the market for financial swaps, both on SEFs and on swap trading platforms such as those available on the BLOOMBERG PROFESSIONAL® service.

The cost-benefit analysis in the Adopting Release made no mention of these adverse competitive effects.  The Commission likewise gave no consideration to the costs the Rule will impose on SEFs, and immediately on swap trading platforms, by incentivizing DCMs to convert financial swaps into substantially equivalent financial "swap futures" contracts, which can only be listed on DCMs.  7 U.S.C. § 6(a).

Altogether, the Commission devoted only two pages in the *Federal Register* to discussing the costs and benefits of Rule 39.13(g)(2)(ii).  In that discussion, the Commission admitted that its approach of "using only one criterion—*i.e.*, the characteristic of the commodity underlying a swap—to determine liquidation time could result in less-than-optimal margin calculations."  76 Fed. Reg. at 69,418.  For some products, the Commission elaborated, "a five-day minimum may prove to be excessive and tie up more funds than are strictly necessary for risk management purposes."  *Id.*  And yet, the Commission undertook no analysis to determine whether for commonly-traded financial swaps that would be affected by the Rule—such as "on-the-run" Markit CDX and iTraxx credit default swaps and 10-year Fixed-Floating USD 3-month LIBOR swaps—5 days was an appropriate liquidation period.  The Commission's cost-benefit analysis did not cite or discuss a single commonly-traded swap or futures contract and the estimated amount of time to liquidate a position in that instrument in the event of default.

Indeed, the Commission's cost-benefit analysis contained no quantitative discussion or information of any kind.  The Commission said that taking account of "the risk characteristics, price volatility, and market liquidity of even a sample [of products] for purposes of determining a liquidation time" would be a "formidable task."  On that ground, it declined to conduct any such

PROTECTED INFORMATION
TO BE KEPT CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

analysis. *Id.* at 69,418-19.  This "formidable task" that the Commission declined to perform is one that DCOs perform on a daily basis, and are required to perform by the Rule.  Moreover, data readily available to the CFTC would have permitted it to conduct the analysis for at least a "sample" of swaps.  *See, e.g.*, Procedures To Establish Appropriate Minimum Block Sizes for Large Notional Off-Facility Swaps and Block Trades, 77 Fed. Reg. 15,460, 15,468 (Mar. 15, 2012) ("The Commission obtained transaction-level data for these asset classes from two third-party service providers . . . ."); 77 Fed. Reg. at 74,284 (describing data received from DCOs in determining clearing requirements).

In its cost-benefit analysis, among the benefits the Commission attributed to Rule 39.13(g)(2)(ii) was that minimum liquidation times "will provide legal certainty" to the marketplace.  76 Fed. Reg. at 69,419.  The Commission did not address whether *different* minimum liquidation times would provide the same amount of "legal certainty" to market participants.

The Public Interest.  The CFTC is also required by statute to consider its rules' effects on the public interest.  7 U.S.C. § 19(a)(1)-(2).  In the Dodd-Frank Act, Congress created SEFs to—among other things—increase the transparency of derivative products to the public.  *See supra* at 6.  For the reasons set forth above, Rule 39.13(g)(2)(ii) will make trading in financial swaps more costly than trading in economically equivalent "swap futures," and will therefore divert trading away from swaps and toward futures, which are not subject to the same stringent post-trade transparency requirements and cannot be traded on SEFs.  Rule 39.13(g)(2)(ii) will thereby both deter the development of the SEFs that Congress sought to encourage through the Dodd-Frank Act and reduce the extent to which the public benefits from the transparency that Congress intended to bring to the swaps market via real-time, free-of-charge public reporting of post-trade data.  Instead, the Rule will incentivize trading in economically equivalent "swap futures" prod-

16

PROTECTED INFORMATION
SUBJECT TO RELEVANT TO
PROTECTIVE ORDER

ucts, which are not reported to the public in real-time and free of charge, and for which pre-trade transparency requirements are more easily evaded by DCMs' setting lower block trade thresholds for futures contracts.  *See supra* at 6.  In addition, the Rule will reduce consumers' choice with regard to clearing venue and competition.  That is because the Rule pushes trading to DCMs, which are connected to a single DCO, and away from SEFs, which will permit swap counterparties to choose the DCO on which they will clear.

In evaluating the Rule's effect on the public interest, the Commission did not address these adverse effects, even though the Adopting Release acknowledged elsewhere that reducing the appeal of SEFs as trading venues was a result to be avoided.  And, because the Commission did not propose the terms of Rule 39.13(g)(2)(ii) for comment, there was no opportunity for interested parties to emphasize the Rule's adverse effects for the public.

The Dissents.  Commissioners Sommers and O'Malia dissented from the Commission's adoption of Rule 39.13(g)(2)(ii).  Among other things, they noted the inconsistency in the Commission relying on DCOs' "reasonable and prudent judgment" to derive the Rule's minimum liquidation times, while at the same time setting minimum liquidation times that—in the case of financial swaps—sharply constrain DCOs' ability to use their experience and judgment to set liquidation times.  76 Fed. Reg. at 69,474 (Sommers); *accord id.* at 69,478 (O'Malia).  Commissioner O'Malia also deplored the Adopting Release's cost-benefit analysis, which, he said, "fail[ed] to attempt meaningful quantification."  *Id.* at 69,479.

## D.     The Rule's Imminent Adverse Effects On Plaintiff And Others

Rule 39.13(g)(2)(ii) threatens significant, irreparable harm to market participants, including Bloomberg.

Most swaps currently are traded over the telephone or on electronic trading platforms such as those available on the BLOOMBERG PROFESSIONAL® service, pending completion

PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH THE PROTECTIVE ORDER

of the CFTC's SEF rulemaking.  Macdonald Decl. ¶ 4.  On June 10, 2013, pursuant to a require-ment of the Commission's "clearing" rules, a large number of market participants who generally have not been clearing their swaps—and often have not been posting or exchanging margin on swaps—must begin clearing many commonly-traded interest rate swaps and credit default swaps. Accordingly, as a result of the June 10 "Phase 2" clearing mandate, a large body of market par-ticipants, who are particular sensitive to margin obligations, will become subject to the Rule's 5-day margin requirements for financial swaps, and will immediately be incentivized to seek less costly alternatives to clearing such swaps.  Brown-Hruska Decl. ¶ 46.  As Commissioner O'Malia recently explained, the disparity in Rule 39.13(g)(2)(ii)'s treatment of financial swaps and financial futures contracts "creates an incentive to trade financial futures over swaps."  Scott O'Malia, Commissioner, Commodity Futures Trading Comm'n, Keynote Address at the Securi-ties Industry and Financial Markets Association Compliance and Legal Society Annual Seminar (Mar. 19, 2013), *at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opaomalia-22.

The cost difference for market participants created by the Commission's Rule is substan-tial.  A participant in the Commission's recent "Futurization" Roundtable cited evidence that the 5-day liquidation period for a swap under the Rule would "generate approximately 2.23 times the margin held against futures subject to a 1-day period."  Tseytlin Decl., Ex. B, at 76.

Already, futures exchanges are unveiling products and making changes to capture the business that will result from the Rule's preferential treatment of futures.  CME Group and Eris Exchange now offer on their DCMs interest rate "swap futures" contracts, which they have ad-vertised as requiring "margins that are approximately 50% lower than cleared" interest rate swaps.  CME, James Boudreault, Swap Rate Curve Strategies with Deliverable Interest Rate Swap Futures, *available at* http://www.cmegroup.com/trading/interest-rates/files/dsf-swap-rate-

PROTECTED INFORMATION
TO BE KEPT CONFIDENTIAL PURSUANT TO
PROTECTIVE ORDER

curve-spreads.pdf (last visited on Apr. 30, 2013), at 1.  ICE has announced that it intends by May 2013 to list on its DCM futures contracts based on financial swaps.  Press Release, Intercontinen-talExchange Announces May Launch of Credit Index Futures Contracts (March 11, 2013), *available at* http://ir.theice.com/releasedetail.cfm?ReleaseID=747018.   At the Commission's Futuri-zation Roundtable, one participant described how futures exchanges "tout[] the lower margin costs for non-fungible swap futures over swaps [in] their printed sales pitch[es]," and warned that if "swaps are overmargined," this will result in "additional cost borne to the U.S. economy." Tseytlin Decl., Ex. B, at 77.

Plaintiff Bloomberg—a limited partnership organized under the laws of the State of Del-aware—is a multi-national financial news provider and a leader in global business and financial information.  Bloomberg delivers analytics and data on approximately 5 million financial in-struments, as well as news on almost every publicly traded company, through the BLOOM-BERG PROFESSIONAL® service, television, radio, websites, mobile applications, and maga-zines.  Macdonald Decl. ¶ 5.  The BLOOMBERG PROFESSIONAL® service also offers lead-ing platforms for electronic trading and processing of swaps.  Bloomberg currently has more than ▮▮▮▮▮ subscribers that use its swap trading platforms.  *Id.* ¶ 5.

As soon as the CFTC rules permit, Bloomberg intends to operate a SEF in order to facili-tate trading in the swaps market.  Macdonald Decl.  ¶ 7.  Bloomberg has created a subsidiary that will operate the SEF, has drafted a rulebook for the SEF that has been reviewed by the National Futures Association, and has taken substantial steps toward creating the SEF's technological in-frastructure.  In preparation for launching its SEF, Bloomberg has invested ▮▮▮▮▮▮▮ ▮▮▮▮▮ hired ▮▮ employees, and committed ▮▮▮▮ work days.  *Id.*  As a result of the requirement in Dodd-Frank that all swap trades be reported to a Swap Data Repository ("SDR"), Bloomberg

PROTECTED INFORMATION
SUBJECT TO RELEVANT TO
PROTECTIVE ORDER

has already taken substantial steps to create an SDR.  Macdonald Decl. ¶ 7  Bloomberg has al-

ready invested approximately ████████ in computer equipment and has committed ██ work

days in research and development as well as ██ work days in meetings and other preparations for

launching its SDR.

In light of the increased availability of market data that Congress sought to encourage

with the creation of SEFs, Bloomberg also intends—through the services identified above—to

devise additional analytics for professional investors and to provide more news and information

for both professional investors and the general public.

If Rule 39.13(g)(2)(ii) is not stayed before June 10, Bloomberg will experience immedi-

ate, irreparable harm in connection with all of the activities described above:  the BLOOMBERG

PROFESSIONAL® service, the SEF it is developing, and its plans to offer additional analytic

services to its customers.

1.  Rule 39.13(g)(2)(ii) creates indisputable financial incentives to "futurize" swaps—

which are traded on the BLOOMBERG PROFESSIONAL® service—into "swap futures" con-

tracts that may only be listed and executed on DCMs.  DCMs already have begun offering fu-

tures alternatives to swaps, and are promoting such futurized swaps on the basis, in part, of Rule

39.13(g)(2)(ii)'s lower margin requirements and trading costs for futures.  *Supra* at 18-19.

The flight from OTC venues to DCMs will be accelerated by the fact that trading plat-

forms are subject to "network effects," under which an increase in the number of participants in-

creases the platform's value to other participants.  Brown-Hruska Decl. ¶ 43.  Conversely, a de-

crease in the number of participants erodes the value and viability of the platform.  *Id.*  These

network effects occur because as trading volume migrates to a single platform and as trading ac-

tivity becomes more concentrated in that platform, the costs of trading become lower for each

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

participant. *Id.* Once a platform establishes a dominant position for a product, the cost to market participants of switching to a competing platform can be prohibitively high. *Id.* ¶ 44. Trading volume thus tends to migrate to a single platform and stay there, giving a powerful advantage to those platforms that first gain a critical mass of liquidity-enhancing trading volume. *Id.*

Business that moves from the BLOOMBERG PROFESSIONAL® service and other swap trading venues to DCMs is thus unlikely to return even if Rule 39.13(g)(2)(ii) is eventually vacated. *Id.* ¶ 46; *accord* Macdonald Decl. ¶ 15. Rather, the advantages that DCMs obtain from the shift from swaps to futures driven by Rule 39.13(g)(2)(ii) will create a "locked in" effect that cannot be reversed. Brown-Hruska Decl. ¶ 46. Thus, Bloomberg projects that, if Rule 39.13(g)(2)(ii)'s discrimination between financial swaps and futures is not stayed before June 10, Bloomberg will lose ▮▮ of credit default swap trading volume and ▮▮ of interest rate swap trading volume on its swap trading platforms, resulting in projected annual losses of ▮▮ ▮▮ Macdonald Decl. ¶ 12. It projects that a vast majority of these customers will not return even if Rule 39.13(g)(2)(ii) is vacated by this Court at the conclusion of this litigation. *Id.* ¶ 13.

2. Business that is diverted from OTC venues to DCMs must be expected, for similar reasons, to remain with DCMs once the Commission completes its ongoing SEF rulemaking and SEFs are able to begin operating. Brown-Hruska Decl. ¶ 46. Accordingly, if Rule 39.13(g)(2)(ii) is not stayed, the lower expected viability and profitability of SEFs will have the immediate effect of discouraging and reducing investment in the development of SEFs. *Id.* ¶ 39. These new trading venues—conceived by Congress and encouraged by the Dodd-Frank Act— will be unable to attract the investment and critical mass of participants needed to flourish. *Id.*; *accord* Macdonald Decl. ¶ 14.

PROTECTED INFORMATION SUBJECT TO PROTECTIVE ORDER

Bloomberg projects that, if Rule 39.13(g)(2)(ii)'s discrimination between financial swaps and futures contracts is not stayed before June 10, it will lose ███ of the trading volume it had expected on its SEF and ███ of the data reported to its SDR, resulting in estimated losses of ███████ in its first year of operation, growing to losses of ████████ in annual revenues by its fifth year of operation.  Macdonald Decl. ¶ 14.  Moreover, it is possible that the Rule will make Bloomberg unable to profitably operate a SEF at all, losing much of the more than ███████ it has invested to date to develop its SEF.  *Id.* ¶ 15.

3.  The migration of trading from swap to futures—driven by Rule 39.13(g)(2)(ii)'s discriminatory liquidation time regime—will also irreparably harm Bloomberg's business of delivering information and analytics to its customers.  Bloomberg's analytics and information gathering services depend critically upon the broad availability of relevant data.  Macdonald Decl. ¶ 5.  The Dodd-Frank Act requires that more data regarding swaps be made available to the public than DCMs are required to disclose in respect of futures.  *See supra* at 6.  If Rule 39.13(g)(2)(ii)'s discrimination between financial swaps and futures contracts is not vacated or otherwise repealed by June 10, thus critically damaging the future viability of SEFs, information will either not be made available to Bloomberg for distribution to its customers at all or will be made available only under burdensome financial and legal terms.  Macdonald Decl. ¶ 16.

By letter dated March 11, 2013, Plaintiff requested that the Commission stay the Rule, and that the Commission respond to the request by March 19.  *See* Ex. 2.  That request was neither granted nor denied.  On April 24, after filing the Complaint in this case, Plaintiff filed a Motion for Stay with the Commission, which again—and formally—requested a stay.  *See id.*  A response was requested by 5 p.m. April 29.  Plaintiff then waited three additional business days

PROTECTED INFORMATION
TO BE ~~REDACTED~~ PURSUANT TO
PROTECTIVE ORDER

and, having received no decision on its Motion, filed this Application in light of the imminent June 10 Phase 2 clearing date.

### III.    SUMMARY OF ARGUMENT

This Court considers four factors in deciding whether to issue a preliminary injunction: (1) whether the plaintiff has established "a substantial likelihood of success on the merits"; (2) whether the plaintiff "would suffer irreparable injury if the injunction were not granted"; (3) whether "an injunction would not substantially injure other interested parties"; and (4) whether "the public interest would be furthered by the injunction." *Brady Campaign To Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 11 (D.D.C. 2009).  "[A] particularly strong showing in one area can compensate for weakness in another" (*id.*), and the presence of "a serious legal question" will support an injunction when "little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

Plaintiff Bloomberg satisfies each of these four factors, and therefore is entitled to an order preliminary injunction enjoining the Commission from applying Rule 39.13(g)(2)(ii) to require different minimum liquidation times for financial swaps as opposed to futures.

Plaintiff has a strong likelihood of success on the merits.  In promulgating the Rule, the Commission failed to satisfy the most basic requirement of notice and comment rulemaking: giving the public a fair opportunity to comment on the approach that it ultimate adopted.  Instead, the Commission first proposed a regime that imposed minimum liquidation times based upon the venue of execution and then, in the Adopting Release, abandoned that approach for a different, wholly unexpected regime, thereby denying the public an opportunity to comment on the flaws of Rule 39.13(g)(2)(ii), and depriving the Commission itself of the benefit of those comments.  This failure to vet the Commission's new approach had the predicted effect, as the

Commission adopted a patently defective rule in a textbook case of arbitrary reasoning:  The Commission and Congress recognized that swaps and futures can be "economically equivalent," yet Rule 39.13(g)(2)(ii) imposes significantly divergent minimum liquidation times on financial swaps and futures that are unsupported by the record and the nature of the products, and that will cause many of the harms the Commission purported to avert.  The Commission also failed to conduct its statutorily-required cost-benefit analysis, offering no quantitative analysis of Rule 39.13(g)(2)(ii)'s costs, and failing even to acknowledge—let alone assess—the Rule's severe impacts on the markets and the public.

Bloomberg will experience irreparable injury absent preliminary injunctive relief, and the public interest will also suffer.  If the Rule is not enjoined before the commencement of Phase 2 clearing, Bloomberg and other market participants will lose customers who move their business from swap trading platforms to DCMs to avoid the higher costs the Rule will impose on swaps trading.  Once business has shifted to DCMs and the "swap futures" those DCMs already are marketing, it will be forever lost Bloomberg, other OTC-trading venues, and the SEFs that Congress purposely established through the Dodd-Frank Act.  The Rule's severe impact on SEFs will harm the public interest by undermining the transparency and flexibility that Congress intended SEFs to promote.  A preliminary injunction, on the other hand, would pose no threat to the public interest.  The Commission has acknowledged in this very rulemaking that DCOs have historically set minimum liquidations times responsibly, and, in any event, the Commission will retain oversight of DCOs' risk management activities.

PROTECTED INFORMATION
SUBJECT TO
PROTECTIVE ORDER

## IV.     ARGUMENT

### A.     Plaintiff Is Substantially Likely To Succeed On The Merits; At Minimum, It Has Raised A Serious Legal Question

#### 1.     The Commission Did Not Comply With The APA's Notice Requirements, Leading To Arbitrary And Capricious Treatment Of Economically Equivalent Products

a. The Administrative Procedure Act ("APA") requires that federal agencies afford "interested persons an opportunity to participate in the rule making" (5 U.S.C. § 553(c)), through the submission of data, viewpoints, or other arguments.  Notice and comment is "designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

An essential condition of notice and comment rulemaking is that an "agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).  If a final rule is not the "logical outgrowth" of the proposal, the public will have had no opportunity to comment on (and to inform the agency's consideration of) the requirements codified as law in the final rule.  The logical outgrowth test prevents agencies from using "the rulemaking process to pull a surprise switcheroo on regulated entities."  *Id.* at 996.  Under this test, a "rule is deemed a logical outgrowth if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (quotation omitted).

PROTECTED INFORMATION
SUBJECT TO
PROTECTIVE ORDER

Thus, for example, in *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076 (D.C. Cir. 2009), the Surface Transportation Board proposed a rule that allowed parties in railroad rate cases to suggest "comparison groups" from the most recent **year** of data. *Id.* at 1078. The final rule, however, allowed parties to select comparison groups from the last **four years** of data. *Id.* The Board argued that the "mere mention of the release of one-year data for comparison groups gave notice that the amount of data available for that purpose might change." *Id.* at 1082. The D.C. Circuit invalidated the rule, explaining that while "the NPRM proposed several revisions to the existing system, it nowhere even hinted that the Board might consider expanding the number of years from which comparison groups could be derived." *Id.*

For similar reasons, in *Association of Private Sector Colleges & Universities ("Private Sector Colleges") v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012), the D.C. Circuit invalidated a Department of Education regulation that, for the first time in the final rule, required institutions offering distance education services to obtain "authorization from all states in which its students *reside* that require such authorization." *Id.* at 434 (emphasis added). The Government argued that this mandate had been presaged by language in the proposed rule that would have required authorization "'from the states where [institutions] operate,'" in contrast to the existing requirement to obtain authorization from "the State in which the institution is *physically located*." *Id.* at 461 (emphasis added; brackets in original). The D.C. Circuit found, however, that this terminological shift was "at best, an oblique—and hence, insufficient—indication that the Department was considering the distance education regulation" adopted as the final rule. *Id.* at 462.

The lack of notice by the CFTC in this case is at least as serious as in these D.C. Circuit cases where the agency rules were invalidated. Here, in the NPRM, the Commission proposed "a liquidation time that is a minimum of one business day" for swaps executed on DCMs, and "a

PROTECTED INFORMATION
TO BE KEPT PURSUANT TO
PROTECTIVE ORDER

liquidation time that is a minimum of five business days for cleared swaps that are not executed

on a DCM," including those executed on SEFs.  76 Fed. Reg. at 3704.  This proposal—which

recognized that a 1-day minimum was appropriate for *all* swaps, provided that they were swaps

traded on a DCM—drew extensive criticism for it differential treatment of DCMs, on the one

hand, and other platforms (such as SEFs), on the other hand.  As a result, the Commission aban-

doned its venue-based proposal.  76 Fed. Reg. at 69,366-67.

Then, without any warning whatsoever, much less opportunity to comment, the Commis-

sion unexpectedly a fundamentally different approach in the Rule:  Minimum liquidation times

would not be based on the venue of execution, but on (i) whether the product was a swap or a

future and (ii) on the nature of the referenced commodity, with (iii) a 1-day minimum liquidation

period for *all* futures (as well as commodity-based swaps), and a 5-day period for *all* financial

swaps.  None of these aspects of the final rule was identified or presaged in the rule proposal:

not the use of the underlying referenced commodity to determine minimum liquidation periods,

not the across-the-board differential treatment of all futures and financial swaps, and not the re-

quirement that all financial swaps be subject to a minimum 5-day liquidation period.  (To the

contrary, one day had been deemed sufficient in the proposal, so long as the platform of execu-

tion was a DCM.)  The Rule thus imposed a completely different standard than the one proposed,

fundamentally shifting the nature of the analysis.  This about-face was not fairly included in the

NPRM, and was not a "logical outgrowth."

If the Commission had presaged that it was considering discriminating between financial

swaps and economically equivalent "swap futures" contracts—regardless of the platform of exe-

cution—Plaintiff (as well as other interested parties) would have explained that this distinction,

no less than the venue-based distinction the Adopting Release rejected, would—in the Commis-

PROTECTED INFORMATION TO BE FILED PURSUANT TO PROTECTIVE ORDER

sion's own words, in its explanation for rejecting the venue-based approach—"potentially create detrimental arbitrage between standardized swaps traded on a SEF and futures contracts with the same terms and conditions traded on a DCM," "put SEFs at a competitive disadvantage to DCMs," and "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs." 76 Fed. Reg. at 69,366-67.  As it was, however, "interested parties would have had to 'divine [the Commission's] unspoken thoughts'" to identify the significant adverse consequences of the final rule.  *Int'l Union*, 407 F.3d at 1260 (brackets in original).  The Commission "nowhere even hinted" that it was considering the approach it ultimately adopted (*CSX*, 584 F.3d at 1082), and Rule 39.13(g)(2)(ii) must be vacated.

b.  Notice and comment not only "ensure fairness to affected parties" and "give affected parties an opportunity to develop evidence in the record," but also improve the quality of agency decisionmaking and final rules by mandating "that agency regulations are tested via exposure to diverse public comment."  *Int'l Union*, 407 F.3d at 1259.  Simply, the government governs better when the public is heard.  In this case, the Commission's failure to allow notice and comment on the terms of Rule 39.13(g)(2)(ii) resulted in patently arbitrary and capricious decisionmaking that stands in clear violation of the APA.

An agency engages in the "reasoned decisionmaking" required by the APA when, among other things, it "articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Agency action that is "internally inconsistent and inadequately explained" is a plain violation of the APA (*Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987)), and an agency must "treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Indep. Petroleum Ass'n of*

PROTECTED INFORMATION
SUBJECT TO
PROTECTIVE ORDER

*Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."); *cf. Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 196-97 (D.D.C. 2012), as amended (Jan. 2, 2013) ("Derivatives are flexible products that can be designed to achieve almost any financial purpose."). ("Given the goal of Dodd–Frank to protect the integrity of U.S. financial markets by promoting more regulatory transparency, the CFTC is justified in taking prophylactic measures to treat entities engaging in the *same* regulated activity in the *same* manner" (emphases added)).

As Judge Friedman explained in *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997), "[t]he disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious." *Id.* at 28.  In that case, the court considered motions for preliminary injunction by several drug companies whose imaging products for use in ultrasounds were "identical in all material respects" (*id.*), except that the Food and Drug Administration ("FDA") subjected plaintiffs' products to more onerous regulations by treating their products as a "drug," while a competitor's essentially identical product was classified as a "device," and was therefore subject to a lower regulatory burden.  *Id.* at 26-27.  Analyzing the plaintiffs' likelihood of success on the merits, the court held that "the FDA either must provide a rational basis for treating MBI's imaging agent as a device while simultaneously regulating essentially identical agents as drugs, or it must treat all four of these similar products in the same way." *Id.* at 28.  While acknowledging the FDA's discretion in determining how to regulate the products at issue, the court added: "[w]hat the FDA is not free to do, however, is to treat them dissimilarly and to permit two sets of similar products to run down two separate tracks, one more treacherous than the other, for no apparent reason." *Id.*  The court therefore held that the plain-

PROTECTED INFORMATION
SUBJECT TO PROTECTIVE ORDER

tiffs were "likely to succeed on this argument as a matter of law." *Id.* Observing that disparate treatment of plaintiffs and their competitors irreparably harmed plaintiffs' ability to compete (*id.* at 28-29), and that "[r]equiring the FDA to test similar products with the same scrutiny is consistent with the FDA's mission and is in the public interest" (*id.* at 30), the court granted plaintiffs' preliminary injunction. *Id.* at 31.

In the present case, the Commission engaged in similarly arbitrary decisionmaking.  In the Adopting Release, the Commission recognized that applying a 1-day minimum liquidation period in one circumstance—and a 5-day minimum liquidation period in another, related circumstance—could have serious consequences for competition and the public interest, including by encouraging market participants to engage in regulatory arbitrage that will impair the viability of SEFs.  76 Fed. Reg. at 69,366-67.  Rule 39.13(g)(2)(ii), however, imposes that same 5-day/1-day distinction, based on whether the product involved is a financial swap or a futures contract.  That is a textbook example of an agency failing to "treat similar cases in a similar manner" (*Indep. Petroleum*, 92 F.3d at 1258)—as illustrated by the CFTC Chairman's statement that the difference between a swap and a "swap future" is a mere matter of "relabeling" (*see supra* 5), and the acknowledgment by Congress that swaps and futures can be "economically equivalent."  7 U.S.C. § 6a(a)(5)(A).  Indeed, in a filing in the D.C. Circuit last month, the Commission characterized certain swaps and futures as "economically equivalent."  CFTC Br., *Int'l Swaps & Derivatives Ass'n v. CFTC*, No. 12-5362, 2013 WL 1386242, at *40-41 (D.C. Cir. Apr. 5, 2013).

In the rulemaking, the Commission did not—and could not—claim that the risk profiles of financial swaps and economically equivalent futures contracts are materially different for purposes of liquidation time.  To the contrary, data in the Commission's own possession demonstrates that many swaps have significant liquidity. *See supra* at 9.  For example, the Commission

PROTECTED INFORMATION
SUBJECT TO
PROTECTIVE ORDER

had data showing that there were more than 1,800 daily transactions in some indices, with a no-tional value of hundreds of billions of dollars.  *Id.*   With these amounts of liquidity, defaulted positions can be liquidated in a matter of hours, far more quickly than the 5-day mandatory min-imum in Rule 39.13(g)(2)(ii).  *See* Brown-Hruska Decl. ¶ 32.  Given these circumstances, the CFTC's "disparate treatment of functionally indistinguishable products is the essence of the meaning of arbitrary and capricious."  *Bracco*, 963 F. Supp. at 28.[3]

The Commission also violated its duty to engage in reasoned decisionmaking because Rule 39.13(g)(2)(ii) is "internally inconsistent and inadequately explained."  *Gen. Chem.*, 817 F.2d at 846.  In the Adopting Release, the Commission abandoned its proposed venue-based ap-proach because it was "persuaded" by commenters that, among other things, it would "potential-ly create detrimental arbitrage between standardized swaps traded on a SEF and futures contracts with the same terms and conditions traded on a DCM," "put SEFs at a competitive disadvantage to DCMs," and "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs."  76 Fed. Reg. at 69,366-67; *see also* Commodity Pool Operators and Commodity Trading Advisors: Compliance Obligations, 77 Fed. Reg. 11,252, 11,264 (Feb. 24, 2012) (CFTC rescind-ing an exemption to avoid "regulatory arbitrage" with respect to entities that are "similarly situ-ated").  Yet the Commission then inconsistently and without explanation adopted the require-ments of Rule 39.13(g)(2)(ii) that will have the same adverse effects.  The Rule will unquestion-ably create "detrimental arbitrage between standardized swaps traded on a SEF and futures con-

---

[3]   Rule 39.13(g)(2)(ii)(d) provides that the Commission may establish "[s]uch longer liquida-tion time as is appropriate based on the specific characteristics of a particular product or port-folio" and that "the Commission, by order, may establish shorter or longer liquidation times for particular products or portfolios."  That the Commission has retained for itself the author-ity to increase or decrease the liquidation time for any particular swap or future product does not alter the Rule's arbitrary and harmful distinction between financial swaps, on one hand, futures and commodity-based swaps, on the other hand.

PROTECTED INFORMATION
TO BE DISCLOSED PURSUANT TO
PROTECTIVE ORDER

tracts with the same terms and conditions traded on a DCM," and has already begun to do so, as market participants have begun "futurizing" swaps into "swap futures" contracts in order to avoid the Rule's 5-day minimum liquidation regime. *See supra* at 18-19. This arbitrage will put "SEFs at a competitive disadvantage to DCMs" because only swaps can be executed on SEFs, and the higher cost associated with posting margin based on a 5-day minimum liquidation time will drive market participants away from swaps. This, in turn, will "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs."

The Commission adopted "internally inconsistent and inadequately explained" reasoning in other respects as well. *Gen. Chem.*, 817 F.2d at 846. For example, the Commission correctly found that "a five-day minimum may prove to be excessive and tie up more funds than are strictly necessary for risk management purposes," but immediately thereafter contradicted itself by stating that because Rule 39.13(g)(2)(ii) "simply establishes minimums [5 days, for financial swaps], it will not hinder the exercise of sound risk management practices." 76 Fed. Reg. at 69,419. Undisputed data in the CFTC's possession demonstrates that the CFTC's first statement is true, while the second is false: the 5-day minimum liquidation period is "excessive" for many financial swaps and therefore *will* "hinder the exercise of sound risk management practices." *See supra* at 9. In addition, as explained by both Commissioners O'Malia and Sommers, the CFTC inconsistently relied on the "reasonable and prudent judgment" of DCOs to derive their minimum liquidation times, while arguing at the same time that DCOs could not—even in the more regulated post-Dodd Frank Act environment—be given discretion to set their own liquidation times based on their reasonable assessment of a particular product. 76 Fed. Reg. at 69,474 (Sommers); *id.* at 69,478 (O'Malia).

PROTECTED INFORMATION
SUBJECT TO
PROTECTIVE ORDER

In short, this is a clear case of basic regulatory failure:  The Commission adopted an important regulatory requirement without notice, and—predictably—committed glaring blunders that will have serious adverse effects on the swaps markets, and on the design and purpose of the Dodd-Frank Act.  Plaintiff is substantially likely to prevail on the merits of its APA claims.  At minimum, it has presented a "serious legal question."

**2.      The Commission Did Not Comply With The Requirement That It Conduct A Cost-Benefit Analysis Before Promulgating A Rule, And That It Evaluate Effects On Competition, Efficiency, And The Public Interest**

The Commission's errors in this rulemaking are all the more pronounced in light of its statutory responsibility to evaluate the costs and benefits of its regulations according to numerous, specific criteria.

"Before promulgating a regulation . . . the Commission shall consider the costs and benefits of the action of the Commission . . . .  The costs and benefits of the proposed Commission action shall be evaluated in light of: (A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations."  7 U.S.C. § 19(a).  This directive is similar to an obligation of the Securities and Exchange Commission that has resulted in a series of decisions invalidating SEC rules.  Thus, in one leading case, the D.C. Circuit held that even if there were difficulties obtaining reliable data, that did "not excuse the [SEC] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005).  The court explained that while the SEC might not have been able to estimate the cost of its new corporate governance regulation for the *entire* mutual fund industry, it "readily could have estimated the cost *to an in-*

PROTECTED INFORMATION SUBJECT TO PROTECTIVE ORDER

*dividual fund*, which estimate would be pertinent to its assessment of the effect the condition would have upon efficiency and competition" industry-wide.  *Id.* at 144 (emphasis added).

Despite recent admonitions by the D.C. Circuit, in this rulemaking the Commission refused to conduct any financial or quantitative analysis of Rule 39.13(g)(2)(ii)'s costs.  Determining "the risk characteristics, price volatility, and market liquidity of even a sample for purposes of determining a liquidation time" would be a "formidable task," the Commission lamented, and any results would be subject to "a range of uncertainty."  Then, on that basis, the Commission simply refused to carry out this "task."  76 Fed. Reg. at 69,418.  The Commission has a duty, however, "to determine as best it can the economic implications of the rule it ha[d] proposed," even if it could only identify a "range" of costs.  *Chamber of Commerce*, 412 F.3d at 143.  In assessing the Rule's impact, the Commission had to "exercise its expertise to make tough choices" about the appropriate analytic model, "and to hazard a guess as to" the Rule's estimated effects, even if "the estimate will be imprecise."  *Id.* (quoting *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004)).  The Commission was duty-bound to conduct such an analysis so it could evaluate whether the Rule's discrimination between financial swaps, on the one hand, and futures, on the other hand, would further "efficiency, competitiveness, and financial integrity of futures markets," "sound risk management practices" and the "public interest."  In refusing to perform the analysis, the Commission failed to conduct an "evaluat[ion]" of the Rule's costs and benefits worthy of the name.

Remarkably, the Commission neglected these statutory responsibilities even though it requires each DCO to perform the same purportedly "formidable task" for each contract that it clears.  76 Fed. Reg. at 69,420.  Specifically, the Commission requires DCOs to consider—in determining whether to set liquidation times above the Commission-imposed mandatory mini-

PROTECTED INFORMATION
TO BE REDACTED PURSUANT TO
PROTECTIVE ORDER

mums—factors such as: "(i) [a]verage daily trading volume in a product; (ii) average daily open interest in a product; (iii) concentration of open interest; (iv) availability of a predictable basis relationship with a highly liquid product; and (v) availability of multiple market participants in related markets to take on positions in the market in question." *Id.* at 69,368. And the Commission itself will "consider these [very same] factors in determining whether a particular liquidation time was appropriate[ly]" as set by a DCO. *Id.* Nevertheless, the Commission inexplicably declined to conduct any analysis under this 5-factor test that it requires DCOs to conduct, and that it acknowledged it will have to apply in the future. *Id.*

In fact, the Commission had access to data that would have enabled it to perform a far more searching cost-benefit analysis. For instance, it had ready access to information that would have permitted it to analyze the time it would actually take a DCO to liquidate a defaulted swap position in a sampling of commonly-traded financial swaps. Indeed, the Commission has obtained and relied upon such data in other rulemakings. *See supra* at 9. But rather than providing an example of the margin that would be required for even a single representative product—and then considering the estimated effects on cost and demand under a 5-day versus a 1-day rule— the Commission simply threw up its hands. 76 Fed. Reg. at 69,419. That was in direct violation of the court's instruction in *Chamber of Commerce*, 412 F.3d at 144, that the agency "could have estimated the cost to an individual fund" and used that to inform its analysis of the rule's costs as a whole. *Id.*; *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011).

The Commission also had access to data that would have permitted it to analyze Rule 39.13(g)(2)(ii)'s impact on a broader segment of the swap population, beyond a mere sample of financial swaps. As the CFTC's use of data in other rulemakings demonstrates, the Commission is able to obtain from market participants data relating to a broad number of swaps, if it chooses

to do so.  *See supra* at 9.  The Commission's error thus replicates a fatal defect in *Business*

*Roundtable*, where the SEC ignored the data that was readily available to it.  647 F.3d at 1150.

By conducting the fleeting and superficial cost-benefit "analysis" that it did, the Commis-

sion also failed to properly address the specific factors set forth in the CEA, including the Rule's

effects on "competitiveness," "efficiency," and the "public interest."

Competitiveness.   The Commission abandoned the NPRM's venue-based approach to

minimum liquidation periods in part because applying different margin requirements to equiva-

lent products would "put SEFs at a competitive disadvantage to DCMs" and could "create detri-

mental arbitrage between standardized swaps traded on a SEF and futures contracts with the

same terms and conditions traded on a DCM."  76 Fed. Reg. at 69,366.  Despite recognizing the-

se risks to competitiveness posed by different minimum liquidation periods, the Commission

adopted the Rule without analyzing whether the Rule's disparate minimum liquidation require-

ments for economically comparable products would likewise restrict the "competitiveness" of

SEFs and create "detrimental arbitrage between standardized swaps traded on a SEF and futures

contracts with the same terms and conditions traded on a DCM."  Similarly, the Adopting Re-

lease omitted any discussion of the Rule's effects on existing swap platforms (such as the swap

platforms available on the BLOOMBERG PROFESSIONAL® service), which must compete

with DCMs that are offering futures products with comparable characteristics and risk profiles,

but which require substantially less margin because they are subject to a 1-day rather than a 5-

day minimum liquidation period.

Efficiency.  The Commission failed to evaluate the implications for "efficiency" of caus-

ing DCMs to "futurize" swaps into economically equivalent "swap futures" for reasons that de-

pend on arbitrary distinctions drawn by the agency, rather than on the genuine economic merits

PROTECTED INFORMATION
TO BE REDACTED PURSUANT TO
PROTECTIVE ORDER

of the transaction. As the Commission recognized, unnecessarily high minimum liquidation requirements could "tie up more funds than are strictly necessary for risk management purposes." 76 Fed. Reg. at 69,418. The Commission nevertheless did not consider that it was imposing minimum liquidation times that would be excessive—and thus "inefficient"—for many commonly traded swaps. In addition, Rule 39.13(g)(2)(ii) will encourage DCMs to expend scarce resources to "futurize" swaps into "swap futures." Incentivizing companies to invest time and resources to shift from one set of economically equivalent products to another is the prototype of inefficiency. *See* Brown-Hruska Decl. ¶ 4; *accord* Gordon Tullock, The Welfare Costs of Tariffs, Monopolies, and Theft, 5 Western Econ. J. 224, 226 (1967).

In failing to include any discussion of the Rule's adverse effects on SEFs, the CFTC omitted, as well, any discussion of the implication to the public interest of hobbling these new trading venues that Congress sought to foster so as to increase public information on derivatives transactions. The Chairman of the Commission has said that SEFs "will fulfill Congress' intent to bring transparency and partial access to the swaps market" (Tseytlin Decl., Ex. C, at 10), yet the Adopting Release provided no assessment of the extent to which the Rule would curb these benefits. In particular, the Commission did not discuss how the Rule's driving of trading from swaps to financially equivalent "swap futures" will undermine the transparency protections that Congress intended to foster by requiring—through the Dodd-Frank Act—dissemination of pre-trade and post-trade information for swaps.

Finally, the Commission's terse discussion of Rule 39.13(g)(2)(ii)'s purported benefits prevented the Commission from adequately weighing the Rule's benefits against its costs. A principal benefit of the minimum liquidation periods, the Commission said, was that they "will provide legal certainty" to the marketplace by establishing fixed minimum periods for calculat-

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

ing margin. 76 Fed. Reg. at 69,419. However, the D.C. Circuit rejected the same faulty reason-

ing in vacating an SEC regulation in *American Equity Investment Life Insurance Co. v. SEC*, 613

F.3d 166 (D.C. Cir. 2010). In the cost-benefit analysis at issue there, the SEC had claimed that

the rule being imposed was beneficial because it "will bring about clarity in what has been an

uncertain area of the law." *Id.* at 177 (quotation omitted). In rejecting this "flawed" reasoning,

the court explained that "[t]he SEC cannot justify the adoption of a particular rule based solely

on the assertion that the existence of a rule provides greater clarity to an area that remained un-

clear in the absence of any rule. *Whatever* rule the SEC chose to adopt could equally be said to

make the previously unregulated market clearer than it would be without that adoption." *Id.* at

177-78 (emphasis added). So too here, *any* minimum liquidation periods would have increased

"legal clarity"—but that is not a reason to prefer the Commission's costly 5-day/1-day regime

over an approach that would have treated like products comparably. The Commission's failure

to establish *this* Rule's benefits is sufficient by itself to warrant vacatur and thus establishes

Plaintiff's likelihood of success on the merits. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468

F.3d 831, 840 (D.C. Cir. 2006) ("[W]here [an agency] has relied on multiple rationales (and has

not done so in the alternative), and we conclude that at least one of the rationales is deficient, we

will ordinarily vacate the order unless we are certain that FERC would have adopted it even ab-

sent the flawed rationale.").

*          *          *

The Commission's failure to adhere to the notice and comment requirements of the APA

and to perform the cost-benefit analysis required by the CEA has produced an arbitrary rule that

threatens the same harms to Plaintiff and the public that caused the Commission to abandon the

liquidation requirements of its initial, flawed proposal. For all of these reasons, Plaintiff is sub-

38

stantially likely to succeed on the merits of its challenge to this Rule.  At minimum, it has presented a serious legal question.

## B.     The Rule Will Impose Irreparable Harm On Plaintiff And The Public

If Rule 39.13(g)(2)(ii) remains in effect pending resolution of this dispute on the merits, Plaintiff and the public will be irreparably harmed.  Specifically, if the Rule is not stayed before June 10, 2013, the financial swaps market will be substantially harmed by the Commission's arbitrary imposition of heightened minimum liquidation requirements on financial swaps as opposed to economically equivalent "swap futures" contracts.  These harms will be irreversible because once business has shifted away from OTC swap trading platforms and SEFs, and toward DCMs, it is highly unlikely to return because of network effects and cost advantages inherent in trading platforms.  Staying the Rule will, by contrast, have no harmful effects on other interested parties or the public at large.  Rather, a halt to the Rule's arbitrary, disparate treatment of economically equivalent products will foster—as intended by Congress—transparency and increased competition in the derivatives market.

### 1.     The Rule Will Cause Substantial, Irreparable Harm To Plaintiff

Plaintiff can establish irreparable harm absent injunctive relief if it can demonstrate that the challenged action will cause it to incur the "loss of its customers and . . . possibly permanently damaged relationships with its customers."  *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001); *accord* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 2005) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999).  This showing can be made, among other ways, by demonstrating that customer relationships are "sticky," such that lost customers are unlikely to return even if the plaintiff succeeds on the merits at a later date.  *See TiVo*

PROTECTED INFORMATION
SUBMITTED PURSUANT TO
PROTECTIVE ORDER

*Inc. v. EchoStar Commc'ns Corp.*, 446 F. Supp. 2d 664, 669-70 (E.D. Tex. 2006), *aff'd in part, rev'd in part, remanded in part*, 516 F.3d 1290 (Fed. Cir. 2008); *Atlanta Attachment Co. v. Leggett & Platt Inc.*, No. 1:05-CV-1071-ODE, 2007 WL 5011980, at *7 (N.D. Ga. Feb. 23, 2007).

Judge Collyer's decision in *Nalco Co. v. EPA*, 786 F. Supp. 2d 177 (D.D.C. 2011), is instructive. There, the EPA prohibited a company from selling its "anti-slime" product to pulp and paper mills. In granting the company's motion for a preliminary injunction against the prohibition, Judge Collyer explained that the "cost and disruption to [the company's] customers' mills would be substantial [because] . . . once forced to change its anti-slime system from OxiPRO, a customer would be unlikely to incur voluntarily such cost and disruption a second time to return." *Id.* at 188. The company "has already, and will inevitably further, suffer the loss of '[l]ong-standing clients . . . [that may be] unwilling, or unable, to do business' with [it] hereafter if no injunction is issued." *Id.* (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008)) (ellipsis and some brackets in original).

In the present case, the loss of customers if Rule 39.12(g)(2)(ii) is not enjoined before June 10 will be permanent. Therefore, Plaintiff will suffer irreparable harm absent an injunction.

Rule 39.13(g)(2)(ii) will cause Bloomberg to lose customers because the Rule imposes substantially higher costs on market participants who trade in financial swaps than on those who trade in economically comparable "swap futures" contracts. As described in detail above (*see supra* at 20-21), these unequal costs will cause DCMs to "futurize" swaps into futures contracts and to shift their business to DCMs, the only platforms on which futures can be executed. This "futurization" has already begun (*see supra* at 18-19), and will accelerate dramatically when Phase 2 clearing begins on June 10. On that date, the market participants that are most sensitive to margin obligations, and which trade swaps with a potential volume of hundreds of billions of

PROTECTED INFORMATION SUBJECT TO PROTECTIVE ORDER

dollars per day, will become subject to the Rule's 5-day margin requirements for financial swaps. *See supra* at 8. These market participants will be under clear and powerful economic incentives to move their trading away from financial swaps toward swap futures that often are economically indistinguishable—except for the fact that when being cleared, they are subject to materially lower margin requirements. The irreparable harm that results from the regulatory arbitrage will be swift and irreversible. Brown-Hruska Decl. ¶ 7. This will have an immediate and direct effect on swap trading platforms, including those available on the BLOOMBERG PROFESSIONAL® service. Specifically, Bloomberg projects that if Rule 39.13(g)(2)(ii) is not enjoined before June 10, 2013, its BLOOMBERG PROFESSIONAL® service will lose ▮▮▮▮ of credit default swap trading volume and ▮▮▮▮ of interest rate swap trading volume. Macdonald Decl. ¶ 12.

These losses will be permanent, and will not be recouped if Plaintiff is ultimately successful on the merits. Trading on swap and futures platforms is "sticky" because of the network effects inherent in such platforms. Brown-Hruska Decl. ¶ 43. Specifically, an increased number of participants on a platform makes that platform more attractive to participants by increasing liquidity on the platform, whereas a decrease in the number of participants has the opposite effect. *Id.* Accordingly, once swap trading platforms that are currently available, such as those on the BLOOMBERG PROFESSIONAL® service, lose customers as a result of the "futurization" caused by Rule 39.13(g)(2)(ii), those losses will accelerate and, once beyond a tipping point, the platforms are unlikely to recapture those customers. Brown-Hruska Decl. ¶ 46; *accord* Macdonald Decl. ¶ 15.

Bloomberg will also be irreparably harmed in its investment to date to develop a SEF. Bloomberg has spent ▮▮▮▮ to create a SEF, which will become operational once the CFTC completes its SEF rulemaking. Macdonald Decl. ¶ 15. Yet, as more and more financial swaps

PROTECTED INFORMATION
SUBJECT TO PROTECTIVE ORDER PURSUANT TO
PROTECTIVE ORDER

are "futurized" as a result of "Phase 2" clearing that commences on June 10, the SEF model will be jeopardized, a risk that is compounded by the network effects associated with trading platforms. Brown-Hruska Decl. ¶ 46. The shift from financial swaps will imperil SEFs' ability to obtain a critical mass of participants because futures contracts cannot be traded on SEFs. And even if Rule 39.13(g)(2)(ii) is later vacated, the harm to SEFs—such as Bloomberg's planned SEF—will be irreparable because the liquidity that would have flourished on SEFs will have migrated, permanently, to DCMs. *Id.* Bloomberg thus projects that if Rule 39.13(g)(2)(ii) is not enjoined before June 10, 2013, Bloomberg will lose ███ of the trading volume it had expected on its SEF, which will produce losses of ████████████ *See supra* at 22.

This adverse impact on financial swaps will also cause irreparable harm to Plaintiff's business of gathering news and information for professional investors and the general public. The Dodd-Frank Act contains robust requirements that swap information be disseminated to the public, free of charge. *See supra* at 22. On the other hand, "swap futures" executed on DCMs are not subject to these transparency requirements. Accordingly, the market-wide shift away from swaps and toward "swap futures" caused by Rule 39.13(g)(2)(ii) will mean that there is less information available for Plaintiff to gather and provide to its customers  without burdensome fees and restrictions. *Id.*

Finally, Plaintiff will suffer irreparable harm because, even if Plaintiff were to prevail and win back its lost customers, the Commission could not be made to pay for the economic injury the Rule had caused Bloomberg while the case was pending. *See Feinerman*, 558 F. Supp. 2d at 51; *Nalco*, 786 F. Supp. 2d at 188. Although "[n]ormally the mere payment of money is not considered irreparable, . . . that is because money can usually be recovered from the person to whom it is paid." *Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in cham-

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

bers) (citation omitted).  But "[i]f expenditures cannot be recouped, the resulting loss may be ir-

reparable." *Id.*  That is the case here.

> ### 2.    The Rule Threatens The Public Interest, And Enjoining The Rule Would Not Substantially Injure Any Interested Parties

Rule 39.13(g)(2)(ii), if not enjoined, will imperil the viability of SEFs and thus severely

harm the public interest.

One of Congress's primary purposes in enacting the Dodd-Frank Act was to create a new

trading platform for swaps, to provide flexibility in execution methods and more consistent pre-

trade transparency than other derivative trading platforms, including DCMs.  Dodd-Frank seeks

to accomplish this, in part, by authorizing the Commission to regulate the "block trade thresh-

olds" that determine which swaps are subject to increased pre-trade transparency requirements.

Brown-Hruska Decl. ¶ 40.  By contrast, a DCM itself sets the block trade thresholds for futures

contracts listed on the DCM—these thresholds are often low, enabling market participants to

avoid pre-trade transparency requirements by executing the futures contract away from the ex-

change.  Congress also requires that *post-trade* swap data for most executed swap transactions be

disseminated to the public—immediately and free of charge.  *See supra* at 6.  The shift from

swaps to futures contracts caused by the Rule will jeopardize these transparency benefits.  *Id.*  It

will also reduce consumer choice, because DCMs—unlike SEFs—are affiliated with a single

DCO.  *Id.*

The CFTC has acknowledged the importance of SEFs to the Dodd-Frank Act, the public,

and to the vitality of the financial markets, including in this very rulemaking, where it discarded

its proposed venue-based approach to setting minimum liquidation times because of the adverse

effects on SEFs.  76 Fed. Reg. at 69,366-67.  As the Chairman of the Commission has explained,

"[t]he more transparent a marketplace is, the more liquid it is, the more competitive it is and the

PROTECTED INFORMATION
TO BE DISCLOSED ONLY PURSUANT TO
PROTECTIVE ORDER

lower the cost for hedgers, borrowers, and ultimately, their customers in the American public."
Tseytlin Decl., Ex. C, at 9.  But if Rule 39.13(g)(2)(ii) is allowed to take effect with respect to
Phase 2 clearing and begin its debilitating erosion of SEFs before the CFTC even finalizes its
SEF rules, that will deprive the public of the benefits of SEF trading that the Dodd-Frank Act
intended.  And given that the business decision to move from swaps to futures (which cannot be
traded on SEFs) is sticky, the loss in transparency will be permanent.

Rule 39.13(g)(2)(ii) would also harm the public by arbitrarily increasing the cost of en-
gaging in swap transactions, to the extent those transactions are not yet "futurized."  As the
Commission itself recognized in the Adopting Release, "a five-day minimum may prove to be
excessive and tie up more funds than are strictly necessary for risk management purposes."
76 Fed. Reg. at 69,418.  In fact, Rule 39.13(g)(2)(ii) *will* unquestionably prove "excessive," as
evidence in the Commission's own possession demonstrates.  *See supra* at 9.

Further, Rule 39.13(g)(2)(ii) will harm the public because it will drive market participants
to engage in economically inefficient regulatory arbitrage.  It is by definition inefficient when
erroneous legal restrictions cause economic actors to forgo transactions that they would deem
optimal in the absence of the mistaken governmental interference, to engage instead in economic
activity that is at most second-best.  This inefficiency harms both market participants and the
general public.  *Id.*

By contrast, enjoining the application of Rule 39.13(g)(2)(ii)'s discriminatory treatment
of financial swaps vis-à-vis futures contracts will cause no harm.  DCOs will continue to employ
"reasonable" and "prudent" margining policies (76 Fed. Reg. at 69,419) in the absence of the
Rule's arbitrary margin requirements on financial swaps.  DCOs are also subject to regulatory
oversight by the Commission.  7 U.S.C. § 7a-1.  Staying the Rule will also bring stability to the

PROTECTED INFORMATION
SUBJECT TO PROTECTIVE
ORDER

market and allow parties to choose their derivative products, execution venues, and clearing organizations based on their respective merits and sound risk management principles, rather than in pursuit of regulatory arbitrage.

## V.    CONCLUSION

For the foregoing reasons, the Court should promptly enter an order enjoining the Commission from implementing or enforcing Rule 39.13(g)(2)(ii), to the extent the Rule provides minimum liquidation times that are longer for financial swaps than for futures contracts.

Respectfully submitted,

Dated: May 2, 2013

| | |
|---|---|
| Mario M. Cuomo | Eugene Scalia, SBN 447524 |
| (admitted *pro hac vice*) | escalia@gibsondunn.com |
| mcuomo@willkie.com | Misha Tseytlin, SBN 991031 |
| Thomas H. Golden | (admitted *pro hac vice*) |
| (admitted *pro hac vice*) | mtseytlin@gibsondunn.com |
| tgolden@willkie.com | Alex Gesch, SBN 1012422 |
| WILLKIE FARR & GALLAGHER LLP | (admitted *pro hac vice*) |
| 787 Seventh Avenue | agesch@gibsondunn.com |
| New York, NY 10019-6099 | GIBSON, DUNN & CRUTCHER LLP |
| Telephone: 212.728.8260 | 1050 Connecticut Avenue, N.W. |
| Facsimile: 212.728.9260 | Washington, D.C. 20036 |
| | Telephone: 202.955.8500 |
| | Facsimile: 202.467.0539 |

*Counsel for Plaintiff*

PROTECTED INFORMATION
REDACTED PURSUANT TO
PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of May, 2013, I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Columbia using the Court's CM/ECF system.

I also certify that I caused the foregoing document to be served on the following counsel by CM/ECF:

Mary T. Connelly
U.S. Commodity Futures Trading Commission
Office of the General Counsel
1155 21st Street, N.W.
Washington, D.C. 20581

Robert A. Schwartz
U.S. Commodity Futures Trading Commission
Office of the General Counsel
1155 21st Street, N.W.
Washington, D.C. 20581

Leslie Randolph
U.S. Commodity Futures Trading Commission
Office of the General Counsel
1155 21st Street, N.W.
Washington, D.C. 20581

/s/ Eugene Scalia
Eugene Scalia