# Exhibit 4

*Bloomberg L.P.  v. CFTC*, Civil Action No. 13-523 (BAH)

Memorandum of Points and Authorities in Support of Plaintiff's Application for a Preliminary Injunction (May 2, 2013)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------------

BLOOMBERG L.P.,                                          :

                        Plaintiff,          :

             - against -            :           Civil Action No. 13-523 (BAH)

UNITED STATES COMMODITY FUTURES        :
TRADING COMMISSION,
                             :
                  Defendant.

---------------------------------------------------------------

## Declaration of Dr. Sharon Brown-Hruska

1.     I have been asked to consider the effects of the imposition of disparate minimum liquidation times for determination of initial margin requirements for futures and commodity-based swaps, on one hand, and financial swaps, on the other hand, as required in Rule §39.13(g)(2)(ii) (the "Rule") of the Commodity Futures Trading Commission ("Commission" or "CFTC").[1]  The Rule is an implementing provision of the Core Principles governing Derivatives Clearing Organizations ("DCOs") of the Commodity Exchange Act ("CEA") that has been effective since May 7, 2012, but its impact will not be fully felt by derivatives markets until the clearing of critical swaps contracts becomes mandatory for a large segment of the market on June 10, 2013 ("Phase 2 Clearing").[2]  The Rule sets a minimum liquidation time for calculation of margin for futures and commodity-based cleared swaps at one day, and the minimum

---

[1] Derivatives Clearing Organization General Provisions and Core Principles, 76 Fed. Reg. 69,334 (Nov. 8, 2011).

[2] Release PR6312-12, CFTC Approves Regulations to Phase in Compliance with Clearing Requirements of the Dodd-Frank Act, July 24, 2012.

liquidation time for all other cleared swaps, including financial swaps, at five days effectively mandating higher initial margins for financial swaps than for similar futures and commodity-based swaps.

2.     The Commission's discussion supporting the longer liquidation times for financial swaps stops well short of conducting an analysis of costs and benefits of the approach, and is based on the contention that financial swaps have greater risks and are less liquid than other contracts, including agricultural, energy, and metals markets.  The appropriate liquidation time for a product, however, is closely related to the liquidity of the product.  As a financial economist with over 25 years experience in the commodities and financial derivatives markets, I find that the premise of the Commission's Rule runs counter to the well-established fact that financial contracts are often more liquid than physical contracts, with less friction in payment and settlement processing.  Many cash-settled financial swaps exhibit higher levels of market liquidity than other asset types of comparable features, as measured by standard and well accepted measures used by economists in my field.  These products may warrant a shorter liquidation time than commodity-based contracts.

3.     The Rule as currently defined will raise costs for hedgers and other market participants in the derivatives markets and result in serious anti-competitive consequences, causing irreparable harm to derivatives markets, and in particular Swap Execution Facilities ("SEFs")  and other swaps trading platforms.  Many of these platforms have been operating for several years, while others have only recently emerged or will soon emerge to provide more transparent and accessible venues for swaps execution.  These platforms, like the one operated by Bloomberg, have brought increased transparency to the swaps markets, and have improved the liquidity of

these important hedging vehicles.  However, the promulgation of the minimum liquidation Rule for cleared swaps threatens to undermine that progress.

4.      The Rule creates a regulatory arbitrage that induces entities to reduce transactions on SEFs because of the increased capital costs associated with longer liquidation times, while increasing economically equivalent transactions on futures exchanges, or Designated Contract Markets ("DCMs").  DCMs affiliated with DCOs have already introduced swap futures contracts designed to exploit the arbitrage created by the Rule, marketing substantial margin savings for equivalent swap exposures.  Regulatory arbitrage is inefficient because it causes individuals and institutions to make decisions on the basis of regulatory and other legal considerations and not on the basis of the underlying economic characteristics of the regulated products.[3]   If the minimum liquidation Rule proceeds as currently constructed, entities will engage in regulatory arbitrage that is economically inefficient, diverting customers from their preferred contract, creating a windfall for DCMs and their affiliated DCOs, and irreparably harming SEFs and existing swap trading platforms.

5.      By contrast, if the Rule were modified to provide equal margining treatment for economically equivalent financial swaps and swap futures contracts, these inefficiencies would be avoided.  Under those circumstances, customers could choose their preferred product absent the artificial incentives created by the Rule's different treatment of economically equivalent products, thereby increasing efficiency.

6.      The CFTC's minimum liquidation rule for cleared swaps will cause irreparable harm to SEFs and swap trading platforms because the Rule, in conjunction with the onset of Phase 2 Clearing, will result in trading volume permanently migrating from swap trading platforms to

---

[3] For more on the costs of inefficient regulation, see Tullock, Gordon, "The Welfare Costs of Tariffs, Monopolies, and Theft," *Western Economic Journal*, 5:3 p. 226, (June 1967).

futures exchanges and the futurization of highly liquid swaps contracts. Because of the different minimum liquidation times created by the Rule for margin calculation, the cost to market participants of holding futures positions will be lower than the cost of holding economically equivalent cleared swap positions. Because of this cost difference for holding economically equivalent positions, market participants who "but for" the margin treatment would be indifferent to holding positions in futures or swaps will no longer be indifferent and will have a powerful incentive to execute and hold futures positions instead of cleared swap positions. If the CFTC's Rule makes it uneconomic to use swaps by facilitating the futurization of swaps platforms, existing swap trading platforms and soon-to-be-launched SEFs will be unable to compete with the incumbent futures exchanges in the markets for many critical financial instruments.

7.      The irreparable harm that results from the regulatory arbitrage will be swift and irreversible. The impending implementation of the financial swap clearing requirements subject to related margin requirements discussed above on June 10, referred to by the Commission as Phase 2 of the implementation of its rulemaking for swaps, will have an immediate effect on existing swap trading platforms and swaps market liquidity—and those effects may already be starting to occur. If the Rule is not enjoined before Phase 2 takes effect, the futurization of swaps will proceed unabated to the detriment of SEFs, existing swap trading platforms, and the swaps market participants.

8.      The disparate margin treatment for futures and swaps will have a detrimental effect on the quality of the swaps markets, resulting in reduced liquidity, increased risk, and greater costs for market users seeking to manage risk, take positions, and provide liquidity. The increased capital requirements associated with holding swaps will be substantially higher than

economically-equivalent futures, resulting in collateral requirements that exceed those necessary to ensure performance and risk management.  The longer liquidation time prescribed in the Rule will also damage price discovery and reduce efficiency and price transparency in the derivatives markets overall.

**Presentation of Credentials and Experience in Government, Academia, and Economics**

9.      I am a Vice President in the Securities and Finance Practice of National Economic Research Associates, Inc. ("NERA").  I am an expert in financial markets and their regulation, and I have taught, researched, and written studies on topics related to the matters at issue here, specifically the products, liquidity, and risks inherent in the exchange-traded futures and options markets, and that of the over-the-counter swaps markets.  I have also consulted and written on the costs and benefits of clearing, and the efficiencies inherent in the collateral, netting, and processing of the central counterparty clearing model.  I have also worked with entities to navigate the practical realities of liquidation and customer asset preservation in the event of default or market crisis.

10.     In addition to my work on these issues as a research economist and a scholar, I served as Commissioner (2002-2006) and Acting Chairman (2004-2005) of the CFTC.  While at the CFTC, I testified before Congress on the function and regulation of the U.S. futures and options markets. I also have addressed numerous governmental and financial organizations and associations. Thus, I have a record of service and experience in overseeing and ensuring the integrity of markets and market participants, and a deep appreciation for and understanding of the charge of federal agencies to promote the efficient function of markets while seeking to maintain financial integrity and minimize systemic risk.

11.     I have also held faculty posts in academia and have taught courses in financial markets, investments, derivatives, and risk management, and am currently a Visiting Professor of Finance in Tulane University's A.B. Freeman School of Business.  I have published various articles and reports on derivatives in both over-the-counter swaps and forward markets, and in exchange-traded markets.  I hold a PhD and MA in economics and a BA in economics and international studies from Virginia Polytechnic Institute and State University in Blacksburg, Virginia.  My Curriculum Vitae is attached as Appendix A.

**Many Financial Swaps Have Economically-Equivalent Risk Profile to Futures and are Comparable With Respect to Liquidity**

12.     As a basis for the adoption of the different time periods in calculating initial margin for cleared products, the Commission states that financial swaps have different risk characteristics that would justify the disparate treatment, and that this approach "is consistent with existing requirements that reflect the risk assessments DCOs have made over the course of their experience clearing these types of swaps."[4]

13.     The risk characteristics of many financial swaps are comparable to futures, and as a result of hedging and arbitrage between the two markets, many financial futures and swaps are economically-equivalent in their fundamental risk and pricing attributes.  For example, a plain-vanilla interest rate swap involves an exchange of the difference between fixed and floating interest payments at regular intervals (monthly, quarterly, semi-annually, etc.) and can be replicated by a series of futures contracts on Treasuries (as a proxy for a risk-free asset with no credit risk) and Eurodollars (incorporating credit risk and evolution of market factors

---

[4] 76 Fed. Reg. 69,334, 69,367.

representing the floating rate).  Because of arbitrage relationships between these instruments, which are similarly manifest in currency and other financial swaps, the market risk underlying these futures and swaps are fundamentally the same.

14.     Because the risks underlying swaps can, in many cases, be further decomposed into a portfolio of futures contracts, or structured to resemble futures, their pricing is closely linked.  As a result, the cash flows of swap contracts will be economically equivalent to a portfolio of futures contracts.  The payoffs of futures contracts are widely recognized to be one of the financial building blocks for pricing swap contracts.[5]  Swap futures are designed to take advantage of the pricing relationships inherent in derivatives with the same underlying product or benchmark.  Cleared swap futures are designed to, and do, replicate the risk profile of a swap. Therefore, as between a swap future and the corresponding swap, the risk profile of the swap cannot be an economic justification for requiring a longer liquidation period.

15.     In some instances, swap dealers have deliberately structured swap contracts to be virtually identical to a series, or strip, of futures contracts.  For example, The CME Group has offered a five-year LIBOR-based swap contract which is structured with 20 quarterly reset dates that correspond precisely with the expiration dates of a strip of 20 sequentially-expiring Eurodollar futures contracts (a LIBOR-based contract) on a quarterly expiration cycle over five years.   Because these swaps use the quarterly futures expiration cycle of the CME Group's International Monetary Market ("IMM") these swaps are referred to as "IMM-dated swaps."  In general, swaps with reset dates structured to correspond to futures expiration cycles are known as "lookalike" swaps because they mimic the cash flows and risk management characteristics of a

---

[5] See, for example, the building block approach to swap valuation used by Charles W. Smithson, Clifford W. Smith, Jr., and D. Sykes Wilford, *Managing Financial Risk*, Irwin Professional Publishing, Burr Ridge, IL, 1995.

strip of economically-equivalent futures contracts.  For lookalike swaps, futures prices are often used as the reference prices for calculating coupon payments at swap reset dates.[6]

16.     "Futurization" has come to be used to describe the structuring and listing of a futures contract, referred to as a swap future, which replicates the risk exposures of swaps contracts. Futures exchanges, like the CME Group, offer futures contracts designed to precisely resemble the payoff of certain types of swaps.  For example, the CME Group offers swap futures that are structured as a preassembled strip of futures contracts with the aggregate cash flows resembling swaps with the same size, tenor, and reset characteristics.[7]  The NASDAQ OMX Futures Exchange, Inc, has also offered swap futures in the form of its (now discontinued) IDEX USD 3 Month Interest Rate Swap Futures Contract.

17.     Congress in both the Commodity Futures Modernization Act of 2000 and the Dodd Frank Wall Street Reform and Consumer Protection Act encouraged the broader application of electronic execution and clearing to swaps markets.  However, the vertically-integrated futures model is characterized by monopoly in order flow as a result of the bundling of clearing and execution.[8]  This is because each DCM is connected to a single DCO (often the DCM's affiliate), which clears all futures contracts executed on that DCM.  This affiliation of a DCM with a particular DCO requires that any contract opened on a DCM must also be closed on the same DCM. Since contracts for longer maturities have often struggled to gain trading interest and liquidity, rolling or closing out a contract on a DCM introduces increased execution risks and

---

[6] The CFTC glossary defines a "lookalike swap" as follows: "Lookalike Swap": An over-the-counter swap that is cash settled based on the settlement price of a similar exchange-traded futures contract on a specified trading day." See: http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_l#lookalikeswap

[7] See: http://www.danielstrading.com/resources/education/exchange-publications/cme/swap-futures.pdf

[8] Falvey, J. M., and A. N. Kleit. "Commodity Exchanges and Antitrust," *Berkeley Business Law Journal* 4, no. 1: pp. 123–176 (2007).

costs, without any concomitant risk reduction.  Swaps, on the other hand, have the terms fixed in the contract and eliminate the uncertainty and the transactions costs associated with DCM execution.

18.     The clearing requirement of the Dodd-Frank Wall Street Consumer Protection Act seeks to reduce risk associated with swaps, while simultaneously resolving the anticompetitive concerns associated with vertically integrated model where a DCM with an affiliated DCO is able to capture open interest.  To enhance competition and encourage liquidity, clearable swaps can be executed on any trading platform, SEF or DCM.  Additionally, swaps trading platforms, including SEFs, will likely connect to multiple DCOs, which will clear swaps at the DCO that has been requested by the swap counterparties.  Swap futures, on the other hand, can only be executed on a DCM and cleared through its affiliate DCO.

19.     While there are valid economic reasons for central clearing by DCOs, such as the potential for reduced collateral requirements from portfolio margining, the benefits of clearing should not be held captive by the DCO and its DCM affiliate.  To the extent there is migration to the futures market, it should be the result of market forces, not because regulation has tipped the scales in favor of vertically integrated futures exchanges.  The Rule's disparate liquidation times defeat the beneficial effects of competition, encouraging exchanges to simply change the name of an economically equivalent swap to a future in order to benefit from the regulatory arbitrage created by the Rule.


**Clearable Financial Swaps Exhibit High Levels of Liquidity, and Liquidation Times Are Consistent with Economically-Equivalent Futures**

20.     When making comparisons with regard to the liquidity of similar financial instruments like futures and swaps, it is important to recognize that the equivalent risks underlying these

instruments are a source of liquidity for both futures and swaps.  The growth and success of the

Eurodollar and currency futures and options contracts are in part due to their use by swaps

market participants to hedge incremental risks of their swaps positions.  A source of swaps

liquidity, on the other hand, has been the ease with which risk could be laid off in the futures

markets.

21.     Futures contracts are standardized with regard to contract size, maturity, and other

features, and this facilitates liquidity by channeling trading activity into specific contracts.  As a

result, liquidity as measured by volume and bid-ask spread is concentrated in the contracts for

near-month (prompt) maturity.[9]  However, as one goes further out the maturity spectrum, the

number of trades drops off considerably and many listed futures contracts do not trade at all.

Further, in a review of the historical experience of futures contracts, economists at the

Commission have documented that the majority of interest rate futures contracts introduced over

the period studied did not attract the liquidity necessary to remain listed, with 27% failing to

attract volumes within 3 years of introduction.[10]

22.     Because swaps have historically been tailored to the risk of individual market users'

needs, liquidity is distributed across the spectrum.  For contracts with more tailored features or

that are large in size, dealers and voice brokers have performed a market making function by

providing quotes and facilitating transactions.  For less liquid instruments, existing swap

platforms (like the soon-to-be-launched SEFs) have developed request-for-quote ("RFQ") and

voice trading protocols to allow dealers to make markets where there is not enough continuous

---

[9] Cost and Benefits of Mandatory Electronic Execution Requirements for Interest Rate Products, ISDA Discussion
   Paper Series, p. 15, Nov., 2011.

[10] See Grant Cavanaugh and Michael Penick, "The Lifecycle of Derivatives Contracts," Working Paper, Commodity
   Futures Trading Commission, Nov. 19, 2012.

demand on both sides of the market to support a central limit order book required in the DCM

model.  For these large size or bespoke instruments, the RFQ and voice-trading protocols models

provide a market structure that makes positions easier to liquidate than on a DCM.

23.     Swaps have also increased in the degree of standardized features, and this has contributed

favorably to their liquidity as measured by transaction volumes (referred to as "turnover").

Many contracts, like the plain-vanilla interest rate swap contracts, foreign currency contracts,

and on-the-run credit default swap ("CDS") indices, exhibit high levels of liquidity.  Indeed,

publicly available data demonstrate that certain commonly traded interest rate swaps can be

executed in the market almost immediately.  Likewise, certain "on-the-run" credit default index

swaps are very liquid, and substantial positions in them can be executed easily.

24.     Depository Trust & Clearing Corporation's ("DTCC's") Global Trade Repository

("GTR") has aggregated interest rate derivatives data from 16 major dealers ("G16").[11] GTR data

includes outstanding contract volumes and aggregate gross notionals of the positions outstanding.

As per the report released for the week ending April 19, 2013, the notional outstanding for all

interest rate derivatives was over $536 trillion, of which plain-vanilla interest rate swaps

accounted for over half the outstanding notional at $295 trillion. In terms of outstanding contract

volume, there are over 4.7 million contracts for all outstanding interest rate derivatives and, as

with the notional amounts outstanding, the number of contracts outstanding are also primarily in

the plain-vanilla swaps category at over 3.5 million contracts. The notional amounts and the

---

[11] The 16 major dealers of OTC derivatives, commonly referred to as the G16, account for the bulk of OTC
derivatives market activity. The dealer list includes Barclays Capital, BNP Paribas, Bank of America – Merrill
Lynch, Citibank, Credit Suisse, Deutsche Bank AG, Goldman Sachs & Co, HSBC Group, J.P. Morgan, Morgan
Stanley, Nomura Securities, Royal Bank of Canada, The Royal Bank of Scotland Group, Societe Generale, UBS
AG, and Wells Fargo Bank, N.A.

outstanding contract volumes include USD and other currencies[12] as well as cleared and uncleared OTC interest rate derivatives.  Table 1 below includes the interest rate derivative notional and contracts outstanding by product type and customer type.  The customer types are broken out in three categories: Dealer vs. Dealer, Dealer vs. Non-Dealer, and Dealer vs. Central Clearing Counterparty ("CCP").

**Table 1: Outstanding Interest Rate Trades by Customer Type and Product Type as of the Week Ending April 19, 2013 (Notional in Billions of USD)[1,2]**

| Product/Sub Product | Dealer vs Dealer | | Dealer vs Non-Dealer | | Dealer vs CCP | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Gross Notional | Contracts | Gross Notional | Contracts | Gross Notional | Contracts | Gross Notional | Contracts |
| | | | | | | | (8) = | (9) = |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (2)+ (4)+(6) | (3)+ (5)+(7) |
| Swap | 29,140 | 431,617 | 71,184 | 1,254,827 | 195,074 | 1,877,616 | 295,399 | 3,564,060 |
| OIS | 7,854 | 32,201 | 13,848 | 42,551 | 36,060 | 40,180 | 57,761 | 114,932 |
| Basis Swap | 7,111 | 42,126 | 8,097 | 49,049 | 12,973 | 40,795 | 28,181 | 131,970 |
| Other Swaps[3] | 9,980 | 145,490 | 13,963 | 224,857 | | | 23,942 | 370,347 |
| Swap Total | 54,085 | 651,434 | 107,092 | 1,571,284 | 244,107 | 1,958,591 | 405,284 | 4,181,309 |
| | | | | | | | | |
| FRA | 7,060 | 20,953 | 11,732 | 34,006 | 71,698 | 222,487 | 90,490 | 277,446 |
| Forward Total | 7,060 | 20,953 | 11,732 | 34,006 | 71,698 | 222,487 | 90,490 | 277,446 |
| | | | | | | | | |
| Swaption | 15,557 | 91,547 | 13,175 | 133,080 | | | 28,732 | 224,627 |
| Swaption Total | 15,557 | 91,547 | 13,175 | 133,080 | | | 28,732 | 224,627 |
| | | | | | | | | |
| Cap Floor | 4,098 | 14,638 | 6,103 | 48,851 | | | 10,202 | 63,489 |
| Option Exotic | 606 | 2,412 | 797 | 8,969 | | | 1,403 | 11,381 |
| Debt Option | 16 | 138 | 760 | 2,133 | | | 775 | 2,271 |
| Option Total | 4,720 | 17,188 | 7,660 | 59,953 | | | 12,380 | 77,141 |
| Grand Total | 81,423 | 781,122 | 139,659 | 1,798,323 | 315,805 | 2,181,078 | 536,886 | 4,760,523 |

**Notes:**
1) DTCC Global Trade Repository Interest Rate Swap Data.
2) DTCC took into account double counting and reported only one-side of the trade, if both counterparties submitted a given trade.
3) Other Swaps category includes Cross Currency Swaps, Swap Exotic, Inflation Swaps, Callable Swaps, Cross Currency Swap Exotics.

25.     Table 1 above shows that over half of the notional and contracts that are outstanding are with CCPs. For interest rate swaps, $195 trillion of the total $295 trillion outstanding is currently with a CCP.  Table 2 below shows a snapshot of daily volume as of the close of business on April 26, 2013, that was cleared at SwapClear. The volume of U.S. dollar ("USD") interest rate

---

[12] Other currencies have been converted to USD at the prevalent exchange rate.

swaps cleared on April 26, 2013 was $167 billion whereas the total for all currencies (including USD) was $875 billion.  If we take into account other interest rate derivative products in addition to interest rate swaps, the notional value cleared on April 26, 2013 jumps to $241 billion for USD products and over $1.5 trillion for all currency products (including USD).  This shows that a substantial amount of the market is being cleared.

**Table 2: Daily Notional Volume by Product Totals as of COB April 26, 2013[1]**

|  | Notional (USD Billions) | |
| --- | --- | --- |
| **Product** | **USD Trades** | **All Currencies (USD Equivalent)** |
| **(1)** | **(2)** | **(3)** |
| Interest Rate Swaps | 167 | 875 |
| Overnight Index Swaps | 17 | 450 |
| Basis Swaps | 26 | 30 |
| Zeroes | 0.04 | 0.9 |
| FRAs | 31 | 233 |
| **Total** | 241 | 1,589 |

**Notes:**
1) Data obtained from LCHClearnet.com.

26.     Cleared interest rate swaps and cleared credit default index swaps have a significant amount of open interest and this open interest is expected to increase as Phase 2 clearing commences and more products are designated for mandatory clearing.  For example, interest rate swaps that are cleared on LCH.Clearnet's DCO display an average daily open interest amount of over $650 billion dollars. [13]  Further, credit default index swaps that are cleared on CME Group's DCO account have an average daily open interest amount of over $46 billion.[14]  It can be assumed that the open interest for all interest rate swaps and credit default index swaps is larger

---

[13] *See* http://www.lchclearnet.com/swaps/volumes/daily_volumes.asp

[14] *See* http://www.cmegroup.com/trading/cds/?tabs=21#data

than these numbers, as the numbers do not reflect open interest at other DCOs that clear such products and open interest from identical products that are exempt from clearing requirements.

27.     Bid-ask spreads can provide a measure of the liquidity of financial securities and contracts.  We analyze some of that data from the quotes available on Bloomberg for some key interest rate and CDS products. Table 3 below lists the bids, asks, and the spreads for plain-vanilla fixed-float swaps with maturities of 2-, 5-, 10-, and 30-years from April 1, 2013 through April 25, 2013. The floating rate for these swaps is the three-month USD LIBOR. The fixed rate bids and asks are for taking on the pay-fixed side of the plain-vanilla fixed-float swaps.

**Table 3: Bloomberg CBBT Interest Rate Swap Pricing Composite Bids and Asks[1]**

| Date | 2-Year Swap | | | 5-Year Swap | | | 10-Year Swap | | | 30-Year Swap | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ask | Bid | Spread | Ask | Bid | Spread | Ask | Bid | Spread | Ask | Bid | Spread |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) |
| | -------%------- | | bps | -------%------- | | bps | -------%------- | | bps | -------%------- | | bps |
| 04/01/13 | 0.407 | 0.411 | 0.40 | 0.936 | 0.940 | 0.40 | 1.990 | 1.993 | 0.30 | 2.971 | 2.974 | 0.30 |
| 04/02/13 | 0.404 | 0.408 | 0.40 | 0.950 | 0.954 | 0.40 | 2.008 | 2.012 | 0.40 | 2.983 | 2.986 | 0.30 |
| 04/03/13 | 0.394 | 0.398 | 0.40 | 0.925 | 0.928 | 0.30 | 1.978 | 1.982 | 0.40 | 2.955 | 2.958 | 0.30 |
| 04/04/13 | 0.384 | 0.388 | 0.40 | 0.897 | 0.901 | 0.40 | 1.938 | 1.941 | 0.30 | 2.910 | 2.913 | 0.30 |
| 04/05/13 | 0.371 | 0.375 | 0.40 | 0.865 | 0.868 | 0.30 | 1.866 | 1.869 | 0.30 | 2.773 | 2.777 | 0.40 |
| 04/08/13 | 0.376 | 0.379 | 0.30 | 0.872 | 0.876 | 0.40 | 1.893 | 1.896 | 0.30 | 2.812 | 2.816 | 0.40 |
| 04/09/13 | 0.374 | 0.378 | 0.40 | 0.878 | 0.881 | 0.30 | 1.908 | 1.912 | 0.40 | 2.855 | 2.860 | 0.50 |
| 04/10/13 | 0.376 | 0.380 | 0.40 | 0.896 | 0.900 | 0.40 | 1.952 | 1.955 | 0.30 | 2.917 | 2.921 | 0.40 |
| 04/11/13 | 0.368 | 0.372 | 0.40 | 0.896 | 0.899 | 0.30 | 1.949 | 1.952 | 0.30 | 2.921 | 2.925 | 0.40 |
| 04/12/13 | 0.371 | 0.375 | 0.40 | 0.871 | 0.874 | 0.30 | 1.907 | 1.911 | 0.40 | 2.873 | 2.877 | 0.40 |
| 04/15/13 | 0.363 | 0.367 | 0.40 | 0.857 | 0.861 | 0.40 | 1.882 | 1.885 | 0.30 | 2.835 | 2.838 | 0.30 |
| 04/16/13 | 0.367 | 0.371 | 0.40 | 0.870 | 0.874 | 0.40 | 1.882 | 1.885 | 0.30 | 2.819 | 2.824 | 0.50 |
| 04/17/13 | 0.363 | 0.367 | 0.40 | 0.858 | 0.861 | 0.30 | 1.865 | 1.869 | 0.40 | 2.798 | 2.802 | 0.40 |
| 04/18/13 | 0.364 | 0.368 | 0.40 | 0.859 | 0.863 | 0.40 | 1.854 | 1.858 | 0.40 | 2.785 | 2.788 | 0.30 |
| 04/19/13 | 0.368 | 0.371 | 0.30 | 0.870 | 0.873 | 0.30 | 1.864 | 1.867 | 0.30 | 2.792 | 2.795 | 0.30 |
| 04/22/13 | 0.358 | 0.362 | 0.40 | 0.858 | 0.861 | 0.30 | 1.861 | 1.864 | 0.30 | 2.792 | 2.795 | 0.30 |
| 04/23/13 | 0.357 | 0.361 | 0.40 | 0.862 | 0.865 | 0.30 | 1.866 | 1.870 | 0.40 | 2.809 | 2.813 | 0.40 |
| 04/24/13 | 0.358 | 0.361 | 0.30 | 0.864 | 0.867 | 0.30 | 1.882 | 1.886 | 0.40 | 2.830 | 2.834 | 0.40 |
| 04/25/13 | 0.363 | 0.367 | 0.40 | 0.872 | 0.876 | 0.40 | 1.891 | 1.895 | 0.40 | 2.846 | 2.850 | 0.40 |
| **Average (bps):** | | | **0.38** | | | **0.35** | | | **0.35** | | | **0.37** |

**Notes and Sources:**
Data from Bloomberg, LP.

[1] The Bloomberg CBBT Composite is a trimmed, weighted average of dealer-contributed pricing on vanilla interest rate swaps. We use intraday values provided by Bloomberg as a conservative sample of observed intraday bid-ask spreads available in the market.

28.     The average spread between the bid and the ask for the period selected is less than 0.40 basis points for all four swap maturities (the average ranges from 0.35 basis points to 0.38 basis points).[15]  The measure used for calculating the spreads is a conservative one, as we have relied upon the composite[16] bids and asks as opposed to the best bid and the best ask at a given point in time. Taking the best bid and the best ask results in an even tighter spreads for the swaps. For the same time period in April 2013, taking the best bids and best asks reduces the average spreads down to less than 0.30 basis points for all four maturities.

29.     The spreads calculated for the interest rate swaps are comparable or better than the ones observed for the CME Eurodollar futures contracts.  In March 2013 for 500-lot orders, bid-ask spread was recorded at approximately one-half of one basis point or 0.50 basis points, a level which corresponds to the CME's Eurodollar future's minimum price move, or the "tick level."[17]

30.     We also reviewed the quotes available on Bloomberg for some key CDS indices. The bid-ask spreads calculated in Table 4 below are comparable to the tight spreads observed in the interest rate market.  Table 4 below lists the composite bids and asks for various CDS indices as well as the corresponding spreads over April 2, 2013 through April 25, 2013. Composite bids and asks have been used as a conservative measure as opposed to the best bid and the best ask. The swaps that we have selected for the analysis are those based on on-the-run[18] 5-Year Markit

---

[15] One basis point is equal to 1/100 of a percent or 0.01%. Therefore, 0.40 basis point is equal to 0.004%.

[16] The Bloomberg CBBT Composite is a trimmed, weighted average of dealer-contributed pricing on vanilla interest rate swaps.

[17] CME Group Liquidity Monitor 1st Quarter 2013 (available at http://www.cmegroup.com/education/featured-reports/liquidity-monitor.html).  For the Eurodollar futures the tick size is one-half of one basis point (0.005 = $12.50 per contract) except for the nearest expiring contract month where the tick size is one-quarter of one basis point (0.0025 = $6.25 per contract).

[18] Markit iTraxx and CDX indices 'roll' every six months when a new series of the index is created with updated constituents. The previous series continues trading although liquidity is concentrated on the new series. The new series is referred to as being on-the-run, with previous series referred to as being off-the-run. (Markit Credit Derivatives Glossary, March 2009).

iTraxx index, 5-Year Markit CDX Investment Grade index, and 5-Year Markit CDX High-Yield index.

**Table 4: Bloomberg CBBT Credit Default Swap Pricing Composite Bids and Asks ("bps")[1]**

| Date | iTraxx 5Y CDS Index | | | Markit 5Y Investment-Grade CDS Index | | | Markit 5Y High-Yield CDS Index | | |
|------|------|------|--------|------|------|--------|------|------|--------|
| | Ask | Bid | Spread | Ask | Bid | Spread | Ask | Bid | Spread |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
| 04/02/13 | 120.76 | 121.24 | 0.48 | 87.68 | 88.06 | 0.38 | 103.30 | 103.42 | 0.11 |
| 04/03/13 | 120.08 | 120.57 | 0.48 | 88.03 | 88.42 | 0.38 | 103.24 | 103.33 | 0.09 |
| 04/04/13 | 120.19 | 120.67 | 0.48 | 87.83 | 88.21 | 0.39 | 103.18 | 103.29 | 0.11 |
| 04/05/13 | 117.70 | 118.18 | 0.48 | 88.10 | 88.47 | 0.37 | 102.96 | 103.07 | 0.11 |
| 04/08/13 | 116.59 | 117.07 | 0.48 | 85.84 | 86.21 | 0.37 | 103.45 | 103.54 | 0.09 |
| 04/09/13 | 114.95 | 115.44 | 0.48 | 85.64 | 86.00 | 0.36 | 103.80 | 103.90 | 0.10 |
| 04/10/13 | 109.69 | 110.17 | 0.48 | 81.57 | 81.95 | 0.38 | 104.19 | 104.28 | 0.10 |
| 04/11/13 | 107.93 | 108.41 | 0.48 | 81.61 | 81.97 | 0.37 | 104.36 | 104.46 | 0.10 |
| 04/12/13 | 110.93 | 111.41 | 0.48 | 82.74 | 83.10 | 0.37 | 104.30 | 104.39 | 0.10 |
| 04/15/13 | 111.05 | 111.54 | 0.48 | 82.32 | 82.69 | 0.37 | 104.33 | 104.43 | 0.10 |
| 04/16/13 | 111.60 | 112.08 | 0.48 | 83.85 | 84.22 | 0.37 | 104.08 | 104.18 | 0.10 |
| 04/17/13 | 113.44 | 113.92 | 0.48 | 84.12 | 84.50 | 0.38 | 104.03 | 104.13 | 0.10 |
| 04/18/13 | 113.25 | 113.75 | 0.49 | 83.89 | 84.26 | 0.37 | 103.97 | 104.07 | 0.10 |
| 04/19/13 | 113.63 | 114.12 | 0.48 | 84.28 | 84.64 | 0.37 | 103.94 | 104.03 | 0.10 |
| 04/22/13 | 110.88 | 111.38 | 0.50 | 82.55 | 82.92 | 0.37 | 104.23 | 104.34 | 0.12 |
| 04/23/13 | 107.32 | 107.81 | 0.48 | 80.85 | 81.24 | 0.39 | 104.63 | 104.74 | 0.11 |
| 04/24/13 | 105.95 | 106.44 | 0.48 | 80.41 | 80.78 | 0.37 | 104.69 | 104.79 | 0.10 |
| 04/25/13 | 104.97 | 105.45 | 0.48 | 77.75 | 78.12 | 0.37 | 105.28 | 105.38 | 0.10 |
| Average (bps): | | | 0.48 | | | 0.37 | | | 0.10 |

**Notes and Sources:**

Data from Bloomberg, LP.

[1] The Bloomberg CBBT Composite is a trimmed, weighted average of dealer-contributed pricing on credit default indices. We use intraday values provided by Bloomberg as a conservative sample of observed intraday bid-ask spreads available in the market.

31.    The average bid-ask spreads based on the composite quotes for the CDS indices over the April 2013 dates selected range from 0.10 basis points for the Markit 5-Year CDX High-Yield index to 0.48 basis points for the Markit iTraxx 5-Year index.  These data demonstrate that

defaulted positions in these products could be liquidated easily, often in a matter of hours, and far more quickly than the Rule's 5-day mandatory minimum.

**The Minimum Liquidation Time for Swaps in Inconsistent with the Risk Profile of the Instruments**

32.     In the energy and other exempt commercial markets that successfully introduced clearing for swaps in the early 2000s, the Commission supported the efforts of the DCOs in order to facilitate better functioning of the markets, but did not impose differential margin requirements on the DCOs.  The energy industry at that time was struggling to regain confidence in the aftermath of the bankruptcy of major derivatives dealer Enron and other significant credit and liquidity concerns.  Instead of discouraging the application of clearing to the OTC energy swaps markets through mandating a margin policy, the Commission required that the DCO and clearing members should maintain additional capital.  DCOs then set margin at levels commensurate with the closely-related contracts in the futures markets, using the SPAN system for portfolio margining.[19]

33.     The current scenario for financial swaps, including interest rate, foreign exchange, and many credit default swaps, is much different than that of the energy markets of 10 years ago. These contracts are available to market users through various sources, from screen-based direct access platforms being offered by Bloomberg, request-for-quote models, open trading models that seek to incorporate features of a central limit order book, and many new models that seek to build liquidity in the swaps markets.  Competition is robust in the credit, interest rate, and foreign exchange swaps and customers can not only access these sources, but can view a

---

[19] See U.S. Commodity Futures Trading Commission Order Pursuant to Section 4d of the Commodity Exchange Act, Treatment of Funds Held in Connection with the Clearing of Over-the-Counter Products by the New York Mercantile Exchange, Feb. 10, 2004.

substantial amount of information on market prices, both pre-trade quotations and actual executed transactions.

34.     In the event of a default of a swaps counterparty, DCOs have developed auction mechanisms that enable prompt liquidation of the open positions.   Also, in order to ensure that they have adequate collateral in the event a position constitutes a large proportion of open interest, DCO's make adjustments to margin requirements to increase collateral levels to ensure coverage of significant price moves that may occur during the liquidation period.  In the case of a liquidation, LCH.Clearnet and ICE currently have additional "concentration provisions" that they apply whenever a participant's position exceeds certain pre-set thresholds.[20]  This additional collateral helps address liquidity concerns (and protection of the clearing house) raised by large positions without imposing undue costs on those who have less concentrated exposure.

35.     The setting of an arbitrarily longer liquidation time for financial swaps essentially takes the determination of the appropriate levels based on risk assessments away from the DCOs and their clearing members.  While recognizing that DCOs have expertise in assessing risk and determination of liquidation times, and that this expertise will increase with experience as more swaps are cleared and become even more liquid, the imposition of a strict minimum standard contradicts these facts.  By doing no independent analysis and simply setting arbitrary minimum liquidation times, the Commission reduces incentives of DCOs to make efforts to test the risk levels and characteristics consistent with a robust risk management program.  By contrast, providing the same minimum liquidation time for economically equivalent cleared financial swaps and swap futures contracts would allow DCOs to engage in a robust risk management

---

[20] *See* LCH.Clearnet, CDSClear, CDS Clearing Procedures, Section 2 – Margin and Price Alignment, pp. 1, 9. (May 7, 2012). Available at: http://www.lchclearnet.com/images/cdsclearprocedures2_tcm6-61334.pdf. ICE Clear Credit, CDS Client Clearing Overview, p. 11. (April 2013). Available at: https://www.theice.com/publicdocs/clear_credit/ICE_Clear_Credit_Client_Clearing_Overview.pdf

program based on the economic characteristics of the derivative product, rather than the label applied by DCMs in response to the Commission's Rule.  The past practice of DCOs demonstrates their ability in safely managing the risks posed by clearing derivative products, and an equal margining treatment for economically equivalent products would further, rather than discourage, that goal.


**The Enactment of the Final Rule Will Increase the Cost of Using Swaps as a Risk Management Tool, Adversely Affecting Hedgers and Other Market Participants Who Rely on them for Risk Management**

36.     The Commission's rulemaking fails to recognize the substantial incentives that incumbent DCMs affiliated with DCOs have for converting financial swaps into swap futures to increase their revenues.  The primary source of revenue for DCMs is execution fees for transactions conducted on their respective platforms.  In addition, the leading DCMs have affiliated with DCOs that clear all futures contracts executed on the DCM (as well, in some cases, as swap contracts executed on other platforms).  The expected revenues from executing and clearing a large notional trade are likely to be greater for swap futures.  Since swap futures expire and deliver into swap contracts, market users would be required to roll (sell as maturity approaches, and buy a new swap futures contract with a new maturity) in order to avoid posting additional margin to support the position as required by the rule.

37.     Since clearing fees are often assessed on the number of transactions, DCOs stand to gain from the futurization of swaps caused by regulatory arbitrage.  Since the CME and ICE are organized as vertically integrated exchanges, with execution and clearing operating as affiliates under the same structure, their expected revenues from the futurization of swaps are doubled as

they are set to enjoy revenues from both levying more transaction execution fees on their DCMs and more clearing fees on their DCOs.

38.     DCMs have noted that a shorter margin liquidation period for interest rate swap futures would enable a 50% reduction in margin compared to margin for cleared interest rate swaps.[21] Because of the higher cost associated with posting margin on financial swaps positions executed on SEFs and other swap trading platforms and cleared at DCOs, market users have an incentive to shift their business to futures and futures exchanges.

39.     The substantially increased cost of using swaps brought on by the Commission's determination to require greater margin will have a detrimental effect on the development of new swaps platforms for the trading of swaps, such as SEFs.  Market participants likely to be affected by Phase 2 clearing, including managed funds and other buy-side participants, are highly sensitive to collateral costs, and this will impact their willingness to use these platforms. By increasing the cost of using cleared swaps, the Rule discourages the progress of the development of SEFs by making it uneconomic for customers to use swaps, resulting in lower investment into swaps platforms and halting the process of innovation in the SEFs and existing swaps platforms that have been developed to trade swaps.  This in turn will lead to lower transparency in the swaps markets, compromising price discovery and the increases in market efficiency enabled by it.

40.     The move toward futurization also will negatively affect market integrity and transparency. Some have suggested that firms who would have been required to register and satisfy business conduct standards as a consequence of their swaps usage will be able to avoid registration by moving into futures.  Exchanges have also pointed out in their marketing effort

---

[21] *Deliverable Interest Rate Swap Futures*, CME Group Presentation, (Nov. 13, 2012).

for swap futures that using futures will allow participants to avoid registration and the requirements for reporting of swaps to swap data repositories (SDRs).   For example, the Eris Exchange web site lists as one of the advantages to users of its swap futures product is that users face "No swaps regulatory overhead or swaps reporting."[22]   Swaps transactions executed on SEFs will be subject to pre-trade transparency requirements, except where the value of the swap exceeds a certain "block trade" threshold, which will be set by the CFTC and is expected to be sufficiently high to ensure significant transparency for all but the largest block trades.   These requirements for greater pre-trade transparency though the availability of quotations as envisioned by the Commission in its SEF proposals can also be circumvented by using futures, because DCMs set their own block trade thresholds and regularly set those thresholds at lower levels.   In addition, post-trade transparency is greater on a SEF or swaps trading platform.   The lower block sizes for futures contracts, as has been implemented by exchanges in the futurization of swaps (and associated longer delays in reporting) will lead to less information available to the marketplace in real time.   Furthermore, DCMs charge fees to access timely post-trade futures data, and charge for historical data as well.   As a result, the move also thwarts the aims of Congress in the Dodd-Frank Act to increase transparency and promote more efficient price discovery.

**The Enactment of the Final Rule Will Cause Irreparable Harm to Swaps and Entities Offering OTC Platforms Trading Swaps**

41.     Because of the "winner-take-all" nature of competition between trading venues, once trading volume migrates to futures exchanges from swap trading platforms following the June 10

---

[22] http://www.erisfutures.com/summary

Phase 2 implementation date, the volume itself will create a persistent cost advantage for futures exchanges. This cost advantage will occur because the trading volume migrating to futures exchanges adds to futures market liquidity and thereby reduces trading costs for those who trade there. This means that swap trading platforms will be irreparably harmed, because once trading volume has migrated to competing venues, the shift in volume becomes permanent. Trading volume is likely to remain at futures exchanges because the cost advantage at these venues will persist even if the margin rules are eventually changed. Moreover, this persistent cost advantage, caused by the volume shift triggered by CFTC margin rules for cleared swaps, will cause irreparable harm to soon-to-be-launched SEFs attempting to compete for trading volume with futures venues.

42.     The irreparable harm that will result from the unlevel playing field created by the Rule is likely to be substantial. As per the compliance schedule approved by the CFTC, Phase 2 requires market participants designated as "Category 2 entities," to begin clearing all new swaps entered into on or after June 10, 2013.[23] Category 2 entities include banking institutions (non-dealer), commodity pools and private funds (other than active i.e. those with less than 200 swap trades per month). These Category 2 entities are likely to be more sensitive than currently-clearing Category 1 entities to differences in margin obligations between swap platforms and futures exchanges. This is because Category 2 entities typically keep positions open longer than Category 1 entities and must maintain margin throughout the holding period. Category 1 entities, which include swap dealers, typically offset their swap positions promptly, mitigating their margin obligations. In interest rate swaps, we can expect a significant proportion of those swaps

---

[23] Release PR6312-12 CFTC Approves Regulations to Phase in Compliance with Clearing Requirements of the Dodd-Frank Act, July 24, 2012.

that are currently cleared (IRS swaps, OIS, and Basis swaps), mostly by swap dealers,  will now have to be required to be cleared under Phase 2 by Category 2 entities as well. We estimate this additional cleared volume will increase the current volume of cleared swaps by about one-third, or $530 billion daily. [24]   In credit default swaps, we use the same logic to estimate that additional CDS volumes required to be cleared under Phase 2 will add $16.8 billion daily to the current volumes already being cleared. Given that the majority of energy swap trading volume was futurized, we predict that a significant percentage of IRS and CDS trading volume is likely to be futurized also.

43.    The "winner-take-all" nature of competition between trading venues occurs because of network effects in the trading of financial products.[25]  The role of network effects in the markets hosted by financial exchanges has been studied extensively in the academic finance literature.[26] Although several trading venues may offer similar products in direct competition with one another, typically only one (if any) venue succeeds in establishing a viable market for the product.  Swap contracts and futures contracts are regarded by market participants as economically similar products and therefore close substitutes.  The network effect occurs because as trading volume migrates to a single trading venue, and as trading activity becomes more concentrated, the costs of trading become lower for each participant at that trading venue from volume-induced increases in market liquidity.  Trading costs become lower as market liquidity becomes greater because of the increased interaction of competing bids and offers at

---

[24] Based on daily notional values cleared by LCH.Clearnet's SwapClear platform.

[25] For more information on network effects, see S.J. Liebowitz and S.E. Margolis, Network Externalities (Effects), *The New Palgrave's Dictionary of Economics and the Law*, MacMillan (1998).

[26] See, for example, Nicholas Economides, Network Economics with Application to Finance, *Financial Markets, Institutions, & Instruments*, Vol. 2, no. 5, pp. 89-97 (Dec, 1993); Ian Domowitz, Electronic derivatives exchanges: Implicit mergers, network externalities, and standardization, *The Quarterly Review of Economics and Finance,* Vol. 35, Issue 2, pp. 163-175 (Summer 1995); and Nicholas Economides, How to Enhance Market Liquidity, *Global Equity Markets*, R. Schwartz (ed.), Irwin Professional. New York (1995).

high-volume trading venues.  The lower trading costs attract additional trading volume, creating

a reinforcing feedback loop whereby trading volume attracts additional volume, causing markets

to become more liquid.  Once the market has tipped in this way, the volume advantage becomes

self-reinforcing and therefore permanent, or "locked in," by the network effects, even if the

margin rules are eventually changed to eliminate any disparity in margin treatment.

44.     Relatedly, once a trading venue establishes a dominant position for a product, the cost to

market participants of switching from an established, liquid trading venue to a competing illiquid

trading venue can be prohibitively high.  Trading volume tends to migrate to a single trading

venue and stay there, giving a powerful advantage to those venues that first gain significant

liquidity-enhancing trading volume.[27]

45.     Instances where direct competition between trading venue results in trading volume

migrating from an established, liquid venue to a less liquid venue are rare and noteworthy when

they do occur.[28]  The fact that these instances are rare is consistent with the hypothesis that once

a trading venue establishes a dominant position, the cost of switching to competing venues

becomes high—reinforcing the advantage of the dominant trading venue.

46.     Because of the network effects involved in the trading process, and the winner-take-all

nature of competition between trading venues, the CFTC's margin rules will cause irreparable

harm to both existing swap trading platforms and soon-to-be-launched SEFs.  The shift to futures

markets has not yet become locked in because the a significant proportion of the daily swap

trading volume is not yet subject to clearing requirements and to the Rule's disparate margining

---

[27] See Robert W. Kolb and James A. Overdahl, *Understanding Futures Markets*, 6th Edition, Blackwell Publishing, 2006, pp. 52-56.

[28] See Craig Pirrong, Bund for Glory, or It's a Long Way to Tip a Market, Working paper, University of Houston, (Mar., 2005).

treatment of cleared financial swaps and swap futures contracts.  This will change after the June

10 Phase 2 Clearing requirements, when the vast majority of the swap trading volume (that is,

the currently cleared swap volume plus the additional cleared volume under Phase 2) will be

subject to the Commission's clearing requirements.  At that time, the regulatory arbitrage created

by the Rule will provide powerful incentives for financial swap market participants to shift *en

masse* to DCMs for comparable swap futures contracts to avoid the Rule's heightened margin

requirements on cleared financial swaps.  When Phase 2 Clearing begins on June 10, the

differential margin rules for economically equivalent products can "tip" trading volume to

futures exchanges from swap trading platforms.  This means that as trading volume migrates to

futures exchanges (i.e., the market becomes "futurized") it becomes the more liquid, lower-cost,

market.  This cost advantage, caused by the migration of trading volume spawned by the

differential margin rules, will persist even if the margin rules are eventually changed.  As a result,

after the June 10 Phase 2 clearing deadline, the trading volume lost by swap trading platforms

will not be recovered by existing swap trading platforms or gained by soon-to-be-launched SEFs,

even if the margin rules are eventually changed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 2nd day of May, 2013 in _Washington_, _DC_ .

Sharon Brown-Hruska

APPENDIX A

# NERA
Economic Consulting

**Sharon Brown-Hruska**
Vice President

National Economic Research Associates, Inc.
1255 23rd Street NW
Washington, DC 20037
+1 202 466 3510 Fax +1 202 466 3605
Direct dial: +1 202 466 9222
sharon.brown-hruska@nera.com
www.nera.com

# SHARON BROWN-HRUSKA
## VICE PRESIDENT

Sharon Brown-Hruska is a Vice President in NERA's Securities and Finance Practice and Visiting Professor of Finance in the A.B. Freeman School of Business of Tulane University. She is a leading expert in securities and derivatives markets, investments, trading, and risk management. Prior to joining NERA, she served as Commissioner (2002-2006) and Acting Chairman (2004-2005) of the U.S. Commodity Futures Trading Commission (CFTC).

**Regulation:** Dr. Brown-Hruska provides consulting to exchanges, businesses, and governments regarding regulation and compliance. While at the CFTC, she served as a member of the President's Working Group on Financial Markets, with the Secretary of the Treasury, Chairman of the Federal Reserve Board, and the Chairman of the Securities and Exchange Commission (SEC). During this period the Working Group considered expansion of SEC and CFTC antifraud authority as applied to hedge funds and foreign exchange transactions, registration and disclosure requirements for investment advisors, commodity pool operators, commodity trading advisors, and securities futures brokers, among other issues. Dr. Brown-Hruska has testified and spoken to U.S. House and Senate Committees and Congressional staff on commodities and securities law and economics, with a recent focus on the Dodd-Frank Wall Street Reform and Consumer Protection Act and its implications. She has addressed numerous governmental, financial organizations and associations, including the International Monetary Fund, International Organization of Securities Commissioners, Managed Funds Association, Futures Industry Association, Structured Products Association, and the International Swaps and Derivatives Association.

**Economics Advisory:** Dr. Brown-Hruska is an expert in market design and the implications for credit and financial risk management. She has evaluated and advised on the auction rules and processes for the valuation and allocation of reference entity securities underlying Credit Default Swaps (CDS). She has analyzed techniques and innovations in clearing mechanisms for operational and counterparty risk management in the over-the-counter (OTC) derivatives markets. She has also compared and evaluated various exchange and OTC markets for differences in market quality and their susceptibility to manipulation and other market abuses.

**Enforcement and Adjudication:** Dr. Brown-Hruska provides consulting and expert witness testimony in cases alleging fraud or manipulation in securities and derivatives markets and various enforcement and regulatory matters.  She has testified as an expert in FINRA arbitrations and is an arbitrator for the National Futures Association.  As a Commissioner, she issued separate opinions in adjudicatory matters.  In *Hussain*, she argued against a standard that viewed a brokerage firm's efforts to liquidate the margin account of a defaulting customer as a form of unauthorized trading.  In *Man Financial,* she challenged the assumption that omissions absent deceit should be construed as a breach of a fiduciary that rose to the level of fraud. In *Nikkhah, Miller, R&W, Gorski,* and *Staryk,* she emphasized the importance of economic methods to achieving deterrence in determining civil monetary penalties. In *Gorski,* she urged the CFTC to be more open to the use of tools derived from economic analysis, and to strive to complement institutional knowledge of trading practices with empirical techniques for evaluating and interpreting market information that impart greater objectivity and weight to the evidence.

**Energy:** Dr. Brown-Hruska provides consulting and expert testimony on energy markets, energy trading, and their regulation. She has spoken on energy issues to many forums and organizations, including the Energy Bar Association, Edison Electric Institute, and the World Forum on Energy Regulation.  She has published articles in the *Energy Daily* on energy derivatives and the *Futures and Derivatives Law Report* on market manipulation in the energy markets.  She was awarded the Key Women in Energy's Global Leadership Award in March 2004, announced at the National Energy Marketers Association Conference in Washington, DC.

**Financial Markets Research and Teaching: Financial Markets Research and Teaching:** Dr. Brown-Hruska is a Visiting Professor of Finance at Tulane University's A.B. Freeman School of Business.  Prior to her public service, Dr. Brown-Hruska was an Assistant Professor of Finance at George Mason University (1998-2002) and at Tulane University (1995-1998) teaching courses on financial markets and investments at the undergraduate finance and graduate levels (including Masters of Business Administration and Chartered Financial Analyst track courses). Courses taught include Investments, Financial Markets, International Finance, Risk Management and Financial Innovation, and Venture Capital and Private Finance.  She has delivered talks on investments and regulation to various public audiences, including programs sponsored by the Chamber of Commerce, Smithsonian Institute, the Center for Innovative Technology, and the Century Club's Grubstake Breakfast series. She served as Associate Editor for Accounting and Finance of the *Journal of Business Research*.  She has published in applied and scholarly publications including the *Capital Markets Law Review, Barron's, Regulation,* and the *Journal of Futures Markets.*

# Education

### Virginia Polytechnic Institute and State University
Ph.D., Economics, 1994;

M.A., Economics, 1990;

B.A., Economics and International Studies, 1983.

## Professional Experience

|  |  |
|---|---|
| 2006- | **NERA Economic Consulting, Washington, DC**<br>Vice President |
| 2002-2006 | **Commodity Futures Trading Commission, Washington, DC**<br>Commissioner and Acting Chairman |

- Nominated by the President and confirmed by the Senate in August 2002, as Commissioner, Commodity Futures Trading Commission; re-nominated and confirmed in November 2004, and served until July 2006

- Designated by the President in July 2004 as Acting Chairman, Commodity Futures Trading Commission, and served until July 2005

|  |  |
|---|---|
| 2012- | **Tulane University, New Orleans, LA**<br>Visiting Professor of Finance<br>Courses: Energy Risk Management, Portfolio Management |
| 1998-2005 | **George Mason University, Fairfax, VA**<br>Assistant Professor of Finance<br>Courses: Investments, International Finance, Venture Capital and Private Finance |
| 1995-1998 | **Tulane University, New Orleans, LA**<br>Assistant Professor of Finance<br>Courses: Portfolio Management, Risk Management and Financial Innovation, International Finance, Financial Markets, International Trade and Finance, Energy Risk Management |
| 1994-1995 | **Virginia Polytechnic Institute and State University, Falls Church, VA**<br>Adjunct Professor of Finance, Investments<br>Northern Virginia MBA Program |
| 1990-1995 | **Commodity Futures Trading Commission, Washington, DC**<br>Financial Economist |
| 1987-1990 | **Virginia Polytechnic Institute and State University, Falls Church, VA**<br>Graduate Assistant<br>Center for the Study of Futures and Options, and Virginia Tech Economics |
| 1984-1987 | **Frederick County Public Schools, Winchester, VA**<br>Spanish Teacher |

## Selected Advisory and Litigation Consulting

Gaskins, Bennett, Birrell, & Schupp, L.L.P, 2012 – present.
> Testifying expert in U.S. District Court case involving investments in securities lending collateral pool, including mortgage-backed securities, collateralized debt obligations, and other structured finance vehicles.  Report submitted, ongoing.

Drinker Biddle & Reath LLP, 2012 – present
> Consulting expert in regulatory investigation into alleged manipulation of the energy futures markets.

Gibson and Dunn, 2010 – present
> Consulting expert on derivatives in fixed income and foreign currency in regulatory investigation and litigation alleging manipulation and antitrust violations.

Electric Power Independent System Operator, 2012.
> Provide assessment analysis of credit reforms in organized wholesale electric markets, including the feasibility of becoming a central counterparty in the clearing of electric power contracts in the context of a Nodal Market design. Report submitted; presentation to the Board of Directors.

Aurora Cooperative Elevator Co., Aurora, Nebraska, 2011 – 2012.
> Conduct analysis and assessment of hedging program for grain.  Report submitted and presented to the Board of Directors and Executive Officers.

Hunton and Williams, 2011 – 2012.
> Evaluate costs and benefits of proposed rules and implementation of Title VII of the Dodd Frank Wall Street and Consumer Protection Act for commercial energy firms designated as swap dealers or major swap participants.

Futures Industry Association, 2010- present.
> Assessment and quantification of the economic impact, implementation and operational costs of the CFTC's proposed rulemaking requiring an Ownership and Control Report.

King and Spaulding, 2010 - present.
> Consulting expert on issues related to customer funds and collateral posted for securities and futures investments, regulations on proper handling of customer funds, disclosures, and securities regulatory filings.

Kirkland and Ellis, 2009 – present
> Consulting expert on risk management and trading strategies, including analysis of large derivatives portfolio of a global energy trading firm.

Barrasso Usdin Kupperman Freeman & Sarver, L.L.C., and Bass Berry & Sims PLC, 2009-2010.
> Testifying expert for respondents' counsel in connection with investments in mutual funds and closed-end funds by shareholders. *Gus B. Denton, et al., v. Morgan Keegan & Company,*

*Inc.* FINRA Dispute Resolution Arbitration No. 01567. Report submitted, testified at arbitration.

Property and Casualty Insurers Association, 2009 – 2010.
Conduct analyses and write White Papers to address the economic costs and benefits of financial regulatory reform proposals for measurement and management of systemic risk under consideration in the U.S. Congress.

Clifford Chance LLP, 2009-2010.
Expert in regulatory investigation by the CFTC into alleged manipulation of the crude oil futures markets. Performed analysis of TAS block trades, associated hedge transactions, and conducted damages analysis. Action settled.

Greenberg Traurig, LLP, 2009.
Testifying expert for respondents' counsel in connection with investments in mutual funds and closed-end funds by shareholders. *Poer, Powell, and Perkins v. Morgan Keegan & Company, Inc.*, FINRA Dispute Resolution, Case no. 08-03654. Report submitted and testified at arbitration.

Williams and Connolly LLP, 2009-2010
Expert for professional services firm to provide consulting related to regulatory investigation of investment advisor and brokerage firm's handling of collateral posted for securities and futures investments, including regulations regarding proper handling of customer funds, disclosures, and regulatory filings.

Willkie Farr & Gallagher LLP, 2009.
Testifying expert in support of Freedom of Information Request to the Federal Reserve Board of Governors seeking public disclosure of information regarding the composition of bank assets posted as collateral and valuation by third parties.  Declaration filed, Motion for Summary Judgment granted and affirmed by U.S. Supreme Court.

Grippo & Elden LLC, 2008-2009.
Testifying expert in civil litigation concerning the sale of Designated Primary Market Maker joint ventures. Evaluated institutional and market factors that affected interests in options market making businesses. Report filed, Motion for Summary Judgment granted.

Fillmore Riley LLP, 2008-2009.
Testifying expert for futures and options exchange in case involving alleged pre-execution communication and non-competitive trading by futures brokers.  Report submitted, action settled.

Alston & Bird LLP, 2007-2008.
Assisted product development firm create and analyze financial indices based on proxies for risk management and revenue-generation capacity.  Developed and drafted content and systems specifications for patent application.  Application filed, pending.

Davis Wright Tremaine LLP, 2008.
> Consultant to attorneys in the preparation and revision of comments to the Federal Trade Commission's Proposed Rulemaking on Prohibitions on Market Manipulation.

Covington & Burling LLP, 2008.
> Assisted industry trade associations in drafting and submission of comments to the Federal Trade Commission Advance Notice of Proposed Rulemaking on Prohibitions on Market Manipulation and False Information.

Derivatives Securities Exchange, 2008.
> Tested the model and compared costs associated with the borrowing and lending of stock, margin purchases and sales, and synthetic borrowing and lending in stock futures.

International Swaps and Derivatives Association, 2007-2008.
> Analyzed ISDA credit default swap (CDS) Auction Protocol to assess the effect on pricing, liquidity, and efficiency when futures contracts reference the auction final price. Conducted simulation and analysis of CDS prices, bond prices, and related markets.

Chicago Mercantile Exchange, 2007-2008.
> Provided competitive assessment of the current offerings for the over-the-counter (OTC) swaps and swaps-based futures contracts. Prepared White Paper on operational and counterparty risk management in the OTC derivatives markets.

Friedman Kaplan Seiler & Adelman LLP, 2008.
> Analyzed trading strategies of proprietary trader in options and securities in connection with investigation of market manipulation by the Chicago Board Options Exchange (CBOE) and the Financial Industry Regulatory Authority (FINRA).

International Swaps and Derivatives Association, 2006-2007.
> Analyzed underlying economics of the final price determination of CDS auction and its susceptibility to manipulation. Prepared memorandum summarizing findings and made presentations of analysis to ISDA member firms and regulatory agencies.

Sidley Austin LLP, 2007-present.
> Testifying expert for investment bank in case involving trading and management of trading desk of futures and options contracts in the natural gas market, leading to suit for alleged breach of employment contract. Pending.

Alston and Bird, 2006-2008.
> Assist market seeking contract designation in the design of derivative contracts to manage risks associated with sports operations and business activity. Advised on the regulatory framework for the trading of futures and options contracts in event derivatives.

Registered foreign exchange broker, 2007.
> Provided advice to ensure satisfactory compliance with the rules and regulatory requirements of the National Futures Association and the Commodity Futures Trading Commission.

Seward & Kissel, LLP, 2007.
　　Testifying expert for plaintiff regarding hedge fund structure and practice in lawsuit over
　　compensation agreement.

Managed Funds Association, 2006-2007.
　　Prepared white paper on the economic contributions of the hedge fund industry and the
　　impact of hedge funds on investors, the financial markets, and the economy.

Foley & Lardner LLP, 2006-2007.
　　Provided analysis and report to support contract design and submission of event derivatives
　　contracts for regulatory approval on behalf of derivatives contract market.

State Ministry for Economic Affairs and Labour, State of Saxony, Dresden, Germany 2006.
　　Partnered with White & Case LLP to review European Energy Exchange information and the
　　transparency of the German electricity market and conditions for efficient disclosure.

City of London, 2006.
　　Analysis and assessment of the European Commission's proposed measures in the clearing
　　and settlement industry.  Evaluated structure of European clearing and settlement industry
　　and examined the economic assumptions underpinning the European Commission's
　　Regulatory Impact Analysis (RIA).

## Publications

"The Derivatives Marketplace: Exchanges and the Over-The-Counter Market," *Financial
　　Derivatives: Pricing and Risk Management*, (Robert Kolb and James Overdahl, eds.), Wiley,
　　2010.

"Financial Disclosure and SFAS 157: Seeking Transparency in a Perfect Storm," with Shuchi
　　Satwah, *Capital Markets Law Journal* 4(2), Oxford University Press, London, April 2009.

"Establishing Jurisdiction:  The Role of FERC and the CFTC," with Robert Zwirb, *Energy and
　　Environmental Trading: Law and Taxation,* (Andrea Kramer and Peter Fusaro, eds.), Cameron
　　May, London, 2008, 61-81.

"CFTC & FERC vs. Amaranth:  Doing the Sister Regulator Act," with Robert Zwirb, *Futures
　　and Derivatives Law Report*, 27(9), October, 2007, 1-12.

"Legal Clarity and Regulatory Discretion: Exploring the Law and Economics of Insider Trading
　　in Derivatives Markets," with Robert Zwirb, *Capital Markets Law Journal* 2 (3), Oxford
　　University Press, London, 2007, 245-259.

"Striking a Balance in the Regulation of Global Derivatives Markets," *Revue bancaire et
　　financière,* 2005.

"Derivatives Market Innovation and the Commodity Futures Modernization Act," with James
　　Overdahl, *The Euromoney Derivatives & Risk Management Handbook 2005/06,* 249-253.

"The Globalization of Derivatives Markets:  Building a Seamless Global Regulatory Structure," *International Commodities Review*, 2005, 50-53.

"Regulatory Innovation in a Changing Global Environment," *Swiss Derivatives Review*, 26, November 2004, 8-10.

"Market Manipulation in the Energy Markets," *Futures and Derivatives Law Report*, 23(8), November 2003, 1-6.

"Fragmentation and Complementarity: The Case of EFPs," with Paul Laux, *Journal of Futures Markets*, 22(8), August 2002, 697-727.

"A Penny for Your Trade," with Jerry Ellig, *Barron's*, January 1, 2001, 43.

"Financial Markets as Information Monopolies?" with Jerry Ellig, *Regulation*, 23(3), 2000, 29-35.

"Taking Stock of Proposed Securities Regulations." with Jerry Ellig, *Issue Analysis*, CSE Foundation, Number 107, July 2000, 10 pages.

"Volatility, Volume, and the Notion of Balance in the S&P 500 Cash and Futures Markets," with Gregory Kuserk, *The Journal of Futures Markets,* Vol. 15(6), September 1995, 677-690.

"The Chicago Board of Trade," with Barry Schachter, *The New Palgrave Dictionary of Money and Finance* (Peter Newman, Murray Milgate, and John Eatwell, eds.), Stockman Press, NY, (1), 1994, 349.

"On the Existence of an Optimal Tick Size," with Paul Laux and Barry Schachter, *Review of Futures Markets*, Vol. 10 (1), 1991, 50-72.

## Published Studies, Comments, and Reports

"The Real Costs of Eliminating Unsecured Credit Lines and Requiring Cash Collateral in OTC Swaps Markets" (with Kurt Strunk), March 13, 2012, at: http://comments.cftc.gov/PublicComments/ViewComment.aspx?id=57015&SearchText=NERA

"Cost-Benefit Analysis of the CFTC's Proposed Swap Dealer Definition" (with Kurt Strunk), prepared for the Working Group of Commercial Energy Firms, Dec 20, 2011, at: http://comments.cftc.gov/Handlers/PdfHandler.ashx?id=23813

"Don't Prescribe Medieval Solutions," *Financial Times*, http://www.ft.com/cms/s/0/30e0634c-7ed5-11df-ac9b-00144feabdc0,s01=1.html, June 23, 2010.

*De-Mystifying Interconnectedness: Assessing 'Too Interconnected to Fail' and the Fallout from Getting it Wrong* (with Christopher Laursen, Robert Mackay, and John Bovenzi) Apr 23,2010.

*Why 'Too Big to Fail' is Too Short-Sighted to Succeed*, (with Christopher Laursen, Robert Mackay, and John Bovenzi). PCI White Paper. Jan. 18, 2010.

Securities and Exchange Commission and Commodity Futures Trading Commission Joint Meetings on the Harmonization of Regulation, http://www.sec.gov/comments/4-588/4588-37.pdf, Sep. 3, 2009.

Federal Trade Commission Proposed Rulemaking on Prohibitions on Market Manipulation and False Information in Subtitle B of Energy Independence and Security Act ("EISA"), 538416-00038.pdf, Oct. 17, 2008.

Improvement of Transparency in the Power Wholesale Trading Market from an Economic, Energy and Capital Markets Law Perspective (*Verbesserung der Transparenz auf dem Stromgroßhandelsmarkt aus ökonomischer sowie energie- und kapitalmarktrechtlicher Sicht*), NERA Economic Consulting and White & Case, Dec. 18, 2006, 158 pages.

"Why Energy Derivatives Are Good," *The Energy Daily*, August 12, 2003, 1-3.

*Competing Models for Market Data Dissemination: The Case of the Stock and Futures Markets*, Mercatus Center Research Study, George Mason University, May, 2002, 55 pages.

"Proposed Rules for Registration of Security Futures Broker-Dealers," Mercatus Center Regulatory Studies Program, *Public Interest Comment Series*, RSP 2001-9, July, 2001.

"Disclosure of Order Routing and Execution Practices," with Jerry Ellig, Mercatus Center Regulatory Studies Program, *Public Interest Comment Series*, RSP 2000-19, Sep., 2000.

"Issues Related to Market Fragmentation," with Jerry Ellig, Mercatus Center Regulatory Studies Program, *Public Interest Comment Series*, RSP 2000-11, May, 2000.

"Concept Release on Regulation of Market Information, Fees and Revenues," with Jerry Ellig, Mercatus Center Regulatory Studies Program, *Public Interest Comment Series*, RSP 2000-7, Mar., 2000.

"Survey of Swap Market Literature," with K. Daigle, B. Schachter, and P.C. Venkatesh, CFTC Working Papers, *OTC Derivative Markets and Their Regulation*, October, 1993.

*The Role of EFPs in Futures Markets - An Old Dog Does New Tricks*, with Paul Laux, Catalyst Institute Research Series, January, 1997, 112 pages.

## Adjudicatory Opinions

In re Curtis McNair Arnold & London Financial Inc., *Commodity Futures Law Reporter,* (CFTC Docket No. 97-12), CCH  28,983, Concurring, (September 11, 2002).

Hussain v. Saul Stone & Co. *Commodity Futures Law Reporter,* CCH 28,189, Concurring, (April 9th, 2003).

In the Matter of Shahrokh Nikkhah, *Commodity Futures Law Reporter,*CCH 28,129, Concurring, (April 4, 2003).

Halbur v. Refco, LLC, CFTC , Docket No. 02-R030. *Commodity Futures Law Reporter,* Concurring, (June 25, 2003).

In re R&W Technical Services, Ltd., *Commodity Futures Law Reporter,* CCH 29,556 Concurring/Dissenting, (August 1, 2003).

In re Competitive Strategies For Agriculture, Ltd., (CFTC Docket No. 98-4) *Commodity Futures Law Reporter,* Dissenting, (March 2, 2004).

In re Grain Land Cooperative (CFTC Docket No. 97-01) *Commodity Futures Law Reporter,* Concurring, (November 25, 2003).

In re R&W Technical Services, Ltd., *Commodity Futures Law Reporter,* Concurring/Dissenting, (March 3, 2004).

In re Chester Gorski, CFTC Docket No. 93-5, *Commodity Futures Law Reporter,* Concurring, (March 24, 2004).

In re Miller, CFTC Docket No. 92-4, *Commodity Futures Law Reporter* CCH ¶ 29,825, Concurring/Dissenting in Part (March 16, 2004).

Precision Ratios v. Man Financial, Inc., CFTC Docket No. 01-R096, *Commodity Futures Law Reporter* CCH ¶ 29,813,  Dissenting (July 22, 2004).

In re Staryk, CFTC Docket No. 95-5, *Commodity Futures Law Reporter,* CCH ¶ 29,826, Dissenting in Part (July 23, 2004).


## Congressional Testimony

Testimony of Acting Chairman Sharon Brown-Hruska before the Agriculture, Nutrition and Forestry Committee, U.S. Senate, Washington, D.C., March 8, 2005.

Testimony of Acting Chairman Sharon Brown-Hruska before the House Subcommittee on General Farm Commodities and Risk Management, Committee on Agriculture, U.S. House of Representatives, Washington, D.C., March 3, 2005.

Testimony for Senate Confirmation before the Agriculture, Nutrition and Forestry Committee, U.S. Senate, Washington, D.C., June 25, 2002. http://www.gpo.gov/fdsys/pkg/CHRG-107shrg81589/html/CHRG-107shrg81589.htm/


## Selected Presentations and Speeches

Central Counterparty Risk and Clearing Requirements Under the Dodd-Frank Act, *The Journal of Corporate and Financial Law* & The Fordham Corporate Law Center, Feb. 13 2012.

Quarterly Economic Roundtable, U.S. Chamber of Commerce's National Chamber Foundation, Washington, D.C., Nov.8, 2012.

Financial Institutions in the New Regulatory Environment: Opportunities, Constraints, and Global Challenges, Center for Financial Markets and Policy, Georgetown University, McDonough School of Business, Washington, DC., Sep. 22, 2011.

Joint CFTC-SEC Roundtable on Implementation of Final Rules of the Dodd-Frank Wall Street Reform and Consumer Protection Act, May 2, 2011.

Derivatives Regulation after Dodd-Frank, American Law Institute-American Bar Association, Oct. 27, 2010.

The New Regulatory Regime for Derivatives, Practicing Law Institute, July 15, 2010.

The New Architecture for Financial Supervision within the US and the EU, International Derivatives Association Conference, June 9, 2010.

Modernizing Derivatives Oversight, National Chamber Foundation, July 21, 2009.

Understanding the ISDA CDS Auction, ISDA Workshop on Close-Outs and the Impact of Market Events, New York, June 23, 2009.

Complex Financial Entities and Instruments, Bipartisan Policy Center, June 2, 2009.

Derivatives, Liquidity, and Counterparty Risk, Investor and Hedge Fund Risk Summit, New York, Dec. 4, 2008.

Artificial Price from the Perspective of an Economist, FRB-CFTC International Symposium, Federal Reserve Bank of Chicago, Oct. 23, 2008.

Economics, Leverage, and Liquidity, Securities and Exchange Commission, Washington, DC, Jul. 28, 2008.

Perspectives on Energy Markets: Managing Uncertainty in Volatile Markets, Law Seminars International, Atlanta, GA, June 13, 2008.

Detecting Artificial Prices: An Economics Approach, Commodity Futures Trading Commission International Regulators Conference, June 11, 2008.

Future of Financial Regulation, Dennis J. Block Center for International Business Law at Brooklyn Law School, May 1, 2008.

Market Manipulation, Jurisdiction, and Regulatory Compliance, NYC Bar Committee on Energy, Jan. 8, 2007.

Market Manipulation – Managing Regulatory and Legal Risks, SEC Historical Society, Washington, D.C. July 2007.

Myths and Legends in Derivatives and Structured Finance, Structured Products Association, New York, Nov. 13, 2006.

Exploring the Law and Economics of Insider Trading and Manipulation in Commodities Markets, Chicago Bar Association Futures and Derivatives Law Committee, Oct. 17, 2006.

The Role of Futures Markets in the Energy Sector, The International Monetary Fund, Washington, DC, Jun. 15, 2006.

Risk Assets or WMD:  The Case of Derivatives, *Institutional Investor*, New York, NY, Dec. 7, 2005.

Building a More Transparent and Flexible Regulatory Environment for Derivatives, Seoul, Korea, Aug. 30, 2005.

Keynote Address, Managed Funds Association Annual Forum 2005, Chicago, Jun. 7, 2005.

Striking a Balance in the Regulation of Global Markets, Federation of European Securities Exchanges, Brussels, Belgium, May 26, 2005.

Market Competition and Regulatory Cooperation: A New Dynamic in US-EU Financial Relations, Center for European Policy Studies, Brussels, Belgium, May 24, 2005.

Keynote Address, Edison Electric Institute Chief Executives Conference, Colorado Springs, Sep. 4, 2003.

More speeches available at: http://www.cftc.gov/About/Commissioners/hruskaspeeches.html

## Scholarly Presentations

Discussion of Market Pricing of Fair Value Assets Under FAS 157, Conference on the Future of Securities Regulation, University of Notre Dame, April 23, 2009.

The Future of Financial Regulation, Regulatory Economics, George Mason University, Fall 2008.

Markets and Systemic Risk: Regulatory Solutions and Market Discipline, Duke Global Capital Markets Center, Duke University, Nov. 16, 2007.

Futures and Derivatives Regulation, Columbia University Law School, Spring 2005.

Regulation of Futures, Options and Derivatives Markets, Vanderbilt University Conference on Corporate Behavior and Financial Markets, Nashville, Apr. 11, 2003.

Competing Models for Market Data Dissemination: A Comparison of Stock and Futures Markets, Washington Area Finance Association Meetings, April 2002.

Execution Speed and Price Priority: An Options-based Approach to Measuring Best Execution, Southern Finance Association, November 2001.

Market Fragmentation: What the Research Shows, Securities Traders Association, October 2000.

Complementary Markets, Southern Finance Association, 1999 "Outstanding Paper in Derivatives," Financial Management Association, 1998, Washington Area Finance Association, 1998.

Convergence and Market Share in the Exchange-Traded and Over-the-Counter Derivative Markets, Financial Management Association, 1999.

Liquidation Strategies Under Conditions of Futures Market Manipulation, Southern Finance Association, 1996.

A Game Theoretic Model of Futures Market Manipulation, Financial Management Association Doctoral Student Seminar, Financial Management Association Meetings, 1991.

On the Existence of an Optimal Tick Size, Chicago Board of Trade Research Seminar, Vanderbilt University, November 1990.

## Professional Activities

Selection Committee for the Regulatory Innovation Award, Morrison & Foerster and the Burton Foundation, 2011 - Present.

Women and Leadership in Philanthropy Council, Virginia Tech, 2005-Present.

Agenda Committee, NERA's Global Finance, Law, and Economics Conference, 2008-Present.

Futures Industry Association Associate Member, Law and Compliance Division, 2007-Present.

American Bar Association Associate Member, 2006-Present.
  Business Law Section
  Committee on Regulation, Futures and Derivatives Instruments Committee

Associate Editor, Finance and Accounting, *Journal of Business Research,* Publisher: Elsevier Science, Inc., 1997-2000.

Editorial Review Board and Journal Referee, *Journal of Business Research*, 2001-2003.

Journal Referee, *Journal of Futures Markets,* 1993-2001, *The Financial Review,* 1999.

George Mason University Century Club Grubstake™ Breakfast Selection Committee and Post-Selection Subcommittee, 1999-2002.

Seminar on Venture Capital Finance and Valuation, Center for Innovative Technology, 2001.

Managerial Finance, *Smithsonian Institute Mini-MBA Program on the Mall*, 2000.

Chairman, Alberto Culver Lecture Series for Women in Business, Tulane University, 1997-1998.

American Finance Association.

Financial Management Association.


## Awards, Grants and Honors

Key Women in Energy's Global Leadership Award, announced at the National Energy Marketers Association Conference in Washington, D.C, March 31, 2004.

Research Grant, Federal Trade Commission, "Competition in the market for information: A comparison of the futures and securities markets," 2002.

Mercatus Center Research Fellow, George Mason University, 2002.

Diamond Partnership Award, Century Club of George Mason University, 2001.

Outstanding Paper in Derivatives, "Complementary Markets," Southern Finance Association, November, 1999.

Outstanding Associate Editor Award, *Journal of Business Research*, Elsevier Science, Inc., October 1999.

Lilly Endowment Teaching Fellow, for development of the course "Risk Management and Financial Innovation," Tulane University, 1997-98.

Newcomb Fellow, Newcomb College, New Orleans, LA 1996-98.

Earhart Fellowship, H.B. Earhart Foundation, Ann Arbor, MI 1989-91.

Virginia Graduate Scholarship, Virginia Tech Dept. of Economics, Blacksburg, VA 1987-88.

Frank V. Armstrong Foundation Scholarship, Winchester, VA 1978-82.

## Public Director and Advisory Board Service

2011 – Present: Working Group on Financial Markets, Federal Reserve Bank of Chicago

2010 – Present: Public Director, MarketAxess Holdings, Inc.

2009 – Present: Public Director, Electronic Liquidity Exchange ("ELX")
Chairman, Regulatory Oversight Committee

2007 – Present: Trustee, International Securities Exchange Holdings, Inc., ("ISE Trust").

2007 – Present: Pamplin Finance Advisory Board, Virginia Tech.

2009 – 2010:   Public Director, North American Derivatives Exchange ("Nadex").

2006 – 2007:   Board of Directors, Dillon Read Financial Products Funds, managed by Dillon Read Capital Management.

2003 – 2006:   Financial Literacy and Education Commission, Chairman of the Website Development Committee, led the effort to develop mymoney.gov.

2003-2006:     Chairman, Commodity Futures Trading Commission's Technology Advisory Committee