**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BLOOMBERG L.P., | |
| Plaintiff, | |
| v. | Civil Action No. 13-523 (BAH) |
| COMMODITY FUTURES TRADING COMMISSION, | Judge Beryl A. Howell |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

  This is a challenge to a regulation, 17 C.F.R. § 39.13(g)(2)(ii), promulgated by the United States Commodity Futures Trading Commission (the "CFTC" or the "Commission"), which sets minimum liquidation times for swaps and futures contracts. The plaintiff Bloomberg L.P. ("Bloomberg") claims, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500, *et seq.*, that the Commission's regulation is both procedurally and substantively defective and must be set aside. Further, the plaintiff has applied for a preliminary injunction against the challenged regulation, claiming that a forthcoming phase of a related rule's implementation will cause the plaintiff imminent and irreparable harm if the minimum liquidation times are not enjoined. In this regard, Bloomberg alleges that, unless immediately enjoined, the Commission's regulation prescribing minimum liquidation times, when combined with other regulatory and market forces, will encourage the plaintiff's subscribers to migrate permanently to competitors' trading venues. The plaintiff, however, lacks standing to challenge the Commission's regulation and has not made a showing of imminent and irreparable harm sufficient to warrant the extraordinary relief of a preliminary injunction. Therefore, as discussed below, the Court denies

the plaintiff's application for preliminary injunctive relief and dismisses this case for lack of standing.

## I.     BACKGROUND

Since this is an administrative law case, it is appropriate first to discuss generally the economic and regulatory framework of the challenged rule.  Next, the Court will discuss the factual and procedural background of the particular rule being challenged.

### A.     <u>Economic and Regulatory Framework</u>

This case is about how the CFTC regulates the trading of derivatives.  "Derivatives are financial contracts whose prices are determined by, or 'derived' from, the value of some underlying asset, rate, index, or event."  Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis: *The Financial Crisis Inquiry Report: Final Report* 45–46 (2011).  These instruments are not used to form capital or invest; rather, they are used for "hedging business risk or for speculating on changes in prices, interest rates, and the like."  *Id.* at 46.  Although derivatives can come in many forms, there are two categories of derivatives implicated in this lawsuit: "swaps" and "futures."

#### 1.     *How Swaps and Futures Contracts Are Traded*

"A 'swap' is a contract that typically involves an exchange of one or more payments based on the underlying value of a notional amount of one or more commodities, or other financial or economic interest," and it "transfers between the parties the risk of future change in that value without also transferring an ownership interest in the underlying asset or liability." Mem. in Supp. Pl.'s Appl. for Prelim. Inj. ("Pl.'s Mem.") at 3–4, ECF No. 13 (citing 7 U.S.C. § 1a(47)).  In essence, the two parties to a swap agreement trade (or "swap") the cash flows stemming from the assets or liabilities underlying the agreement.  For example, a fixed-to-floating interest rate swap is an agreement whereby one party agrees to pay the cash flows associated with a fixed interest rate, while the other party agrees to pay the cash flows associated

with a referenced floating interest rate (*e.g.*, LIBOR).  *See, e.g.*, *Financial Crisis Inquiry Report*

at 46.  A "futures contract" or simply a "future," by contrast, is "[a]n agreement to buy or sell a

standardized asset (such as a commodity, stock, or foreign currency) at a fixed price at a future

time."  BLACK'S LAW DICTIONARY 746 (9th ed. 2009).

Futures contracts or their functional equivalents have been traded for millennia.  *See, e.g.*,

Michael P. Jamroz, *The Net Capital Rule*, 47 BUS. LAW. 863, 890 n.186 (1992) ("The ultimate

origins of the futures markets can be traced to 2000 B.C., where . . . 'merchants of what is now

Bahrein Island took goods on consignment for barter in India.'" (quoting JERRY W. MARKHAM,

THE HISTORY OF COMMODITY FUTURES TRADING AND ITS REGULATION 3 (1987)).  In the United

States, the first organized futures exchange was the Chicago Board of Trade, which officially

began trading futures contracts in the 1860s.  *See* MARKHAM, HISTORY OF COMMODITY FUTURES

TRADING at 4.  Indeed, "[b]y 1868, futures contracts had become standardized on the Chicago

Board of Trade."  *Id.* at 5.  For several decades, futures exchanges operated without any federal

regulatory oversight until 1922 when Congress enacted the Grain Futures Act, Pub. L. No. 67-

331, 42 Stat. 998, which for the first time[1] required grain futures exchanges to be registered as

"contract markets" and also required them to keep detailed records of trading information.  *See*

42 Stat. at 1000 (providing for designation of "contract markets" by Secretary of Agriculture,

and requiring contract markets to keep records of the terms of futures transactions).

In 1936, Congress replaced the Grain Futures Act with the Commodity Exchange Act

("CEA"), Pub. L. No. 74-675, 49 Stat. 1491, which broadened federal regulation of futures,

---

[1]  The Grain Futures Act was preceded by the Futures Trading Act of 1921, but that statute was declared
unconstitutional by the Supreme Court shortly after it was enacted.  *See Hill v. Wallace*, 259 U.S. 44, 68–70 (1922).
Other than the fact that the Grain Futures Act was explicitly premised on Congress's authority to regulate interstate
commerce, as opposed to its taxing power, the statute was "substantially identical to the [Futures Trading Act] that
was held unconstitutional."  MARKHAM, HISTORY OF COMMODITY FUTURES TRADING at 13.

established the Commodity Exchange Commission,[2] and granted that agency the power to regulate futures traders directly (as opposed to only regulating contract markets). *See* 49 Stat. at 1492. The CEA also, *inter alia*, (1) limited speculative positions that could be taken in futures markets, *see id.* § 5, and (2) established registration requirements for futures brokerage firms known as "futures commission merchants," *id.* The Commodity Exchange Commission also "informally urged the exchanges to adopt minimum margin requirements," even though the statute itself contained no authority to require the adoption of minimum margin rules. *See* MARKHAM, HISTORY OF COMMODITY FUTURES TRADING at 30. "Several exchanges agreed . . . and adopted minimum margin rules." *Id.*

In 1974, federal regulation of futures was expanded even further with the enactment of the Commodity Futures Trading Commission Act, Pub. L. No. 93-463, 88 Stat. 1389. That statute, which forms the basis of the current futures regulatory scheme, created the CFTC as an independent federal agency, authorized to seek injunctive relief, to alter the rules of a contract market, and to prescribe trading limits. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 365–66 (1982); *see also* CFTC Act § 101, 88 Stat. at 1389 (establishing the CFTC "as an independent agency of the United States Government").

Since the amendments to the CEA passed in the Futures Trading Act of 1982, the CEA has required futures to be traded on centralized exchanges known as "designated contract markets" ("DCMs"), *see* 7 U.S.C. § 6(a); *see also* Futures Trading Act of 1982, Pub. L. No. 97-444, § 204, 96 Stat. 2294, 2299, which are subject to a variety of regulatory requirements that ensure transparency and prudent risk management. For example, a DCM is required to "make public daily information on settlement prices, volume, open interest, and opening and closing

---

[2] The Commodity Exchange Commission consisted of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General. *See* 49 Stat. at 1492. It was later renamed the Commodity Exchange Authority. *See* MARKHAM, HISTORY OF COMMODITY FUTURES TRADING at 27.

ranges for actively traded contracts on the contract market."  7 U.S.C. § 7(d)(8).  Specifically, DCMs are required to make information on prices, trading volume, and other trading information "readily available to the news media and the general public without charge, in a format that readily enables the consideration of such data, no later than the business day following the day to which the information pertains."  17 C.F.R. §§ 16.01(e), 38.451.  Additionally, every transaction executed on a DCM must be "cleared" through an entity called a "derivatives clearing organization" ("DCO").  *See* 17 C.F.R. § 38.601(a); *see also* Part I.A.2 *infra* (discussing operation and regulation of DCOs).[3]

By contrast to the ancient roots of futures contracts, swaps are a much newer phenomenon.  Although "there is some debate regarding the timing of the first modern swap agreement, scholars generally agree that the execution of a swap agreement between the World Bank and IBM [in 1981] was one of the earliest and most significant transactions in the development of the swap market."  Kristin N. Johnson, *Things Fall Apart: Regulating the Credit Default Swap Commons*, 82 U. COLO. L. REV. 167, 193 n.141 (2011); *see also* Charles R.P. Pouncy, *Contemporary Financial Innovation: Orthodoxy and Alternatives*, 51 SMU L. REV. 505, 529–30 & n.153 (1998) (tracing roots of the swaps market and discussing the 1981 IBM/World Bank currency swap transaction).  Unlike futures, swaps were (before 2010) traded almost entirely in unregulated "over the counter" ("OTC") markets, where large financial institutions acted as derivatives dealers.[4]  *See Financial Crisis Inquiry Report* at 46.  In OTC markets,

---

[3] Although central clearing of futures was not required by federal law until recently, modern clearinghouses for futures have existed since the latter part of the 19th century.  *See* Craig Pirrong, *The Clearinghouse Cure*, REGULATION, Winter 2008–09, at 45 ("The Minneapolis Grain Exchange established the first modern clearinghouse for futures in 1891, and other futures exchanges in the United States adopted clearing in the years between 1891 and 1925.").

[4] In 2000, Congress enacted the Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763, which "effectively shielded OTC derivatives from virtually all regulation or oversight."  *Financial Crisis Inquiry Report* at 48.

transactions are not required to be cleared, dealers are not required to register with the government, and trading information is not required to be made public.  *See id.*

Without regulatory oversight, "OTC derivatives rapidly spiraled out of control and out of sight, growing to $673 trillion in notional amount."  *Id.* at xxiv.  OTC derivatives then "contributed significantly" to the global financial crisis in 2008, *see id.*, and Congress responded by enacting the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank), Pub. L. No. 111-203, 124 Stat. 1376 (2010).  Dodd-Frank, among other things, (1) placed swaps within the jurisdiction of the CFTC, *see* Dodd-Frank, § 722(a), 124 Stat. at 1672, (2) required the CFTC to determine which swaps must be cleared, *see id.*§ 723(a)(3), 124 Stat. at 1676–77, and (3) mandated that all cleared swaps be traded like futures—on centralized, regulated exchanges, *see id.*, 124 Stat. at 1681; *see also* S. Rep. No. 111-176, at 34 (2010) ("Trading more derivatives on regulated exchanges should be encouraged because it will result in more price transparency, efficiency in execution, and liquidity.").[5]  In particular, Dodd-Frank generally requires that all cleared swaps be traded on either a DCM or a new entity called a "swap execution facility" ("SEF").  *See* 124 Stat. at 1681 (codified at 7 U.S.C. § 2(h)(8)).  Since the CFTC's rules

---

[5] The plaintiff contends that the challenged rule is contrary to the purposes of Dodd-Frank because it will put swap execution facilities ("SEFs") at a competitive disadvantage to DCMs.  *See, e.g.*, Pl.'s Mem. at 2 ("Dodd-Frank introduced and sought to foster [SEFs] for the trading of swaps."); *id.* at 16 (arguing that challenged rule will "deter the development of the SEFs that Congress sought to encourage through the Dodd-Frank Act"); *id.* at 21 (arguing that Congress "encouraged" SEFs); *id.* at 33 (arguing the challenged rule "will have serious adverse effects . . . on the design and purpose of the Dodd-Frank Act").  The plaintiff essentially contends that Dodd-Frank was pro-SEF, rather than pro-transparency and pro-risk management, but the statute and its legislative history do not necessarily support that conclusion.  First and foremost, Dodd-Frank explicitly requires cleared swaps to be traded on *either* a DCM or an SEF.  *See* 7 U.S.C. § 2(h)(8).  If SEFs were the favorite child, Congress could have designated SEFs the exclusive trading venues for swaps, much like DCMs are the exclusive trading venue for futures—but Congress did not do so.  Furthermore, the legislative history indicates that Congress was concerned with promoting the transparency and risk management benefits that a regulated, centralized exchange would bring to the swap market— not with promoting the exchange itself.  *See, e.g.*, S. Rep. No. 111-176, at 33–34 (noting concern with lack of margin requirements, central clearing, price discovery, and transparency in OTC derivatives markets).  In short, there is no conclusive legislative evidence that Congress preferred swaps to be traded on SEFs rather than DCMs, since DCMs are also highly regulated, centrally cleared, and transparent marketplaces.

regarding mandatory clearing and SEFs are still being phased in, however, large swaths of swaps continue to be traded OTC.[6]

### 2. *Derivatives Clearing Organizations*

DCOs are "clearinghouses or similar entities that enable the parties to a derivatives transaction to substitute the credit of the DCO for the credit of the parties to the swap." Pl.'s Mem. at 7 (citing 7 U.S.C. § 2(h)(2)). A transaction is "cleared" when a member of a DCO uses a novation to interpose itself between the two original counterparties to the derivatives contract, thereby assuming the credit risk of both counterparties. *See, e.g.*, Adam J. Levitin, *Response: The Tenuous Case for Derivatives Clearinghouses*, 101 GEO. L.J. 445, 451 (2013). "[E]ach DCM is connected to a single DCO . . . , which clears all futures contracts executed on that DCM." Decl. of Dr. Sharon Brown-Hruska ("Brown-Hruska Decl.") ¶ 17 (May 2, 2013), ECF No. 13-4.

DCO members are generally large financial institutions who "invest capital that the clearinghouse can use to cover default losses," and in this way a DCO is "analogous to a mutual insurance company." Pirrong, *The Clearinghouse Cure* at 46. Unlike a mutual insurance company, however, which charges premiums to the customers it insures, DCOs require their members to post a "margin" or a "performance bond," which acts as collateral against the possibility of default. *See id.*; *see also* Def.'s Mem. in Opp'n to Pl.' Appl. for Prelim. Inj. ("Def.'s Opp'n") at 3, ECF No. 21. When a trade is first cleared, the DCO collects an initial margin payment based on the amount of default risk assumed by the DCO, and then periodically (usually twice per day), the DCO will "mark positions to market" to ensure that "collateral

---

[6] On June 4, 2013, the Commission published the final SEF rules in the *Federal Register*. *See* Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33,476 (June 4, 2013) (codified at 17 C.F.R. pt. 37). Those SEF rules, however, do not go into effect until August 5, 2013, and prospective SEFs will not generally be required to comply with the new rules until October 2, 2013. *Id.* at 33,476.

reflects current market conditions." *See* Pirrong, *The Clearinghouse Cure* at 46. For example, if the price of a commodity goes down during the trading day, the buyer of a futures contract would be required to post additional margin "to offset the risk that a buyer might walk away from a futures contract in which the agreed-upon price now seems too high." *Id.*

DCOs reference a number of inputs to calculate how much margin they will require for a particular trade. In particular, "DCOs calculate the required margin according to a 'value-at-risk' formula." Def.'s Opp'n at 3. Value-at-risk ("VaR") is a formula that uses historical market data to predict what portion of a financial portfolio is statistically likely to be at risk of being lost in the market at any given point in time. *See, e.g.*, *The Risks of Financial Modeling: VaR and the Economic Meltdown: Hearing Before the Subcomm. on Investigations & Oversight of the H. Comm. on Sci. & Tech.*, 111th Cong. 87 (2009) (statement of Gregg E. Berman, Head of Risk Business, RiskMetrics Group) (explaining how VaR is calculated). In addition to market volatility and other considerations, *see id.*, one "standard input" to the VaR formula "is the amount of time the DCO estimates it will take to liquidate the product or portfolio following a default," Def.'s Opp'n at 3 & n.1. This is known as the "liquidation time" for a particular product or portfolio. *See, e.g.*, Pl.'s Mem. at 8–9 ("Liquidation time is the estimated amount of time it would take a DCO to 'liquidate' a position held by a clearing member on behalf of its customer, in the case of default."). All else being equal, a higher liquidation time typically results in a higher initial margin requirement. *See id.* at 9; *see also* Def.'s Opp'n at 3 n.1 (providing typical VaR formula).

One portion of Dodd-Frank put in place eighteen "core principles," with which DCOs are required to comply. *See* Dodd Frank, § 725(c), 124 Stat. at 1687–92 (codified at 7 U.S.C. § 7a-1(c)(2)). One of those principles—Core Principle D—addresses risk management and states

generally that each DCO "shall ensure that the [DCO] possesses the ability to manage the risks associated with discharging the responsibilities of the [DCO] through the use of appropriate tools and procedures." 7 U.S.C. § 7a-1(c)(2)(D)(i). Of particular relevance to this case, Core Principle D states that "[t]he margin required from each member and participant of a [DCO] shall be sufficient to cover potential exposures in normal market conditions." *Id.* § 7a-1(c)(2)(D)(iv). Further, Core Principle D requires that "[e]ach model and parameter used in setting margin requirements under clause (iv) shall be (I) risk-based; and (II) reviewed on a regular basis." *Id.* § 7a-1(c)(2)(D)(v).

### B.      Factual and Procedural Background

#### 1.      *The Proposed Rule*

Pursuant to Dodd-Frank's DCO Core Principles (including Core Principle D) and the rulemaking authority delegated by Congress in the CEA, *see* 7 U.S.C. § 12a(5), the Commission published a Notice of Proposed Rulemaking ("NPRM") on January 20, 2011. *See* Risk Management Requirements for Derivatives Clearing Organizations, 76 Fed Reg. 3698 (proposed Jan. 20, 2011). That NPRM proposed the promulgation of several rules implementing Core Principles C (Participant and Product Eligibility), D (Risk Management), E (Settlement Procedures), F (Treatment of Funds), G (Default Rules and Procedures), and I (System Safeguards). *See id.* at 3698. Of particular relevance to this case, the January 20, 2011 NPRM proposed a regulation that

> would require a DCO to use margin models that generate initial margin requirements sufficient to cover the DCO's potential future exposures to clearing members based on price movements in the interval between the last collection of variation margin and the time within which the DCO estimates that it would be able to liquidate a defaulting clearing member's position (liquidation time).

*Id.* at 3704 (footnote omitted). The NPRM also proposed requiring DCOs to use liquidation times for this margin model that were: (1) "a minimum of five business days for cleared swaps

that are not executed on a DCM," and (2) "a minimum of one business day for all other products that it clears." *Id.*  The NPRM also proposed that a DCO "would be required to use longer liquidation times, if appropriate, based on the unique characteristics of particular products or portfolios." *Id.*; *see also id.* at 3720–21 (proposing language of 17 C.F.R. § 39.13(g)(2)(ii)).

The Commission justified its proposed minimum liquidation times primarily by reference to current industry standards for DCOs.  In this regard, the NPRM explained that "[a] minimum of one business day is the current standard that DCOs generally apply to futures and options on futures contracts." *Id.* at 3704.  It further explained that "[s]everal clearing organizations currently use a five-day liquidation time in determining margin requirements for certain cleared swaps," and thus "[t]he Commission believes that a minimum of five business days is appropriate for cleared swaps that are not executed on a DCM in that such a time period may be necessary to close out swap positions in a cost-effective manner." *Id.*  Cognizant that it could benefit from public comment, however, the Commission also stated that it would "invite[] comment regarding whether the minimum liquidation times specified in proposed § 39.13(g)(2)(ii) are appropriate, or whether there are minimum liquidation times that are more appropriate." *Id.*

### 2.      *Public Comments on the Proposed Rule*

At a broader level, the CFTC proposed rules implementing Dodd-Frank's DCO Core Principles through at least five separate NPRMs, including the January 20, 2011 NPRM discussed above.  *See* 76 Fed. Reg. at 69,335.  The Commission had an initial comment period of sixty days for each NPRM, followed by a thirty-day reopened comment period, which was followed yet again by a late comment period lasting until August 25, 2011.  *See id.*  Therefore, public comment regarding the January 20, 2011 NPRM lasted for approximately eight months.

During that time, the Commission received approximately 119 comment letters directed at the proposed rules regarding DCO Core Principles. *See id.*[7]

Numerous commenters remarked specifically on the Commission's proposed minimum liquidation times, though even the limited sample of comments submitted to the Court reveal a diversity of opinions on the appropriate policy for setting liquidation times.[8] Many of these comments took issue with the venue-based approach used in the NPRM. For example, LCH.Clearnet Group Limited—a large derivatives clearinghouse—suggested that "the rules should not prescribe differential margining treatment for Swaps with equivalent economic and risk profiles based on whether these are executed on a [DCM] or elsewhere." *See* Decl. of Mary T. Connelly ("Connelly Decl.") Ex. A ("LCH Comment Letter") at 11, ECF No. 21-2. Similarly, BlackRock, an asset management firm that represents several derivatives traders, "encourage[d] the CFTC not to treat swaps executed on [SEFs] differently from those executed on [DCMs], for purposes of a DCO's margin calculation." Connelly Decl. Ex. B ("BlackRock Comment Letter") at 2, ECF No. 21-2; *see also* Connelly Decl. Ex. H ("Nodal Exchange Comment Letter") at 2, ECF No. 21-2 ("Nodal Exchange is concerned that the Commission is prescribing initial margin methodology requirements based solely on the swap's execution venue rather than the swap's inherent risk characteristics.").

In this same vein, numerous commenters raised concerns that the proposed venue-based rule would have anticompetitive effects in the swap trading platform marketplace. For example, BlackRock stated that the rule "would raise the cost of executing swaps on SEFs, undermine the

---

[7] The Commission's website indicates that it received 116 comment letters responding specifically to the January 20, 2011 NPRM. *See* CFTC, Comments for Proposed Rule 76 Fed. Reg. 3698, http://comments.cftc.gov/PublicComments/CommentList.aspx?id=957 (last visited June 7, 2013) (listing 116 comments).

[8] At this early stage, the Court does not have the benefit of consulting a comprehensive Administrative Record. Therefore, the Court's summary of the materials considered by the Commission is limited to the evidence that the parties have submitted in connection with the plaintiff's Application for a Preliminary Injunction.

competitiveness of SEFs, and restrict artificially the ability of market participants, including asset managers, to select the best means of execution for their swap transactions." BlackRock Comment Letter at 3. GFI Group Inc., which is a derivatives broker, was concerned that the venue-based approach "would inadvertently place [SEFs] that list cleared swaps for trading at a disadvantage relative to [DCMs] that list the same swaps," which GFI believed was "inconsistent with" the CEA's open-access provisions that "require a DCO to adopt rules providing that all swaps with the same terms and conditions submitted to the DCO for clearing are economically equivalent within the DCO." Connelly Decl. Ex. D ("GFI Comment Letter") at 1–2, ECF No. 21-2; *see also id.* at 3 ("[T]he Proposed Rule would effectively place a 'tax' on market participants that desire to trade swaps on a SEF and would thus put SEFs at a competitive disadvantage that is neither necessary nor appropriate under the [CEA]."). MarketAxess Corporation, another dealer-broker, raised similar concerns. *See* Connelly Decl. Ex. E ("MarketAxess Comment Letter") at 2, ECF No. 21-2 (noting that venue-based approach "would place SEFs at a significant competitive disadvantage relative to DCMs and would frustrate congressional intent").

By contrast, at least one commenter cautioned that competition between DCOs with regard to margin requirements could prove ruinous. Alice Corporation Pty Ltd, an Australian financial markets research and development company, commented that the Commission should "[a]void a 'race to the bottom' between DCOs." *See* Connelly Decl. Ex. I ("Alice Comment Letter") at 8, ECF No. 21-2. In particular Alice noted that "[c]ompetition between DCOs has systemic risk consequences and careful oversight will be required to ensure competition on margin and clearing fees does not increase risk." *Id.* Alice went on to remark that "[t]here is great pressure from market participants for offset across different products," and therefore

"[o]ffsets across products with different maturities and risk profiles should be avoided where possible." *Id.*

As an alternative to a venue-based approach, several commenters advocated for a principles-based approach that would permit each DCO to set liquidation times in its discretion. *See, e.g.*, LCH Comment Letter at 11 (suggesting that liquidation times should "be an objective function of the DCO's measurement of observed market volumes in given products and set at a period that would be sufficient to enable the DCO to adequately hedge or close-out a defaulting member's risk"). In this regard, some commenters suggested adopting the clearing standards set forth by the Committee on Payment and Settlement Systems and Technical Committee of the International Organization of Securities Commissions ("CPSS-IOSCO"). *See* Connelly Decl. Ex. C ("Citadel Comment Letter") at 4, ECF No. 21-2; Connelly Decl. Ex. F ("MFA Comment Letter") at 5, ECF No. 21-2. Others suggested simply setting a one-day minimum liquidation time for all swaps and futures contracts regardless of trading venue. *See* GFI Comment Letter at 2; Nodal Exchange Comment Letter at 3.

By contrast, other comments noted that setting higher liquidation times for certain swaps than for other swaps and all futures would be appropriate. For example, LCH commented that "the current disparity between Swaps and futures contracts requires different risk management techniques and clearing processes." *See* LCH Comment Letter at 1. Although LCH "expect[ed] contract convergence as Swaps become more futures-like," it commented that "it would be inappropriate at this stage to impose futures clearing criteria on long-dated, idiosyncratic and less liquid instruments." *Id.* Indeed, LCH explicitly stated that "the proposed time interval of one business day in [§ 39.13(g)(2)(ii)] is too short" for several reasons, including because "it can, and often will, be impossible for the DCO to close out the defaulting member's position within a

one-day liquidation period," which "is particularly important for DCOs clearing less liquid Swaps." *Id.* at 11. Nodal Exchange similarly remarked that, although the Commission's apparent view "that all swaps are inherently customized and lack the standard terms and conditions of futures contracts, necessitating a longer liquidation time" was not categorically true, it "may be true for many financial swaps." Nodal Exchange Comment Letter at 2.[9]

### 3.    *The Final Rule*

After considering this diverse array of public comments, the Commission published its final rule regarding minimum liquidation times (and several other topics) in the *Federal Register* on November 8, 2011. *See* Derivatives Clearing Organization General Provisions and Core Principles ("Final Rule"), 76 Fed. Reg. 69,334 (Nov. 8, 2011) (codified at 17 C.F.R. pt. 39). This Final Rule, a portion of which is the subject of the instant legal challenge, requires, in pertinent part, that a DCO must use (A) "[a] minimum liquidation time that is one day for futures and options," (B) "[a] minimum liquidation time that is one day for swaps on agricultural

---

[9] Although it took place after the rulemaking challenged in this case and would not be included in the administrative record for the rule, these same concerns about risk management were echoed at a recent roundtable discussion organized by the CFTC, which was submitted by the plaintiff in this case. At that discussion, at least two panelists discussed their belief that there are fundamental differences in the risk profiles of swaps and futures. For example, Kim Taylor, who is the president of the DCO affiliated with the CME exchange, pointed out several factors her DCO considers in setting liquidation times—such as concentration, accessibility, transparency and continuity of liquidity; and default management procedures—and why swaps differ from futures on some of those metrics. *See* Tr. of Roundtable at 147:18–150:21 (Jan. 31, 2013), ECF No. 13-5. With particular regard to default management, Ms. Taylor pointed out that, when a future defaults, the DCO "ha[s] a number of choices generally on how we can liquidate," while with swaps they "really only have a single choice which is to run an auction." *Id.* at 150:4–16. Interestingly, Ms. Taylor said that, as a result of these differences, "you can effectively be margining [swaps and futures] the same way and come up with different coverage targets [i.e., liquidation times] that would be necessary." *Id.* at 151:3–5. Additionally, Don Wilson, who is the founder and CEO of the DRW Trading Group, which is an organization that trades in derivatives on a regular basis, said that "there are important differences between swaps and futures" and "swaps incur greater risk to the clearinghouse than economically equivalent and equally liquid futures contracts." *Id.* at 138:3–13. Also touching upon default management procedures, Mr. Wilson pointed out the risk differences between the gross omnibus model used for futures and the "legal segregation with operational commingling" ("LSOC") model that is used for swaps, in the event of a default. *See id.* at 138:13–140:17. He explained that, under LSOC, there is a higher risk to the DCO from a defaulted swap because there are fewer sources of collateral to cover the default before the DCO's capital reserves need to be tapped to cover the loss. *See id.* at 66:5–18. Under the omnibus model used in futures, by contrast, a DCM will draw on its non-defaulting customers' initial margins before the DCO must draw on its capital reserves. He concluded from this that "it's entirely reasonable and *it would actually be shocking* to me if clearinghouses didn't charge higher margins for cleared swaps than for futures." *Id.* at 66:21–67:2 (emphasis added).

commodities, energy commodities, and metals," (C) "[a] minimum liquidation time that is five days for all other swaps," or (D) "[s]uch longer liquidation time as is appropriate based on the specific characteristics of a particular product or portfolio." *Id.* at 69,438 (codified at 17 C.F.R. § 39.13(g)(2)(ii)). The Final Rule further provided that "the Commission, by order, may establish shorter or longer liquidation times for particular products or portfolios." *Id.*

a) *Explaining the Final Rule*

The Commission discussed this minimum-liquidation-time rule by first reviewing the comments that it received. The Commission recognized that "[n]umerous commenters objected to the proposed difference in requirements that would subject swaps that were either executed bilaterally or executed on a SEF to a minimum five-day liquidation time, while permitting equivalent swaps that were executed on a DCM to be subject to a minimum one-day liquidation time." *Id.* at 69,366. After making this observation, the Commission summarized fourteen different points raised by commenters about the potential negative effects of the venue-based approach. *See id.* at 69,366–67. Three of these fourteen points were that the venue-based approach would (1) "put SEFs at a competitive disadvantage to DCMs," (2) "undermine the goal of the Dodd-Frank Act to promote trading of swaps on SEFs," and (3) "potentially create detrimental arbitrage between standardized swaps traded on a SEF and futures contracts with the same terms and conditions traded on a DCM." *Id.* at 69,366 (citing comment letters from GFI, MarketAxess, BlackRock, Tradeweb, FXall, and Nodal Exchange).

The Commission also observed that it received varying perspectives about the appropriate minimum liquidation times for swaps and futures. In this regard, the Commission stated that "[c]ommenters variously contended that a liquidation time of five business days may be excessive for some swaps, a one-day liquidation period is too short, a one-day liquidation

period is appropriate for swaps executed on a DCM or a SEF, and a two-day liquidation period is appropriate for cleared swaps." *Id.* at 69,367 (citations omitted).  The Commission also noted that two commenters "recommended that if the Commission were to mandate minimum liquidation times in the final rules, it should allow DCOs to apply for exemptions for specific groups of swaps if market conditions prove that such minimum liquidation times are excessive." *Id.* (citing comments submitted by MFA and Citadel).

Following this summary of the multifarious commentary, the Commission concluded that it was "persuaded by the views expressed by numerous commenters that requiring different minimum liquidation times for cleared swaps that are executed on a DCM and equivalent cleared swaps that are executed on a SEF could have negative consequences." *Id.*  As a result, the Commission determined that a venue-based approach was inappropriate, and that "the same minimum liquidation time should be used with respect to cleared swaps that are executed bilaterally." *Id.*  Furthermore, the Commission "acknowledge[d] the concerns expressed by commenters that a five-day liquidation period may be excessive for some swaps." *Id.*  In this regard, the Commission cited the fact that certain DCOs "have successfully cleared swaps based on physical commodities using a one-day liquidation time," while "several DCOs currently use a five-day liquidation time in determining margin requirements for certain swaps based on financial instruments." *Id.*  According to the Commission, "[t]hese differences reflect differences in the risk characteristics of the products." *Id.*

After "[w]eighing the advantages and drawbacks of the alternatives," the Commission concluded that "a bright-line requirement, with a provision for making exceptions, will best serve the public interest." *Id.*  In this regard, the Commission stated that "a DCO will still have considerable latitude in setting risk-based margin levels," while at the same time, "establishing a

minimum liquidation time will provide legal certainty for an evolving marketplace, will offer a practical means for assuring that the thousands of different swaps that are going to be cleared . . . will have prudent minimum margin requirements, and will prevent a potential 'race to the bottom' by competing DCOs." *Id.* The Commission stated that the elimination of the venue-based approach "addresses the competitive concerns raised by numerous commenters and recognizes that once a swap is cleared, its risk profile is not affected by the method by which it was executed." *Id.* Furthermore, the Commission observed once again that the five-day/one-day distinction between swaps based on physical commodities (*i.e.*, agricultural commodities, energy, and metals) and all other swaps was "based on the differing risk characteristics of these product groups and is consistent with existing requirements that reflect the risk assessments DCOs have made over the course of their experience clearing these types of swaps." *Id.* The Commission specifically noted the existence of five-day liquidation times used by several DCOs (including LCH, CME, and ICE Clear Credit) for credit-default swaps and interest rate swaps, which, in the Commission's view were "based on [the DCOs'] assessment of the higher risk associated with these products." *Id.* at 69,367–68. That higher risk assessment, in turn, was based on several "[c]ontributing factors," including (1) "a concentration of positions among clearing members," (2) "the number and variety of products listed," (3) "the complexity of the portfolios," (4) "the long-dated expiration time for many swaps," and (5) "the challenges of the liquidation process in the event of a default." *Id.* at 69,368.

Finally, the Commission observed that "to provide further flexibility," it was including an administrative opt-out provision from the minimum liquidation times because "[a]s markets evolve, it may become appropriate to ease the requirement for certain swaps subject to the five-day minimum." *Id.* Likewise, the Commission recognized that "analysis may reveal that for

other products or portfolios the five-day or one-day minimum is insufficient." *Id.*  In this regard, the Commission specifically explained that "in light of the novelty, complexity, and potential magnitude of the risk posed by financial swaps, prudential considerations dictate that this type of [upward] fine-tuning should be used in appropriate circumstances." *Id.*

b)   *Cost-Benefit Analysis*

In a later portion of the Final Rule, the Commission presented its considerations of the costs and benefits associated with the minimum-liquidation-time regulation, as required by the CEA.  *See* 7 U.S.C. § 19(a).  Specifically, the CEA requires the Commission to consider five areas of market and public concern in its cost-benefit analysis, which include (1) protection of market participants and the public; (2) efficiency, competitiveness, and financial integrity of futures markets; (3) price discovery; (4) sound risk management principles; and (5) other public interest considerations.  *See id.*  The Commission discussed each area in turn.

Beginning with protection of market participants and the public, the Commission noted that, on the cost-side "using only one criterion—*i.e.*, the characteristic of the commodity underlying a swap—to determine liquidation time could result in less-than-optimal margin calculations."  Final Rule, 76 Fed. Reg. at 69,418.  In this vein, the Commission elaborated that "[f]or some products, a five-day minimum may prove to be excessive and tie up more funds than are strictly necessary for risk management purposes," and "[f]or other products, a one-day or even a five-day period may be insufficient."  *Id.*  Despite acknowledging these potential costs, the Commission "believe[d] that it [was] not feasible to estimate or quantify these costs reliably."  *Id.*  The reason for this imprecision, the Commission explained, is that "margin requirements for a particular instrument depend on a variety of characteristics of the instrument and the markets in which it is traded, including the risk characteristics of the instrument, its

18

historical price volatility, and liquidity in the relevant market." *Id.* Indeed, the Commission stated that "[d]etermining the risk characteristics, price volatility, and market liquidity of even a sample [of financial swaps] for purposes of determining a liquidation time specifically for such an instrument would be a formidable task for the Commission to undertake and any results would be subject to a range of uncertainty." *Id.*[10] Due to "the absence of a reasonably feasible and reliable methodology . . . for the Commission to use in calculating the appropriate margin requirements for swaps with either five-day or one-day liquidation times," it was the Commission's belief "that possible future circumstances surrounding margin levels are too speculative and uncertain to be able to quantify or estimate the resulting costs to DCOs, clearing members, or the public from the rule with any precision or degree of magnitude." *Id.* at 69,418–19.

As to the benefits of the Final Rule with regard to protection of market participants and the public, the Commission stated that the five-day and one-day minimum liquidation times were "consistent with existing requirements" and "reflect the risk assessments DCOs have made." *Id.* at 69,419. In the Commission's opinion, the DCOs' determination that "these are the appropriate standards for these instruments" was "a reasonable and prudent judgment." *Id.* At the same time, however, the Commission stated that "[a] minimum standard is designed to prevent DCOs from competing by offering lower margin requirements than other DCOs and, as a result, taking on more risk than is prudent." *Id.* Related to this concern about a "race to the bottom," *see id.* at 69,367, the Commission was also "concerned that a DCO may misjudge the appropriate liquidation time frame because of limited experience with clearing and managing the risks of

---

[10] Relatedly, the Commission observed that "[r]eliable data is not readily available for many swaps that prior to the Dodd-Frank Act were executed on unregulated markets." Final Rule, 76 Fed. Reg. at 69,418.

financial swaps" in particular. *Id.* at 69,419.  In sum, prescribing minimum liquidation times was intended to "prevent DCOs from taking on too much risk." *Id.*

In considering efficiency, competitiveness, and financial integrity, the Commission first noted that the costs-side considerations were "similar" to the cost considerations related to protection of market participants and the public. *Id.*  On the benefits side, the Commission stated that a minimum-liquidation-time rule would "promote efficiency, competitiveness and financial integrity" for several reasons. *Id.*  Principally, the Commission repeated its belief that, by setting a floor for liquidation times, "a DCO will still have considerable latitude in setting risk-based margin levels," while at the same time there would be "legal certainty for an evolving marketplace." *Id.*  The Commission also found that minimum liquidation times would "offer a practical means for assuring that the thousands of different swaps that are going to be cleared subject to the Commission's oversight will have prudent minimum margin requirements." *Id.*  In this regard, the Commission repeated that minimum liquidation times would "help prevent a potential 'race to the bottom' by competing DCOs" and would channel competition among DCOs "to other areas such as level of service." *Id.*  Finally, the Commission acknowledged the "significant, adverse effect" that would accompany the default of either a DCO clearing member or, "[i]n a worst case scenario," a DCO itself, "which could have serious and widespread consequences for the U.S. financial markets." *Id.*  Minimum liquidation times were, according to the Commission, intended to avoid such a calamitous market event, which the Commission viewed as a significant, albeit unquantifiable, benefit. *Id.*[11]

---

[11] As to the other statutory cost-benefit considerations, the Commission stated that it "[did] not believe that this [minimum-liquidation-time] rule will have a material effect on price discovery," and "[b]ecause the rule simply establishes minimums, it will not hinder the exercise of sound risk management," but rather would "foster sound risk management practices." Final Rule, 76 Fed. Reg. at 69,419.

c)    *Dissenting Views*

Two Commissioners—Jill Sommers and Scott O'Malia—appended statements to the Final Rule that were critical of certain aspects of the Commission's rulemaking.  Commissioner Sommers opined that "the rules are needlessly prescriptive, internally inconsistent, and depart from the Commission's time-tested principles-based oversight regime."  Final Rule, 76 Fed. Reg. at 69,473.   On that same token, Commissioner Sommers believed that the Commission had provided "little to no explanation of the costs and benefits of doing so, or even a rationale other than an overarching belief that prescriptive rules will increase legal certainty and prevent a race to the bottom by competing clearinghouses."  *Id.*   With particular regard to the Commission's minimum-liquidation-time rule, Commissioner Sommers declared that it "defie[d] common sense."  *Id.* at 69,474.   Commissioner Sommers took issue with the fact that, in her view, "[t]he Commission gives no reason for its belief that there may be a race to the bottom if we do not establish this less than ideal methodology," and the Commission also did not "acknowledge the existence of other safeguards in the rules that give us strong tools for policing a potential race to the bottom."  *Id.*   Disagreeing with the Commission's interpretation of its statutory mandate, Commissioner Sommers did not believe "that Congress intended for the Commission to strip DCOs of the flexibility to determine the manner in which they comply with core principles" because "there is no reason to believe that [DCOs] will not continue to use their expert judgment in a responsible fashion."  *Id.*

Commissioner O'Malia also submitted extensive comments on the Final Rule, which took issue with the Commission's reasoning and approach.   Like Commissioner Sommers, Commissioner O'Malia felt that "this rulemaking abandons the principle-based regulatory regime which permitted DCOs to perform so admirably in the 2008 financial crisis."  *Id.*  Writing

in general terms, Commissioner O'Malia also predicted that "[c]ertain provisions" might "discourage market participants from executing transactions subject to mandatory clearing, even if they need such transactions to prudently hedge risks, or from clearing on a voluntary basis" because such provisions "may impose substantial costs without corresponding benefits." *Id.*

In addition to these general comments, Commissioner O'Malia leveled several criticisms against the minimum-liquidation-time rule specifically. First, he wrote that "the rulemaking creates the impression that these requirements are arbitrary" because, although the Commission "characterizes these requirements as 'prudent,' it sets forth no justification for this characterization." *Id.* at 69,476–77. Specifically, Commissioner O'Malia criticized the Commission for telling DCOs to consider five factors in establishing minimum liquidation times, when "[t]he final rulemaking presents no evidence that the Commission considered any of the five factors in determining minimum liquidation times." *Id.* at 69,477.[12] In Commissioner O'Malia's view, this amounted to the Commission "holding DCOs to a higher standard than it holds itself." *Id.*

Commissioner O'Malia went on to explain why he felt the Commission's administrative opt-out provision would be insufficient. He wrote that "requiring market participants, during the pendency of such a petition, to pay margin calculated using a five-day minimum liquidation time would likely cause a substantial number of market participants to withdraw from the market, thereby chilling activity—perhaps irrevocably—in the contract." *Id.* Commissioner O'Malia further worried that the costs to a DCM of preparing and filing such a petition, "when coupled

---

[12] These five factors included: (1) average daily trading volume; (2) average daily open interest in a product; (3) concentration of open interest; (4) availability of a predictable basis relationship with a highly liquid product; and (5) availability of multiple market participants in related markets to take on positions in the market in question. *See* Final Rule, 76 Fed. Reg. at 69,368.

with the possibility that the Commission may deny such a petition, would likely deter a DCM from seeking to compete with an incumbent futures contract." *Id.*[13]

Notably, Commissioner O'Malia devoted a portion of his comments to discussing why the minimum liquidation times were likely "to disrupt already established futures markets," *i.e.*, DCMs. *See id.* He cited a proposed rule implementing DCM core principles, which would "prohibit a DCM from listing any contract for trading unless an average of 85 percent or greater of the total volume of such contract is traded on the centralized market, as calculated over a twelve (12) month period." *Id.* (citing 75 Fed. Reg. 80,616).[14] Commissioner O'Malia said that this 85% requirement, juxtaposed with the minimum-liquidation-time rule, would mean that if a de-listed futures contract were converted to a swap, it would be required to comply with the five-day minimum liquidation time even though "nothing substantive about the contract[] change[s] other than [its] characterization." *Id.*[15] Such an effect, he said, would "ha[ve] severe implications for competition" because "market participants generally execute new futures contracts outside the DCM centralized market until the contracts attract sufficient liquidity," which "may take years." *Id.*

---

[13] On this point, Commissioner O'Malia predicted that "the Commission may take a long time to consider any DCO petition," citing the fact that "the Commission took approximately two years to approve a petition to reduce the minimum liquidation time for certain contracts on the Dubai Mercantile Exchange from two days to one day." Final Rule, 76 Fed. Reg. at 69,477. Because of this, Commissioner O'Malia suspected that "this power to petition the Commission for relief may be of little value to offset the likely stifling of competition." *Id.*

[14] Neither this 85% threshold nor any of the other minimum centralized market trading requirements proposed for DCMs were adopted in the Commission's final rule regarding DCM core principles. Instead, in that final rule the Commission stated that "additional time is appropriate before finalizing the proposed rules for Core Principle 9." *See* 77 Fed. Reg. at 36,643. Specifically, the Commission "plan[ned] and expect[ed] to take up the proposed rules under [DCM] Core Principle 9 when it considers the final SEF rulemaking." *Id.* The final SEF rulemaking, which was published on June 4, 2013, contains no discussion of DCM Core Principle 9 or the 85% trading threshold, and no final rule regarding minimum centralized market trading requirements appears to have been published in the *Federal Register.*

[15] Commissioner O'Malia cited "information that [he had] received from one DCM," indicating that the 85% threshold rule "would force conversion of 628 futures and options contracts to swap contracts." Final Rule, 76 Fed. Reg. at 69, 477.

Next, Commissioner O'Malia questioned the Commission's fears regarding a "race to the bottom" among DCOs.  First, "[a]s a conceptual matter," Commissioner O'Malia concluded that, since the Commission "has not demonstrated that the minimum liquidation times that it has decided to mandate are 'prudent,' it cannot demonstrate that the one-day or five-day period would prevent a 'race to the bottom.'"  *Id.* at 69,478.  Second, "[a]s an empirical matter," Commissioner O'Malia pointed out that "the Commission must have decided that DCOs currently competing to clear interest rate swaps and credit default swaps have not entered into a 'race to the bottom,' because the final rulemaking codifies the existing five-day minimum liquidation time that such competing DCOs voluntarily adopted."  *Id.*  Finally, Commissioner O'Malia, like Commissioner Sommers, pointed to "more effective tools" that the Commission has to prevent any potential "race to the bottom."  *Id.*[16]

Finally, Commissioner O'Malia critiqued the Commission's cost-benefit analysis, declaring "[w]e [c]an [d]o [b]etter."  *Id.*  He made clear that his "primary concern" regarding the Commission's cost-benefit analysis was "its failure to attempt meaningful quantification."  *Id.* at 69,479.  While acknowledging that meaningful quantification may sometimes be difficult or impossible, Commissioner O'Malia stated that "[i]f the Commission truly cannot quantify the costs in those instances, then that fact alone should cause the Commission to proceed with caution if it is going to abandon the existing principles-based regime."  *Id.*  One example Commissioner O'Malia found "puzzling, given the capabilities of the Risk Surveillance Group ('RSG') and the DCO Review Group ('DRG')" was the Commission's professed inability to

---

[16] According to Commissioner O'Malia, these tools include (1) the requirement that DCOs determine the adequacy of their initial margin requirements on a daily basis; (2) the requirement that DCOs conduct back testing of their initial margin requirements on a daily or monthly basis; (3) the requirement that DCOs stress test their default resources at least once a month and report the results of such stress testing to the Commission; and (4) the Commission's ability to independently back test and stress test DCO initial margin requirements.  *See* Final Rule, 76 Fed. Reg. at 69,478.

quantify the costs of the minimum-liquidation-time rule due to a lack of reliable data. *Id.* Commissioner O'Malia recognized that "certain swaps" may not have sufficient data to create reliable quantitative cost estimates, but he stressed that such estimates would be possible for "futures contracts currently listed on a DCM that will be converted to swap contracts under the pending DCM proposal." *Id.* In the end, Commissioner O'Malia believed that "any attempt, even an imperfect one, undertaken by the Commission to understand the cost of our rulemakings or to justify our policy decisions is better than no attempt at all." *Id.*

### 4. *The Mandatory Clearing Rule and the Plaintiff's Efforts to Obtain Administrative Relief*

The Commission's Final Rule regarding minimum liquidation times went into effect on January 9, 2012. *See* Final Rule, 76 Fed. Reg. at 69,334. On August 7, 2012, the Commission published a NPRM for another rule, which would also affect the trading of swaps. That NPRM proposed, pursuant to 7 U.S.C. § 2(h), that certain categories of swaps would be required to be cleared by a DCO. *See* Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 47,170 (proposed Aug. 7, 2012). The mandatory clearing NPRM proposed requiring clearing for four specified classes of interest-rate swaps and two specified classes of credit-default swaps. *See id.* at 47,220–21. Related to this mandatory clearing rule, the Commission had promulgated a final rule on July 30, 2012, which laid out a compliance schedule for any mandatory clearing rules passed pursuant to 7 U.S.C. § 2(h). *See* Swap Transaction Compliance and Implementation Schedule: Clearing Requirement Under Section 2(h) of the CEA, 77 Fed. Reg. 44,441 (July 30, 2012) (codified at 17 C.F.R. pt. 50). That schedule was "based on the type of market participants entering into a swap subject to the Clearing Requirement," and in particular it divided market participants into three categories, which correlated to how soon they would need to comply with any clearing rules: Category 1 Entities, Category 2 Entities, and all

other market participants.  *See id.* at 44,442.  Category 1 Entities would have to comply with clearing requirements within 90 days, Category 2 entities would have to comply with clearing requirements within 180 days, and all other market participants would have to comply with clearing requirements within 270 days.  *See id.*; *see also* 17 C.F.R. § 50.25 (codifying compliance schedule).

On December 13, 2012, the Commission published a final rule regarding the categories of swaps that would be required to be cleared pursuant to 7 U.S.C. § 2(h).  *See* Clearing Requirement Determination Under Section 2(h) of the CEA, 77 Fed. Reg. 74,284 (Dec. 13, 2012) (codified at 17 C.F.R. pts. 39 and 50).  That final rule specified exactly the same categories of swaps that the NPRM had specified, *see id.* at 74,336–37, and it stated, in accordance with the compliance schedule passed in July 2012, that "the compliance schedule for this first clearing requirement will commence on March 11, 2013" for Category 1 Entities, *id.* at 74,289.  Similarly in line with the July 2012 compliance schedule, the December 13, 2012 mandatory clearing rule stated that "Category 2 Entities must comply with the clearing requirement by June 10, 2013."  *Id.* at 74,289 n.52.

A month and a half after this clearing requirement was published—and over fourteen months after the minimum-liquidation-time rule was published—the plaintiff sent a letter to the Commission, which raised "a serious concern . . . with the [Final Rule], and more specifically, with regulation 39.13(g)(ii) [sic] which sets out the minimum liquidation time for financial futures and financial swaps."  *See* Def.'s Mot. for Extension of Time Ex. 1 ("January Bloomberg Letter") at 1, ECF No. 16-1.  The plaintiff was interested in the Final Rule because it "operates the BLOOMBERG PROFESSIONAL® service, a leading privately held electronic service that, among other things, facilitates the trading and processing of swaps [OTC]."  Compl. ¶ 10, ECF

No. 1.[17]  Bloomberg generates revenue from its swap trading platform by charging a monthly fee to those who subscribe to its BLOOMBERG PROFESSIONAL® service (also known as "Bloomberg terminals"), and thus Bloomberg does not generate revenue on a per-trade basis. *See* Decl. of Benjamin P. Macdonald ("Macdonald Decl.") ¶ 6, ECF No. 13-3.  In addition, Bloomberg "intends to operate a SEF in order to facilitate trading in the swaps market" and, to that end, "has already created a subsidiary that will operate the SEF, has drafted a rulebook for that SEF . . ., and has taken substantial steps toward creating the technological infrastructure for operating the SEF."  Compl. ¶ 11.

In its January 30, 2013 letter to the Commission, Bloomberg raised a number of objections to the minimum-liquidation-time rule, most of which focused on the so-called "futurization of swaps."  *See* January Bloomberg Letter at 1.  Futurization, according to the plaintiff, refers to "a phenomenon by which futures products are designed to mimic the essential characteristics of a swap."  Pl.'s Mem. at 1.  More specifically, a swap can be "futurized" by "preassembling strips of futures contracts with aggregate cash flows that resemble swaps with the same size, tenor, and reset characteristics."  *Id.* at 5 (citing Brown-Hruska Decl. ¶ 16).  The resulting financial product is often referred to as a "swap future."  *See id.*  Bloomberg contended in its January 30, 2013 letter that the Commission's minimum-liquidation-time rule "on its face will be the strongest driver of the forced 'futurization' of economically equivalent financial swaps."  January Bloomberg Letter at 2.

A major premise of this concern was that so-called "swap futures" have "the same risk characteristics as a swap," *id.* at 1, and thus, by the plaintiff's logic "[e]ither the swap executed on a SEF or futures exchange is being 'over-margined' by a factor of five, or the futures contract

---

[17] Bloomberg's "core business," however, is "the delivery of analytics and data on approximately five million financial instruments, as well as news on every publicly traded company through the BLOOMBERG PROFESSIONAL ® service, television, radio, websites, mobile applications, and magazines."  Compl. ¶ 10.

executed on a futures exchange is being 'under-margined' by a factor of five," *id.* at 3.  The

plaintiff was concerned that this scenario "could lead to clearinghouses absorbing more risk than

they otherwise would have if they were permitted to margin cleared financial products that are

economically equivalent using an appropriate risk-based metric regardless of the formal label

given to the product."  *Id.*  Bloomberg closed its letter by writing that "[f]ortunately, the

Commission recognized that these markets are novel and complex, and consequently, reserved

the right, by order, to 'establish shorter or longer liquidation times for particular products or

portfolios.'"  *Id.*  Since Bloomberg believed "futurization" generally was "exactly the type of

situation the Commission had in mind when it approved this language," Bloomberg "formally

request[ed] that the Commission adopt an order that requires DCOs to impose the same margin

requirements for financial swaps as they impose on financial futures that are economically

equivalent and have a comparable risk profile."  *Id.*

On March 11, 2013, Bloomberg sent a second letter to the Commission—this time

through counsel—which laid out its objections to the minimum-liquidation-time rule in more

detail and stated for the first time that the Final Rule "threatens significant adverse effects for

Bloomberg" that would be "irreversible."  *See* Def.'s Mot. for Extension of Time Ex. 2 ("March

11 Bloomberg Letter") at 1, 11, ECF No. 16-2.  In its March 11, 2013 letter Bloomberg also

sought more far-reaching relief from the Commission, requesting "that the Commission promptly

take all steps necessary to stay the five-day minimum liquidation period for financial swaps, so

that the same one-day minimum period applies to all cleared swaps and futures."  *Id.* at 11.  Two

days later, on March 13, 2013, Ananda Radhakrishnan, the Commission's Director of the

Division of Clearing and Risk, responded by letter to Bloomberg.  *See* Def.'s Mot. for Extension

of Time Ex. 3 ("March CFTC Letter"), ECF No. 16-3.  In that letter, Mr. Radhakrishnan stated

that Bloomberg's January and March 2013 letters "have been referred to the Division of Clearing and Risk for consideration." *Id.* at 1.  After explaining the Commission's rationale for adopting the minimum-liquidation-time rule, Mr. Radhakrishnan concluded that Bloomberg's requests "will be given prompt and careful consideration," though "[t]o assist the Commission staff in considering them," Mr. Radhakrishnan requested that Bloomberg "provide any data, studies, or other supporting information" by March 29, 2013.  *Id.* at 3.

In response to the Commission's request, Bloomberg sent a third letter, through counsel, to the Commission on March 29, 2013, which attached "two sets of data for each trading day in February 2013."  *See* Def.'s Mot. for Extension of Time Ex. 4 ("March 29 Bloomberg Letter") at 1, ECF No. 16-4.  Those data sets were "transaction-by-transaction" lists of (1) index credit-default swap transactions; and (2) interest-rate swap transactions, in which "at least one party to the swap [was] a registered swap dealer or major swap participant."  *Id.*  This data, Bloomberg contended, "illustrate[] that there is deep and consistent liquidity in markets for some index credit default swaps and interest-rate swaps."  *Id.*  From this conclusion, Bloomberg argued that "such swaps could easily be liquidated in less than five days, indeed, often in less than a single day."  *Id.* at 1–2.  Bloomberg also focused on three specific financial swaps, which it believed demonstrated enough liquidity to warrant a minimum liquidation time of less than five days.  *Id.* at 2.  Bloomberg concluded by stating that, since it had not received a response to its March 11, 2013 letter by March 19, 2013, as requested, it had "proceeded with preparing a federal court complaint, which [it] expect[ed] to file shortly."  *Id.*

Bloomberg filed its Complaint in the instant action eighteen days later on April 16, 2013, which the Court will discuss in more detail below.  After filing its Complaint, the plaintiff pursued the final step in its quest for administrative relief, which was to file with the

Commission, on April 24, 2013, a formal motion to stay the portion of the Final Rule establishing minimum liquidation times. *See* Def.'s Mot. for Extension of Time Ex. 5 ("Bloomberg Mot. to Stay"), ECF No. 16-5; *see also id.* at 2 ("Bloomberg hereby renews and formalizes its prior request that the Commission stay Rule 39.13(g)(2)(ii), pending the resolution of Bloomberg's newly-filed challenge against that Rule . . . ."). In its formal motion to stay, Bloomberg requested a response "by no later than 5:00 PM, April 29, 2013, so that it promptly may seek such judicial relief as is necessary." *Id.* (emphasis omitted).[18]

The day after Bloomberg filed its formal motion to stay the minimum-liquidation-time rule, on April 25, 2013, the Commission sent a letter responding to the data submitted by Bloomberg in its March 29 letter. *See* Def.'s Mot. for Extension of Time Ex. 6 ("April CFTC Letter"), ECF No. 16-6. In that letter, Mr. Radhakrishnan stated that the Division of Clearing and Risk had "identified a number of questions which require further data and analysis" before the Commission could come to a conclusion regarding Bloomberg's request to stay the five-day minimum liquidation rule. *See id.* at 1. In particular, Mr. Radhakrishnan asked for clarification about whether Bloomberg was still seeking a waiver of the five-day minimum for "all cleared swaps and futures," as stated in the March 11, 2013 letter, or whether that request was now limited to the three specific types of swaps discussed in Bloomberg's March 29, 2013 letter. *See id.* Also, after asking several questions about liquidity, default management, and complexity and concentration of positions, Mr. Radhakrishnan noted that "no DCO has requested that the Commission issue an order reducing [the five-day] requirement for any product." *Id.* at 3. As a result, Mr. Radhakrishnan asked that Bloomberg "[p]lease identify any DCO that you believe would accept your client's products for clearing on the basis of margin calculated using less than

---

[18] On May 17, 2013, the Commission issued an order denying Bloomberg's motion to stay. *See* Notice of Agency Action, ECF No. 22.

a five-day liquidation period and state the basis for your belief." *Id.* The Court is not aware of any response by Bloomberg to this query.

### 5. *The Plaintiff's Lawsuit*

As referenced above, the plaintiff filed its Complaint in this action on April 16, 2013. The plaintiff's Complaint contains four counts, one under the CEA and the APA, two under only the APA, and one separate count for injunctive relief. *See* Compl.¶¶ 66–89. In its first count, the plaintiff alleges that, in promulgating the Final Rule, the Commission only provided "superficial discussion of the Rule's costs and benefits," in violation of 7 U.S.C. § 19(a)(2). *See id.* ¶¶ 67–68. In its second and third counts, the plaintiff alleges that the Commission violated the APA by failing to give "fair notice of various aspects of Rule 39.13(g)(2)(ii)," *id.* ¶ 74, and by promulgating a minimum-liquidation-time rule that "was arbitrary, capricious, and otherwise not in accordance with law," *id.* ¶ 83. Finally, the plaintiff alleged in its fourth count that it would "be irreparably injured by the further implementation of Rule 39.13(g)(2)(ii)," and therefore it alleged that it was "entitled to injunctive relief under 5 U.S.C. § 702." *Id.* ¶¶ 85, 89.

On May 2, 2013, the plaintiff filed an application for a preliminary injunction that would "stay[] 17 C.F.R. § 39.13(g)(2)(ii) . . . to the extent that the Rule provides minimum liquidation times that are longer for financial swaps than for futures contracts." *See* Pl.'s Appl. for Prelim. Inj. at 1, ECF No. 13. The plaintiff further requested "expedited briefing and consideration" of its application because it would "incur significant, irreversible injury if a preliminary injunction is not entered before the commencement of the CFTC's 'Phase 2' clearing mandate on June 10, 2013." *Id.* (emphasis omitted). That application became ripe on May 21, 2013, and the Court held oral argument regarding the application on May 31, 2013. Currently pending before the Court is the plaintiff's Application for a Preliminary Injunction, and for the reasons discussed below the Court concludes that (1) the plaintiff lacks standing to assert its claims; and, relatedly

31

(2) the plaintiff has not demonstrated that it is likely to suffer irreparable harm absent preliminary injunctive relief.

## II.     LEGAL STANDARD

### A.     Subject-Matter Jurisdiction

A federal court has "an affirmative obligation to consider whether the constitutional and statutory authority exist" for it to hear a case.  *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (internal quotation marks omitted).  When a purported lack of jurisdiction stems from a lack of standing, however, the court "must assume that [the plaintiff] states a valid legal claim."  *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003).   The proponent of jurisdiction bears the burden of proving that jurisdiction exists.  *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  While "the district court may consider materials outside the pleadings," it must "still accept all of the factual allegations in the complaint as true."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations and internal quotation marks omitted).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  FED. R. CIV. P. 12(h)(3).

### B.     Preliminary Injunctive Relief

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  It is "an extraordinary and drastic remedy" and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and internal quotation mark omitted).  Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the

balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

Historically, these four factors have been evaluated on a "sliding scale" in this Circuit, such that "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  Recently, however, the continued viability of that approach has been called into some doubt, as the Supreme Court and the D.C. Circuit have strongly suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction.  *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits." (internal quotation marks omitted)); *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (internal quotation marks omitted)); *see also Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring) ("*Munaf* made clear that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.").

## III.   DISCUSSION

The Court will begin by discussing the plaintiff's standing to sue, since that is "a threshold, jurisdictional concept." *See Deutsche Bank Nat'l Trust Co. v. FDIC*, No. 12-5170, 2013 WL 2157865, at *4 n.4 (D.C. Cir. May 21, 2013).  Additionally, because standing in this case is intimately intertwined with the question of irreparable harm in the context of the

application for a preliminary injunction, the Court will also briefly discuss the plaintiff's ability to establish a likelihood of irreparable harm.

### A.   <u>Standing</u>

Article III of the United States Constitution limits the federal judicial power to the resolution of "Cases" and "Controversies."   U.S. CONST. art. III, § 2.   "In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."   *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).   In other words, "[t]he case-or controversy doctrines state fundamental limits on federal judicial power in our system of government."   *Allen v. Wright*, 468 U.S. 737, 750 (1984).   "The Art[icle] III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines."   *Id.*

As the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements."   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).   First, the plaintiff must have suffered an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."   *Id.* (citations and internal quotation marks omitted).   Second, there must be "a causal connection between the injury and the conduct complained of," *i.e.*, the injury alleged must be fairly traceable to the challenged action of the defendant.   *Id.*   Finally, it must be likely that the injury will be redressed by a favorable decision.   *Id.* at 561.   Moreover, when a plaintiff seeks prospective declaratory or injunctive relief, allegations of past harms are insufficient.   *See, e.g.*, *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).   Rather, when declaratory or injunctive relief is sought, a plaintiff "must show he is suffering an ongoing injury or faces an

immediate threat of [future] injury." *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

The Court finds that Bloomberg does not satisfy any of the three elements of Article III standing in this action, and thus the Court will address each element in turn.  Before delving into the specific elements, however, there are two overarching principles that apply to the standing inquiry in this case.  First, this case involves purported "standing to challenge a [regulation] where the direct cause of injury is the independent action of . . . third part[ies]."  *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1269 (D.C. Cir. 2007).  As will be discussed below, however, "courts [only] occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct."  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004).

Second, and relatedly, the regulation challenged by the plaintiff does not regulate the plaintiff directly; rather, it regulates DCOs.  As the Supreme Court has made clear, "[w]hen . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed."  *Lujan*, 504 U.S. at 562 (emphasis in original).  In that circumstance, "it becomes the burden of the plaintiff to adduce facts showing that . . . choices [of the independent actors] have been or will be made in such a manner as to produce causation and permit redressability of injury."  *Id.*; *see also id.* ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (quoting *Allen*, 468 U.S. at 758)); *see also Renal Physicians*, 489 F.3d at 1273 (noting "the heightened showing required of a plaintiff alleging injury from the government's regulation of a third party").[19]

---

[19] In its reply brief, Bloomberg confidently asserts that it "*is* an object of the government action because the Rule regulates market activity that occurs *on Bloomberg's systems*: that is, swap trading platforms on which swaps are

There are "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Renal Physicians*, 489 F.3d at 1275. "First, a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *National Wrestling Coaches*, 366 F.3d at 940. Second, standing has been found "where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and likelihood of redress." *Id.* at 941.

### 1.   *Injury in Fact*

With the context of the plaintiff's standing framed thusly, the Court will begin by discussing whether the plaintiff has established an injury-in-fact. As discussed above, to satisfy the requirements of Article III, a plaintiff's injury must be both "concrete and particularized" and "actual or imminent," and may not be "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). "While the burden of production to establish standing is more relaxed at the pleading stage than at summary judgment, a plaintiff must nonetheless allege 'general factual allegations of injury resulting from the defendant's conduct' (notwithstanding 'the court presumes that general allegations embrace the specific facts that are necessary to support the claim')." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011)

---

traded." *See* Reply Mem. in Supp. Pl.'s Appl. for Prelim. Inj. ("Pl.'s Reply") at 20 n.9, ECF No. 23 (emphasis in original). This argument simply does not wash. The imposition of minimum liquidation times regulates the process of clearing a derivative, *not* the process of trading (or "executing") a derivative—two separate market activities that, though related, are performed by separate regulated entities (DCMs/SEFs and DCOs, respectively). In fact, the plaintiff touts the fact that "[s]wap counterparties that *execute their trades on SEFs* will be able to choose the *DCO at which they clear*." Pl.'s Mem. at 8 (emphasis added); *accord* Brown-Hruska Decl. ¶ 18 (noting that "swaps trading platforms, including SEFs, will likely connect to multiple DCOs, which will clear swaps at the DCO that has been requested by the swap counterparties," while "[s]wap futures, on the other hand, can only be executed on a DCM and cleared through its affiliated DCO"). Thus, Bloomberg is no more the object of the Commission's minimum-liquidation-time rule than an automobile dealer is the object of a law imposing minimum car insurance requirements on automobile owners.

(quoting *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002)); *see also Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation."). The plaintiff's burden of establishing injury in this case is, as discussed above, "heightened" because Bloomberg is "alleging injury from the government's regulation of a third party." *Renal Physicians*, 489 F.3d at 1273.

Bloomberg contends that "[i]t will lose millions of dollars in business as a direct result of the Rule's discriminatory treatment of financial swaps and financial futures," and this "[l]oss of potential revenue satisfies the injury-in-fact requirement." Reply Mem. in Supp. Pl.'s Appl. for Prelim. Inj. ("Pl.'s Reply") at 20, ECF No. 23 (citing *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003)). The plaintiff is certainly correct that a loss of revenue, particularly one amounting to "millions of dollars" could satisfy Article III's requirement of injury-in-fact. Despite Bloomberg's matter-of-fact statement that "[i]t *will* lose" money, *see id.* (emphasis added), the plaintiff has failed to establish that such a loss is "actual or imminent," as opposed to "conjectural or hypothetical." *See Lujan*, 504 U.S. at 560 (internal quotation marks omitted). To better understand why the plaintiff's purported future injury is "hopelessly conjectural," *Deutsche Bank*, 2013 WL 2157865, at *4, a closer examination of the plaintiff's theory of standing is necessary.

First, to be clear, the plaintiff does not allege that it has yet suffered any injury as a result of the Final Rule. Rather, the plaintiff fears that, because swaps cannot be cleared with lower than a five-day liquidation time, but swap futures can be cleared with as low as a one-day liquidation time, once "Phase 2" clearing begins on June 10, 2013, DCOs will set lower liquidation times for swap futures, traded on competitor DCMs, than for the swaps traded on

Bloomberg's trading platform. *See* Pl.'s Mem. at 18; Pl.'s Reply at 20–21; Compl. ¶ 61 (alleging that the Rule "will result in more favorable margin treatment for the 'swap futures' contract than for the functionally comparable financial swap that has not been 'futurized' and remains subject to a five-day liquidation time"). The plaintiff does *not* allege, however, that any DCO has set liquidation times for any swap futures contract lower than the liquidation times set for any financial swap, despite the fact that "Phase 1" mandatory swap clearing has been underway for nearly three months. *See supra* Part I.B.4 (explaining phasing-in of mandatory swap clearing requirements). The plaintiff attempts to tie its injury to "Phase 2" swap clearing—set to begin on June 10, 2013—because, when that phase of mandatory clearing begins "a large number of market participants who generally have not been clearing their swaps" and thus "are particular[ly] sensitive to margin obligations" will be required to "clear[] many commonly-traded interest rate swaps and credit default swaps." Pl.'s Mem. at 18.

To summarize, the plaintiff's chain of injury goes as follows: (1) at least some DCOs will set lower liquidation times for financial swap futures than for financial swaps; (2) this lower liquidation time will result in lower margin requirements for financial swap futures than for financial swaps; (3) margin-sensitive "Category 2" entities will trade financial swap futures on DCMs rather than trading financial swaps on Bloomberg's trading platform; and, thus (4) at least some Category 2 Entities will stop subscribing to Bloomberg's trading platform, causing Bloomberg to lose revenue. The actualization of this chain of events, however, depends on several assumptions about the behavior of third parties who are not before the Court. Most fundamentally, Bloomberg's injury rises or falls with the behavior of third-party DCOs, who are the entities actually regulated by the minimum-liquidation-time rule and are the ones who actually decide what liquidation times to set and how much margin to collect. Yet, inexplicably,

Bloomberg has not put forth a single factual allegation that any DCO has set or intends to set liquidation times for financial swap futures at a level lower than that set for financial swaps. Instead, Bloomberg (and its expert declarant) simply *assume* the worst-case scenario—DCOs will set liquidation times for financial swap futures at the minimum of one day, and will set liquidation times for financial swaps at the minimum of five days—without grounding their assumption in the actual behavior of DCOs.  *See, e.g.*, Pl.'s Mem. at 18 (stating that "the 5-day liquidation period for a swap under the Rule would generate approximately 2.23 times the margin held against futures subject to a 1-day period" (internal quotation marks omitted)); Brown-Hruska Decl. ¶ 6 ("Because of the different minimum liquidation times created by the Rule for margin calculation, the cost to market participants of holding futures positions will be lower than the cost of holding economically equivalent cleared swap positions."); *id.* ¶ 38 ("[A] shorter margin liquidation period for interest rate swap futures would enable a 50% reduction in margin compared to margin for cleared interest rate swaps.").

Indeed, this Court is essentially picking up where the Commission left off in its April 25, 2013 letter to Bloomberg, in which it asked the plaintiff to "[p]lease identify any DCO that you believe would accept your client's products for clearing on the basis of margin calculated using less than a five-day liquidation period."  *See* April CFTC Letter at 3.  The Court asked the plaintiff's counsel essentially this exact same question at oral argument, to which he responded: "[T]here is no more powerful evidence that you can have than the [Commission]'s own insistence that it would happen."  *See* Tr. of Prelim. Inj. Hr'g at 10:9–11 (May 31, 2013). Bloomberg took this same position in its reply brief, contending that "[t]he entire premise of the Rule's 5-day mandatory minimum liquidation time for financial swaps is that, absent that requirement, DCOs would 'race' to set liquidation times less than 5 days."  Pl.'s Reply at 21

(emphasis omitted).   When pressed at oral argument on this point, however, Bloomberg's counsel conceded that "[w]e don't have evidence on that point specifically," *i.e.*, whether DCOs are setting or intend to set liquidation times below five days for financial swap futures.   *See* Tr. of Prelim. Inj. Hr'g at 11:24–25.   Plaintiff's counsel further conceded that, "if [liquidation times for financial swap futures] would remain up at five [days], that certainly does go to the question whether we have injury." *Id.* at 12:5–7.[20]   Despite these concessions, plaintiff's counsel once again pivoted back to the Commission's rulemaking to argue that "it would be a little remarkable if the two parties were before the Court here expending the time and effort they have—are both doing so with the belief that, in fact, there are no DCOs out there that will be below five [days for financial swap futures]." *Id.* at 12:7–12.

To advance this argument, the plaintiff pointed, both in its brief and at oral argument, to the D.C. Circuit's decision in *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514 (D.C. Cir. 2009).   *See* Pl.'s Reply at 21–22; Tr. of Prelim. Inj. Hr'g at 20:23–21:1, 76:17–21.   That case involved a challenge to a regulation promulgated by the Office of Thrift Supervision ("OTS"), which permitted entities called "mutual holding companies" or "MHCs" to adopt a charter provision for their subsidiaries that would "prohibit any person or entity from acquiring, or offering to acquire, more than 10% of the MHC subsidiary's total minority stock within five years after the minority stock issuance." *Stilwell*, 569 F.3d at 516–17 (emphasis omitted).   The

---

[20] It is telling that plaintiff's counsel used the phrase "*remain* up at five [days]." Tr. of Prelim. Inj. Hr'g at 12:6 (emphasis added).   This made explicit what had previously been implicit: There are currently no DCOs that set liquidation times for financial swap futures below five days.   Plaintiff's counsel later asserted that "I believe it's undisputed that there are lower margin requirements for swap futures currently." *Id.* at 12:24–13:1.   Plaintiff's counsel immediately clarified, however, that this assertion is based not on the margin requirements set by DCOs, but by marketing materials disseminated by DCMs, in which DCMs advertise lower margin requirements for financial swap futures than for financial swaps.   *See id.* at 13:1–4 (referring to "advertising" from certain DCMs "saying, we offer lower margin, fifty percent lower").   These same marketing materials were cited in the plaintiff's briefing.   *See* Pl.'s Mem. at 18–19.   These materials are, however, merely wishful thinking and puffery on the part of DCMs hoping to lure customers away from competitor swap trading platforms, and they do not establish any injury-in-fact on the part of Bloomberg because Bloomberg has not alleged that these marketing materials have resulted in (or will imminently result in): (1) margin requirements for financial swap futures that are *actually* lower than five days, let alone (2) customers leaving Bloomberg's trading platform to trade on DCMs.

purpose of this rule was to prevent activist minority shareholders in MHC subsidiaries from using their leverage to "tak[e] advantage of voting rules that require a majority of the minority shareholders to approve management stock benefit plans." *See id.* at 516.

The Court of Appeals concluded that an injury to the plaintiff—a prolific minority shareholder in MHC subsidiaries—was "substantially probable" because "[t]here [was] plainly a high—indeed, a near-certain—probability that at least some MHC subsidiaries selling minority stock to the public will adopt the optional provision limiting the size of any individual's minority stake." *Id.* at 518. The court's conclusion in this regard was supported by two premises. First, "OTS proposed and ultimately adopted this new approach for this precise reason: to help solve the perceived problems posed by activists like [the plaintiff] investing in MHC subsidiaries." *Id.* Second, and most importantly for purposes of the instant case, "[c]omments on the rule—including from representatives of the prominent bankers' trade associations—supported the rule on the same grounds." *Id.* (citing three comment letters from bankers' trade associations). The court even cited to an *amicus curiae* brief by the American Bankers Association, which noted that "'the outcome of this case will have a very real impact upon the ability of mutual associations to defend themselves.'" *Id.*

*Stilwell* is both factually and legally distinguishable from the instant case with respect to standing. Factually, the *Stilwell* court had before it numerous statements from the relevant third-party market participants (mutual associations) stating essentially that they were likely to adopt the optional charter provision "to defend themselves." *Id.* (internal quotation mark omitted). Legally, the OTS had promulgated the optional charter provision "to help solve the perceived problems posed by activists . . . investing in MHC subsidiaries." *Id.* In fact, the Court of Appeals quoted with approval from the plaintiff's brief to say that "'it is more than a little ironic

that OTS would suggest Petitioners lack standing and then, later in the same brief, label Petitioner Stilwell as a prime example of one of the activist MHC shareholders who supposedly have created the very problem the Rule was intended to address.'" *Id.*

The same cannot be said about the instant case. First, in this case, the "problem" being addressed by the five-day and one-day minimum liquidation times—a ruinous "race to the bottom" among DCOs—is, by all accounts, not currently taking place. A cursory glance at the rulemakings in the two cases demonstrates why this fact is important. In *Stilwell*, the OTS had stated in its NPRM that "OTS has recently become aware of several situations in which minority stockholders *have acquired positions* in the minority stock of Subsidiary Companies, and *have taken actions* that appear intended to influence management to engage in stock repurchases or in a sale of the institution." *See* Optional Charter Provisions in Mutual Holding Company Structures, 72 Fed. Reg. 35,205, 35,206 (proposed June 27, 2007) (emphasis added). In other words, the "problem" addressed by the agency in *Stilwell* was already occurring. By contrast, in the instant case, the Commission stated that in the Final Rule it was promulgating minimum liquidation times as a prophylactic measure to "prevent a *potential* 'race to the bottom' by competing DCOs." *See* Final Rule, 76 Fed. Reg. at 69,367 (emphasis added). Second, the OTS regulation in *Stilwell* was intended to encourage MHC subsidiaries to take a certain action: adopt the minority stakeholder provision. *See Stilwell*, 569 F.3d at 518. By contrast, in this case the Commission adopted minimum liquidation times to *prevent* third-parties from taking certain actions: setting minimum liquidation times too low. In other words, the minimum liquidation times in the instant case were not designed to encourage DCOs to adopt the bare minimum liquidation time for all transactions, as the plaintiff repeatedly assumes. In this way, the plaintiff misreads the import of *Stilwell*'s reasoning: The plaintiff in *Stilwell* had standing because it was

"near-certain" that regulated third-parties would implement the solution provided by the agency, which would, in turn, cause the plaintiff harm. *See id.* That reasoning is inapposite in the instant case because the third-party actions that would potentially harm the plaintiff—DCOs setting differential liquidation times for financial swap futures and financial swaps—is neither mandated nor encouraged by the Commission's rule.[21]

Due to the absence of any factual allegation that DCOs are setting or are imminently likely to set liquidation times for financial swap futures at a level lower than that for financial swaps, the plaintiff cannot establish a "'substantial probability' of injury as a result of the rule." *Stilwell*, 569 F.3d at 518 (quoting *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 462 (D.C. Cir. 2008)). Indeed, without the substantial probability of DCOs setting differential liquidation times for financial swaps and financial swap futures, the rest of the plaintiff's theory of injury becomes utterly unsupportable. As the D.C. Circuit has clearly stated, "[s]peculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient to establish Article III standing." *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004); *accord Branton v. FCC*, 993 F.2d 906, 912 (D.C. Cir. 1993) ("A court is rightly reluctant to enter a judgment which may have no real consequence, depending upon the putative cost-benefit analysis of third parties over whom it has no jurisdiction and about whom it has almost no information."). Therefore, this Court cannot conclude that the plaintiff has established a cognizable injury-in-fact under Article III.

---

[21] Indeed, even assuming the plaintiff is correct in its crucial premise that "financial swaps and futures often have indistinguishable economic characteristics and risk profiles," Pl.'s Mem. at 1, it is telling that (1) no DCO has requested the ability to clear financial swaps with lower than a five-day liquidation time, *see* Decl. of John Lawton ¶ 34, ECF No. 21-1; and (2) there is no allegation that any DCO has cleared any financial swap future with less than a five-day liquidation time.

## 2. *Causation and Redressability*

Even assuming that the plaintiff could establish an injury-in-fact, however, the plaintiff's theory of causation and redressability is also speculative and is thus also fundamentally insufficient to establish standing.   Once again, the plaintiff's contentions in this regard are remarkably perfunctory and devoid of factual support.   All that the plaintiff says in its reply brief about causation and redressability is (1) "[t]he Rule's discriminatory treatment of financial swaps and futures will cause market participants to shift their business to DCMs, thus causing Plaintiff's injury," and (2) "[t]his injury would be redressed by an order vacating the Rule's discriminatory regime, which would close the regulatory arbitrage loophole that is the source of the Plaintiff's injury-in-fact."   Pl.'s Reply at 21 (emphasis omitted).   The plaintiff makes these conclusory statements as if they are self-evident, but in doing so the plaintiff is counting its proverbial chickens before they are hatched.

At the outset, the plaintiff's formulation of causation and redressability ignores the role of DCOs entirely.   The plaintiff simply says that the minimum-liquidation-time rule, on its own, "will cause market participants to shift their business to DCMs," *id.* (emphasis omitted), but that reasoning leaves out the critical intermediary behavior of DCOs who, it is worth once again noting, are the entities who *actually set* the liquidation times for derivatives.   The plaintiff has not presented any factual allegation or even any theory of economics that would support the notion that market participants (*i.e.*, derivatives traders or their clients) would "shift their business to DCMs" based solely on the existence of minimum liquidation times, as opposed to *actual* liquidation times set by DCOs.   The plaintiff does not appear to contest the central role of DCOs; instead, Bloomberg simply chooses to ignore that role for purposes of standing.

The plaintiff also fails to address a long line of precedent from this Circuit and from the Supreme Court, which requires a plaintiff in Bloomberg's position to allege facts that, if true,

would provide "'formidable evidence' of causation" or at least "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  *See National Wrestling Coaches*, 366 F.3d at 941–42 (emphasis omitted).  On this point, the D.C. Circuit's decision in *National Wrestling Coaches* is instructive.  There, plaintiffs challenged an interpretive rule promulgated by the Department of Education, which laid out three ways in which the Department would assess whether educational institutions had complied with Department regulations that required such institutions to select sports and levels of competition to "effectively accommodate the interests and abilities of members of both sexes.'"  *See id.* at 934–35 (quoting 45 C.F.R. § 86.41(c)(1) and 34 C.F.R. § 106.41(c)(1)).  That regulation had been promulgated pursuant to Title IX of the Education Amendments of 1972, which prohibited discrimination on the basis of sex in federally funded educational programs and activities.  *See id.* at 934.  The plaintiffs were "membership organizations representing the interests of collegiate men's wrestling coaches, athletes, and alumni," and their asserted injuries arose "from decisions by educational institutions to eliminate or reduce the size of men's wrestling programs to comply with the Department's interpretive rules implementing Title IX."  *Id.* at 935.  Thus, in *National Wrestling Coaches*, like in the instant case, "the necessary elements of causation and redressability . . . hinge[d] on the independent choices of . . . regulated third part[ies]."  *Id.* at 938.

The D.C. Circuit found causation and redressability lacking in *National Wrestling Coaches* because "nothing but speculation suggests that schools would act any differently than they do with the [challenged interpretive rule] in place" since "[s]chools would remain free to eliminate or cap men's wrestling teams and may in some circumstances feel compelled to do so to comply with the statute and the [previous Department] Regulations."  *Id.* at 940.  Further, the

45

court found that "other reasons unrelated to the challenged legal requirements [*e.g.*, moral considerations, budget constraints] may continue to motivate schools to take such actions." *Id.* From this analysis, and a comprehensive review of the case law, the *National Wrestling Coaches* court concluded that "it is purely speculative whether a decision in appellants' favor would alter the process by which schools determine whether to field certain sports teams." *Id.* at 944.

Similarly here, absent the minimum liquidation times, DCOs would "remain free" to set liquidation times for financial swaps at or above five days "and may in some circumstances feel compelled to do so to comply with the statute and the [Commission's other regulations]." *Id.* at 940. Recall that DCOs, even absent the minimum-liquidation-time rule, would be obligated by law to set margin requirements that are "sufficient to cover potential exposures in normal market conditions." 7 U.S.C. § 7a-1(c)(2)(D)(iv). Also similarly to *National Wrestling Coaches*, it is clear that "other reasons unrelated to the challenged [minimum liquidation times] may continue to motivate [DCOs] to take such actions." *See National Wrestling Coaches*, 366 F.3d at 940. Namely, DCOs have significant skin in the game when it comes to setting margin requirements because they carry all counterparty risk when they clear derivatives. Given the fact that DCOs have consistently elected, both before and after the promulgation of the Commission's minimum liquidation times, to set liquidation times for financial swaps at or above five days, *see, e.g.*, Final Rule, 76 Fed. Reg. at 69,367, 69,419,[22] it would be nothing more than speculation to conclude that this behavior would change absent the rule.

---

[22] This observation is further supported by the CFTC roundtable discussion that included numerous statements from DCOs about the appropriate margining of financial swaps. *See, e.g.*, Tr. of Roundtable at 147:11–15 (statement of DCO president that "before there even were regulations that were propagated about any kind of margin coverage period minimum, we had already determined that the margin coverage period we were going to target for the credit default swaps and the interest rate swaps was five days"); *id.* at 176:12–13 (statement of DCO president that "[w]e have been doing five days for swaps since 1999"). Therefore, it is perhaps no wonder that the plaintiff has not been able to allege that any DCO would set liquidation times for financial swaps below five days absent the challenged rule.

The plaintiff's only response to this is that the Commission has predicted a "race to the bottom" among DCOs, and this prediction is sufficient to conclude that DCOs' behavior will change if the minimum liquidation times were set aside. *See, e.g.*, Pl.'s Reply at 10, 21–22. This point, which pervades the plaintiff's standing arguments, disregards the important and meaningful difference between (1) the predictive judgments of an agency made to support a prophylactic regulation; and (2) the showing of a likelihood of redressability that is required by Article III to establish standing. With regard to the latter, "[a]bstract theory and conjecture are not enough to support standing." *National Wrestling Coaches*, 366 F.3d at 944. Instead, standing requires a plaintiff to support its theory of injury, causation, and redressability with facts (even if they are merely factual allegations). *See, e.g.*, *Sierra Club*, 292 F.3d at 898. By contrast, "[a]n agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, as long as they are reasonable, and need not rest on pure factual determinations." *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (citations and internal quotation marks omitted). Indeed, the Commission itself recognized in the Final Rule that "possible future circumstances surrounding margin levels are too speculative and uncertain to be able to quantify or estimate the resulting costs . . . from the rule with any precision or degree of magnitude." Final Rule, 76 Fed. Reg. at 69,419. Thus, the plaintiff's heavy reliance on the Commission's predictions to establish Bloomberg's standing is fundamentally misplaced because those predictions are not held to the same standard as the factual basis for a plaintiff's standing to sue. It would not be "implausible to hypothesize" or "beyond the pale to assume" that DCOs might set liquidation times below five days for certain financial swap futures at some point, but hypotheses and assumptions are insufficient to establish

standing, *see National Wrestling Coaches*, 366 F.3d at 943–44, even if they are sufficient to support an agency's predictive judgments.

Moreover, it is worth noting that the reasoning at the heart of *National Wrestling Coaches* is not unique and has been applied in numerous other cases from this Circuit and in the Supreme Court to conclude that a plaintiff lacks standing.  *See, e.g.*, *Allen*, 468 U.S. at 758; *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40–46 (1976); *Warth v. Seldin*, 422 U.S. 490, 507 (1975); *Renal Physicians*, 489 F.3d at 1276–78; *Crete Carrier*, 363 F.3d at 493–94; *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669–71 (D.C. Cir. 1996) (en banc); *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 416–19 (D.C. Cir. 1994); *see also Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012) (finding alleged injury "speculative at best" where it "depend[ed] upon the acts of third parties not before the court"); *C-SPAN v. FCC*, 545 F.3d 1051, 1054–57 (D.C. Cir. 2008) (concluding that plaintiffs lacked standing to challenge regulation imposed on third-party market participants where causation and redressability were "speculative").  The exceptions to this line of cases further illuminate the insufficiency of the plaintiff's showing regarding standing.

In two cases from this Circuit—*Tozzi v. U.S. Department of Health & Human Services*, 271 F.3d 301 (D.C. Cir. 2001) and *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986)—the Court of Appeals found causation and redressability despite the fact that the challenged agency action regulated third parties not before the court.  As the Circuit recognized in *National Wrestling Coaches*, however, both of those cases contained "records [that] presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  *National Wrestling Coaches*, 366 F.3d at 941.  For example, in *Tozzi*, the plaintiffs—manufacturers of PVC plastic that contained a

chemical called dioxin—challenged a decision by HHS to add dioxin to the category of "known" carcinogens. *See id.* (discussing *Tozzi*). The court found standing based on the introduction of "affidavits and other record evidence demonstrating that municipalities and health care organizations opted to phase out their use of PVC plastic as a direct result of the Secretary's decision." *Id.* (citing *Tozzi*, 271 F.3d at 308–09). Similarly, *Block* involved a challenge by a group of film distributors to a decision of the Department of Justice to classify certain films as "political propaganda." *See Block*, 793 F.2d at 1306–07. The court concluded that the plaintiffs had established causation and redressability based on "the recitation of instances in which potential customers declined to take the film because of the classification," as well as "the affidavits of potential customers" stating that they would have purchased the films, but for the government's classification. *Id.* at 1308. It is precisely this sort of evidence about the conduct of relevant third parties—whether presented through factual allegations or through sworn declarations—that is noticeably absent from this case.

* * *

As the foregoing discussion makes clear, the plaintiff has failed to establish any of the three elements of the "irreducible constitutional minimum" for Article III standing. *See Lujan*, 504 U.S. at 560. Therefore, the Court lacks subject-matter jurisdiction over this dispute.[23]

---

[23] The Commission also argues that the plaintiff lacks prudential standing. *See* Def.'s Opp'n at 18–20. There is a debate within this Circuit about whether prudential standing is a jurisdictional issue. *Compare Ass'n of Battery Recyclers, Inc. v. EPA*, Nos. 12-1129, 12-1130, 12-1134, and 12-1135, 2013 WL 2302713, at *6 (D.C. Cir. May 28, 2013) (Silberman, J., concurring) ("[W]e treat prudential standing as a jurisdictional limit that cannot be waived."), *with Grocery Mfrs. Ass'n*, 693 F.3d at 182 (Kavanaugh, J., dissenting) ("[P]rudential standing is not jurisdictional, meaning that it can be forfeited and need not be considered by the court if the defendant or respondent does not assert it."). Whether or not prudential standing is jurisdictional, however, need not be addressed here because the Court dismisses this case on the basis of Article III standing. Nevertheless, one argument raised by the plaintiff about the standard that applies to the prudential standing inquiry prompts this Court to address briefly the appropriate standard when the question is whether the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (internal quotation marks omitted).

## B.    **Irreparable Harm**

Although the plaintiff's lack of standing requires the Court to dismiss this case without

reaching the merits, *see, e.g.*, *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012)

("[E]very federal court has a special obligation to satisfy itself of its own jurisdiction before

addressing the merits of any dispute."), the Court will briefly touch upon the issue of irreparable

harm, since this case comes before the Court in the context of an application for preliminary

injunction.[24]  Even assuming that the plaintiff could nudge its theory of standing from the realm

of speculation to the arena of the substantially probable, the plaintiff still would not be able to

---

This "zone of interests" requirement is "a gloss on the meaning of [5 U.S.C.] § 702," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987), which limits the universe of persons permitted to sue under the APA to those "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702.  "The essential inquiry" of the zone-of-interests test "is whether Congress 'intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.'"  *Clarke*, 479 U.S. at 399 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984)).  The plaintiff states in its reply brief that the APA itself may serve as the reference point for the zone of interests inquiry.  *See* Pl.'s Reply at 23 ("It is thus the APA and the CEA that are the 'particular provision of law' at issue." (quoting *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997)).  The Court disagrees.  The zone of interests test inquires "whether a plaintiff (or petitioner) in an APA cause of action is within the 'zone of interests' of the *relevant substantive statute*."  *See Ass'n of Battery Recyclers*, 2013 WL 2302713, at *6 (Silberman, J., concurring) (emphasis added).  Indeed, as discussed above, the Supreme Court has observed that the "zone of interests" requirement is "a gloss on the meaning of [5 U.S.C.] § 702," *Clarke*, 479 U.S. at 395, and that statute plainly limits standing under the APA to persons "adversely affected or aggrieved by agency action *within the meaning of a relevant statute*," 5 U.S.C. § 702 (emphasis added).  As one panel of the Sixth Circuit observed, "[i]t would . . . make little sense to look to the statutory purposes underlying § 706 to determine prudential standing in every judicial review case" because "[i]t is only possible to ascertain that action is arbitrary or capricious by looking at other substantive bases of law."  *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 675 n.5 (6th Cir. 2005); *see also id.* ("While § 706 may be the lens for judicial review, it is upon [the substantive statute] that plaintiff ultimately relies as a basis for relief.").

[24] Although any economic harm to Bloomberg may be "irreparable" in the sense that it would not be recoverable, *see, e.g.*, *Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers) ("If expenditures cannot be recouped, the resulting loss may be irreparable."), the plaintiff also posits a theory of irreparable harm based on a "network effect" among swap trading platforms, *see, e.g.*, Pl.'s Mem. at 20–21, 39–41.  A "network effect" is present when the value of a product depends on the number of people who use it.  This phenomenon is often present for product "platforms" that are used to consume other products (*e.g.*, computer operating systems, media standards, social networking websites).  When a product must be consumed through a platform, the platform becomes more valuable to consumers as more people use it.  Once a platform develops a "critical mass" of participants in the market, a "tipping point" occurs, whereby that platform becomes entrenched as the "dominant" platform, and users of that platform become "locked in" to that platform, to the exclusion of other platforms.  *See* Pl.'s Mem. at 21, 41–42.  Although the plaintiff's network effects theory need not be addressed in detail because the Court does not reach the merits of the plaintiff's Application for a Preliminary Injunction, this network effects theory appears dubious because, even assuming "futurization" occurs, that phenomenon would, *ceteris paribus*, only encourage the departure of customers who trade standardized, "plain vanilla" swaps, but would not similarly encourage the departure of those who trade customized, bespoke instruments.  Due to this fact, and Bloomberg's estimates regarding the number of subscribers it would lose due to futurization, it appears unlikely that futurization would cause a "tipping point" beyond which Bloomberg's trading platform would become permanently damaged.

come close to satisfying the "high standard for irreparable injury" within the preliminary injunction inquiry. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Such injury "must be both certain and great" and the moving party must show "the injury complained of is of such imminence that there is a clear and present need for equitable relief." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis and internal quotation marks omitted).

Even granting the plaintiff the benefit of all reasonable inferences, the plaintiff has still failed to present any potential injury to its business that is simultaneously "certain," "great," and "imminen[t]." *See id.* The plaintiff's theorized injury falls especially short with regard to certainty and imminence. As discussed above, the presence of the plaintiff's injury is based entirely on a series of worst-case scenario assumptions that are anything but certain to occur.[25] Furthermore, although the plaintiff ties the imminence of its harm to the June 10, 2013 compliance date for mandatory swap clearing of Category 2 entities, this date appears to the Court to be nothing more than a red herring. The plaintiff has not explained why this date has any significance to DCOs in setting margin levels. As the Court has repeatedly stressed, DCOs are the only actors who could set into motion the series of market events that would result in the injury that Bloomberg fears. Yet the plaintiff has failed to explain why DCOs would suddenly

---

[25] The plaintiff's primary piece of evidence accompanying its Application for Preliminary Injunction to support the magnitude and certainty of its harm was a declaration authored by Benjamin P. Macdonald, who is Bloomberg's Head of Core Product. *See* Macdonald Decl. ¶ 1. Although the Court will not divulge any of the particular numbers included in that declaration because they are sealed and highly confidential, the Court does observe that the estimates Mr. Macdonald provided in his declaration were based on speculative assumptions and contained several unexplained leaps from generalized characterizations about market trends to specific figures about lost revenues, as well as mathematical errors. Following discussion at oral argument about the deficiencies in this declaration, the Court permitted Bloomberg to supplement its evidence. Mr. Macdonald filed a supplementary declaration in which he candidly admitted that all of his original calculations were backwards, stating: "The calculation [of users lost as a result of the rule] in my initial declaration . . . mistakenly reported the users . . . that Bloomberg is expected to *retain* in spite of the Rule, rather than those it expected to *lose* as a direct result of the Rule." *See* Supp. Decl. of Benjamin P. Macdonald ¶ 5, ECF No. 30-1 (emphasis in original). Such a glaring error, in combination with the speculative assumptions on which his conclusions were based, undermines the persuasiveness of Mr. Macdonald's methodology.

change their margining practices with respect to financial swap futures and financial swaps simply because a broader universe of entities will be required to clear their swaps.  This sleight of hand by the plaintiff, like its arguments regarding standing, does not change the reality that, once the plaintiff's hyperbolic rhetoric is swept away, no facts are left to sustain the relief it seeks.

## IV.    CONCLUSION

As discussed above, the Court concludes that the plaintiff lacks standing to assert its claims.  As a result, the Court must dismiss this case for lack of subject-matter jurisdiction.

An appropriate Order accompanies this Memorandum Opinion.

Date: June 7, 2013

/s/ *Beryl A. Howell*
BERYL A. HOWELL
United States District Judge